HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SEAN WILSON, individually and on behalf of all others similarly situated,

Plaintiff,

v.

PTT, LLC, a Delaware limited liability company d/b/a HIGH 5 GAMES, LLC, a Delaware limited liability company,

Defendant.

CASE NO. 3:18-cv-05275-RBL

ORDER DENYING DEFENDANT'S MOTION TO DISMISS

DKT. #34

## INTRODUCTION

THIS MATTER is before the Court on Defendant PTT, LLC's ("High 5") Motion to Dismiss. Dkt. #34. The underlying dispute is a class action to recover money lost playing electronic gambling games available through mobile apps. High 5 argues that the Complaint should be dismissed for lack of personal jurisdiction and failure to state a claim. Specifically, High 5 contends that it should not be subject to personal jurisdiction because it has no control over the physical location of users who download and use its apps. In addition, High 5 argues that its apps do not allow users to gamble for a "thing of value" and do not constitutes "illegal gambling" under Washington law.

**BACKGROUND**

High 5, a Delaware company headquartered in New York, markets apps that allow players to partake in popular gambling games, such as slot machine. Complaint, Dkt. #1, at 2, 9. The apps allow users to play these games with "virtual coins" that may be won or purchased in the app after users run out of the initial free allotment. *Id.* at 6-7. Wilson purchased $1.99 worth of coins that he subsequently lost playing High 5's games. *Id.* at 9. Despite the fact that these coins cannot be redeemed for actual money, Wilson alleges that they are nonetheless valuable because they can be used to continue playing. *Id.* at 13. Therefore, Wilson alleges that the games on High 5's apps constitute gambling as defined by RCW 9.46.0285 in violation of RCW 4.24.070. *Id.* at 11-13. Wilson also alleges two derivative claims for violation of the Washington Consumer Protection Act, RCW 19.86.010, and unjust enrichment. *Id.* at 14-16.

**DISCUSSION**

I.  **Personal Jurisdiction**

*a.   Legal Standard*

When a defendant moves to dismiss a complaint for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Co.,* 374 F.3d 797, 800 (9th Cir. 2004). A plaintiff cannot simply rest on the bare allegations of its complaint, but rather is obligated to come forward with facts, by affidavit or otherwise, supporting personal jurisdiction. *Amba Marketing Systems, Inc. v. Jobar International, Inc.,* 551 F.2d 784, 787 (9th Cir. 1977). Where the motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Schwarzenegger*, 374 F.3d at 800. A prima facie showing means that the plaintiff has produced admissible evidence, which if believed, is sufficient to establish the

existence of personal jurisdiction. *Ballard v. Savage,* 65 F.3d 1495, 1498 (9th Cir. 1995). Conflicts in affidavits must be resolved in the plaintiff's favor. *Id.*

b.     Application

High 5 contends that Wilson lacks personal jurisdiction to sue in Washington both because High 5 is not headquartered or incorporated in the state and because it merely placed its app in the stream of commerce and did not direct its activities at Washington. Wilson concedes that general jurisdiction is lacking, but argues that specific jurisdiction is satisfied because High 5 entered into numerous contracts with consumers in Washington who had downloaded their app. Essentially, the parties quarrel over whether the "purposeful direction" or "purposeful availment" test for jurisdiction applies.

A court's personal jurisdiction analysis begins with the "long-arm" statute of the state in which the court sits. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.,* 284 F.3d 1114, 1123 (9th Cir. 2002). Washington's long-arm statute extends the court's personal jurisdiction to the broadest reach that the United States Constitution permits, so the jurisdictional analysis under state law and federal due process are the same. *Byron Nelson Co. v. Orchard Management Corp.,* 95 Wn.App. 462, 465 (1999); *Schwarzenegger,* 374 F.3d at 800–01.

Personal jurisdiction exists in two forms: general and specific. *Dole Food Co. v. Watts,* 303 F.3d 1104, 1111 (9th Cir.2002). For specific jurisdiction, the Ninth Circuit applies a three-prong test. *Schwarzenegger,* 374 F.3d at 802. First, "[t]he non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws." *Id.* Second, "the claim must be one which arises out of or relates to the defendant's forum-related

activities." *Id*. Finally, "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Id*.

For the first prong, the "purposeful direction" analysis is most often applied in tort cases and "usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Id*. at 803. The Ninth Circuit applies the "effects test," under which "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Calder v. Jones*, 465 U.S. 783 (1984)). In contrast, the "purposeful availment" analysis is most often used in suits sounding in contract, and often requires "evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Id*. at 802. When deciding whether to apply the purposeful availment or direction analysis, courts look to the underlying dispute to determine whether it primarily sounds in contract or tort. For example, in *Boschetto v. Hansing*, the plaintiff's claims included breach of contract, misrepresentation, fraud, and violation of a consumer protection law against the seller, but the court applied the purposeful availment analysis because all of the claims were premised on the contract. 539 F.3d at 1016; *see also Panthera Railcar LLC v. Kasgro Rail Corp.*, No. C 12-06458 SI, 2013 WL 1996318, at *4 (N.D. Cal. May 13, 2013) (holding that "[t]he alleged torts of intentional and negligent interference with prospective economic advantage arise out of the parties' contract").

In *Mavrix Photo, Inc. v. Brand Technologies, Inc.*, the Ninth Circuit applied the purposeful direction analysis in a copyright infringement suit where the plaintiff alleged that the defendant unlawfully posted its photos on its website. 647 F.3d 1218, 1221-22, 1229 (9th Cir.

2011). The court held that there was jurisdiction and explained that "a website with national viewership and scope [that] appeals to, and profits from, an audience in a particular state . . . can be said to have 'expressly aimed' at that state." *Id.* at 1231; *see also Boschetto*, 539 F.3d at 1018 (describing a "sliding scale analysis that looks to how interactive an Internet website is for purposes of determining its jurisdictional effect").

While the purposeful direction analysis tends to focus on the website itself, purposeful availment applies in cases mainly related to specific transactions carried out online through a website. *Boschetto*, 539 F.3d at 1018. The Supreme Court has described the analysis as a "practical and pragmatic" review of the contractual relationship, including the overall business negotiations and future objectives of the parties. *See id.* at 1016 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985)). In *Boschetto*, the court found that there was no purposeful availment where the parties consummated one lone transaction for a car via eBay. *Id.* at 1017. However, the court also stated that a party's use of eBay to establish "regular business with a remote forum" may be sufficient for purposeful availment. *Id.* at 1019. Indeed, other courts have held that a seller's use of an online platform to run a "sophisticated business" and conduct a "substantial volume of sales" constitutes purposeful availment. *See, e.g., Oakley, Inc. v. Donofrio*, No. SACV1202191CJCRNBX, 2013 WL 12126017, at *5 (C.D. Cal. June 14, 2013); *Sennheiser Elec. Corp. v. Chutkowski*, No. CV1107886SJOFMOX, 2012 WL 13012471, at *4 (C.D. Cal. Apr. 20, 2012). Courts have also found purposeful availment where the defendant sells inventory and provides follow-up services from its own site. *See Helicopter Transp. Servs., LLC v. Sikorsky Aircraft Corp.*, 253 F. Supp. 3d 1115, 1129 (D. Or. 2017).

This case presents a difficult middle ground between the discrete categories of contract and tort. On the one hand, Wilson's claims sounds in contract since he is essentially trying to

recover for numerous transactions that he now argues were illegal. On the other hand, Wilson's claims also rest on the design of High 5's app as a whole, since he can only succeed if this novel form of online gaming constitutes "gambling" under Washington law. In this way, Wilson's suit resembles a product liability action in which High 5 allegedly designed a dangerous product that allows people to gamble online.

However, the essence of Wilson's claim is that High 5 entered into a series of contracts with consumers that should be rescinded on the basis of illegality.[1] High 5 cites a number of older cases stating that the penalties imposed by anti-gambling laws do not derive from contractual obligations, but these same cases also acknowledge, as they must, that such laws were created to make gambling contracts void for illegality. *See Mozorosky v. Hurlburt*, 106 Or. 274, 288 (1923) (quoting *Olson v. Sawyer-Goodman Co.*, 110 Wis. 149 (1901) ("The manifest purpose of these statutory provisions is to make any and all gambling unlawful and punishable; to nullify and avoid any and all contracts, transfers, and transactions based thereon, or growing out of the same."); *Stoddard v. Burt*, 75 Wis. 107, 43 N.W. 737, 738 (1889) (quoting *Irwin v. Williar*, 110 U.S. 499, 510 (1884)) ("[W]agering contracts 'were not void at common law' in England, and . . . the statutes there did not make 'them illegal, but only non-enforceable; while, generally, in this country, all wagering contracts are held to be illegal and void as against public policy."). Therefore, the question is whether a case based primarily on illegality sounds in contract or tort.

Neither party provides any authority that is directly on point. Illegality is often an affirmative defense through which a defendant can escape the enforcement of a contract, since

---

[1] Granted, Wilson does not allege that High 5's apps provide a traditional form of gambling where a player simply bets money in exchange for a chance to win. Instead, High 5's apps allegedly divide the gambling transaction into two steps: one where a user pays to purchase virtual coins, and a second where those coins are spent in exchange for a chance to win more coins. Nonetheless, both steps of this overall transaction are carried out via High 5's apps.

courts will not aid parties who have agreed to illegal terms. *See, e.g., Entm't Publications, Inc. v. Goodman*, 67 F. Supp. 2d 15, 20 (D. Mass. 1999). Here, of course, illegality is being asserted under the auspices of a statute as a means of recovering money otherwise lost in an exchange. However, this should not alter the inherently contractual nature of the claim at issue. To resolve a claim of illegality, courts must examine and often interpret the contract itself, rather than external tortious conduct. *See Consul Ltd. v. Solide Enterprises, Inc.*, 802 F.2d 1143, 1149, 1151 (9th Cir. 1986) (interpreting contract terms to determine whether the contract violated a statute and contrasting plaintiff's tort claims arising from the potentially illegal contract); *see also Roberts v. Fin. Tech.*, No. 3:06-0055, 2007 WL 3125289, at *4 (M.D. Tenn. Oct. 23, 2007) (applying choice of law rules for contract claims to plaintiff's illegality claim and rules for tort claims to plaintiff's fraud claim). Indeed, while this case may not involve interpreting contract terms, it will turn on whether the subject matter of the transactions High 5 entered into with consumers violates RCW 4.24.070.

Applying purposeful availment in this case would also be consistent with the Ninth Circuit's justification for that analysis. When a party enters into a contract in a forum, the forum's laws allow that contract to be enforced. However, in cases arising out of the contract, the party must submit to the same laws that allowed them to embark on the business venture in the first place. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). Here, if High 5 repeatedly sold its virtual coins in Washington it relied on Washington's laws in doing so. It should therefore be subject to those same laws when the transactions are challenged as part of an illegal gambling scheme.

Under the purposeful availment framework, High 5 has sufficient contacts with the forum. *Boschetto*, 539 F.3d at 1015. Unlike cases involving lone or limited transactions, the record shows that High 5 has used its apps to sell many coins to many consumers located in Washington. *See* Dkt. #48, at 8, 10; *see Donofrio*, 2013 WL 12126017, at *5 (finding sufficient contacts where the defendants sold a "significant" number of products to California residents via eBay even though it only amounted to .77% of their overall sales). In addition, similar to *Helicopter Transport Services*, High 5's sales to its users are part of ongoing relationships. 253 F.Supp.3d at 1129. To turn a profit, High 5's games rely on at least some users repeatedly running out of coins and then buying more in order to continue playing. Indeed, High 5 makes much of the fact that only a fraction of its users actually purchase coins, suggesting that those who do must do so repeatedly for HIGH 5 to achieve its profits. Dkt. #48, at 10. This means that High 5 "contemplate[s] future consequences" when it sells coins to its users. *Burger King*, 471 U.S. at 479.

High 5 is also not saved by the fact that consumers initiate the purchases on its app. Although a defendant must act intentionally toward the *forum* and not just the plaintiff, *see Walden v. Fiore*, 571 U.S. 277, 285 (2014),[2] there is a significant difference between sending an "isolated" newsletter to a few plaintiffs in the state and directly carrying out numerous transactions with consumers in the state. *See Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1070 (9th Cir. 2017). Where a defendant directly controls whether consumers in the forum can complete purchases from their website or app, they cannot later claim to have merely inserted their goods into the stream of commerce. *See Plixer Int'l, Inc. v. Scrutinizer GmbH*, 905

---

[2] Although *Walden* did not involve a contract and was therefore a purposeful direction case, the Court framed its jurisdictional discussion in general terms. 571 U.S. at 284 ("This case addresses the 'minimum contacts' necessary to create specific jurisdiction.). The principles are therefore relevant to the purposeful availment analysis.

F.3d 1, 9 (1st Cir. 2018) (holding that a German company intended to serve U.S. customers when it took no steps to restrict access to its site and could determine where its customers were from); *Prater v. Staples the Office Superstore, LLC*, No. C11-526 RAJ, 2012 WL 398623, at *5 (W.D. Wash. Feb. 6, 2012) (holding that the defendant made a "deliberate decision" to allow a third party to market and sell its products nationwide, including in the forum); *Donofrio*, 2013 WL 12126017, at *4 (in which defendants unsuccessfully argued that they could not control who is the highest bidder on eBay). Here, High 5 used its apps to consummate numerous transactions with Washington consumers without the involvement of any third party. This amounts to "affirmative conduct which allows or promotes the transaction of business within the forum state." *Boschetto*, 539 F.3d at 1016 (quoting *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990). Purposeful availment is therefore satisfied.

Even if the purposeful direction analysis were applied, High 5 would still have sufficient contacts with the forum.[3] *Axiom Foods*, 874 F.3d at 1068. High 5 acted intentionally by entering into transactions with Wilson and other Washington consumers. *Mavrix Photo*, 647 F.3d at 1229. In addition, High 5 "expressly aimed at the forum state." *Id*. Like the defendants' website in *Mavrix Photo*, which attracted a nationwide audience but turned a profit on third-party ads targeting California, High 5's apps are available nationwide but benefit High 5 when Washington residents make purchases on the app. *Id.* at 1230; *see also Keeton v. Hustler Magazine, Inc.*, 465

---

[3] While the Ninth Circuit has held that it applies different analyses for tort and contract claims, the Court is not aware of any case mandating the application of one approach or the other in hybrid cases such as this. *Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995). Many courts have chosen to nonetheless apply just one analysis when confronted with plaintiffs alleging both tort and contract claims. *See, e.g., Panthera Railcar LLC v. Kasgro Rail Corp.*, No. C 12-06458 SI, 2013 WL 1996318, at *4 (N.D. Cal. May 13, 2013); *TRC Tire Sales, LLC v. Extreme Tire & Serv., Inc.*, No. CV-08-015-FVS, 2008 WL 3200727, at *3 (E.D. Wash. Aug. 6, 2008); *Goldberg v. Cameron*, 482 F. Supp. 2d 1136, 1144 (N.D. Cal. 2007). However, as one district court observed, a court may also apply both standards "in order to avoid any doubt about the propriety of jurisdiction." *Oakley, Inc. v. Donofrio*, No. SACV1202191CJCRNBX, 2013 WL 12126017, at *4 (C.D. Cal. June 14, 2013).

U.S. 770, 773-74 (1984) (holding that the defendant purposely directed its activities at the forum by distributing its magazine for a large profit, despite the fact that the magazine's content did not target the forum).

Although High 5 tries to rely on *Mavrix Photo*, it misconstrues the holding of that case. In *Mavrix Photo*, the court specifically stated that it was "immaterial whether third party advertisers or Brand targeted California residents." *Id*. at 1230. Rather, what mattered was the fact that the targeted advertisements "indicate[d] that Brand [knew] —either actually or constructively—about its California user base, and that it exploit[ed] that base for commercial gain by selling space on its website for advertisements." *Id*. Here, High 5 can likewise be charged with constructive knowledge of its substantial Washington user base because of its numerous transactions and ability to determine purchasers' IP addresses. The same reasoning also indicates that High 5 "caus[ed] harm that [it] knows is likely to be suffered in the forum state," since the harm as alleged in the Complaint was suffered in Washington by consumers that High 5 was aware existed. *Id*. at 1231.

High 5 also attempts to rely on several out-of-circuit, intellectual property cases holding that personal jurisdiction cannot be premised solely on a user downloading the app in a particular forum. However, those cases did not involve an app that facilitated ongoing economic activity between users and the app developer. *See Zaletel v. Prisma Labs, Inc.*, 226 F. Supp. 3d 599, 604 (E.D. Va. 2016) (involving a photo filter app that sometimes required users to send their photos to defendant's server in Virginia); *Tomelleri v. MEDL Mobile, Inc.*, No. 2:14-CV-02113-JAR, 2015 WL 1957801, at *2 (D. Kan. Apr. 29, 2015) (involving a fish-identifying app that also informed users about bodies of water in Kansas where fish could be found); *Intercarrier Commc'ns LLC v. WhatsApp Inc.*, No. 3:12-CV-776-JAG, 2013 WL 5230631, at *4 (E.D. Va.

Sept. 13, 2013) (involving a messaging app with a "share location" feature). High 5's contacts with Washington go far deeper than app downloads or non-commercial data exchanges.

In contrast, other cases involving gambling websites have found that the defendants purposely directed their activities at the forum. In *Alitalia-Linee Aeree Italiane S.p.A. v. Casinoalitalia.Com*, for example, the court held that a gambling website with just five Virginia members "interacts with Virginia consumers to such degree as to put JPR on notice that it is purposefully directing its activities at Virginia and its residents." 128 F. Supp. 2d 340, 350 (E.D. Va. 2001); *see also 3M Co. v. Christian Investments LLC*, No. 1:11CV0627 TSE/JFA, 2012 WL 6561732, at *6 (E.D. Va. July 12, 2012) (relying on *Alitalia-Linee*). HIGH 5 has more users in Washington than JPR did in Virginia, and consequently purposefully directs its activities at the forum.

The second prong of the personal jurisdiction analysis is also met because Wilson's claims arise out of his purchase and use of coins from apps High 5 makes available in Washington State. *See Schwarzenegger*, 374 F.3d at 802. Although High 5 could argue that the actual *gambling* at issue in this case consists of playing High 5's games with previously-purchased coins, the purchase of coins is inseparable from their subsequent use in High 5's games. Indeed, they have no other purpose.

Finally, the third prong is also satisfied because exercising jurisdiction over High 5 is reasonable and fair. *See id*. High 5 makes its apps available in Washington and profits substantially from business in the forum. As the Ninth Circuit has observed, it would be unfair to "allow corporations whose websites exploit a national market to defeat jurisdiction in states where those websites generate substantial profits from local consumers." *Mavrix Photo*, 647 F.3d at 1231 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473-74 (1985)). In addition,

Washington has a significant interest in adjudicating this dispute, which involves a foreign company reaching into the state and interacting with consumers. In short, High 5 does not present any "compelling reason" why jurisdiction would be unreasonable. *Id.* at 1228. Wilson therefore has specific jurisdiction to sue High 5 in Washington, and this case will not be dismissed or transferred on that basis.

## II.     Failure to State a Claim

*a.     Legal Standard*

Dismissal under Rule 12(b)(6) may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff's complaint must allege facts to state a claim for relief that is plausible on its face. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. Although the court must accept as true the Complaint's well-pled facts, conclusory allegations of law and unwarranted inferences will not defeat an otherwise proper 12(b)(6) motion to dismiss. *Vazquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations and footnotes omitted). This requires a plaintiff to plead "more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citing *id.*).

1    On a 12(b)(6) motion, "a district court should grant leave to amend even if no request to
2    amend the pleading was made, unless it determines that the pleading could not possibly be cured
3    by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242,
4    247 (9th Cir. 1990). However, where the facts are not in dispute, and the sole issue is whether
5    there is liability as a matter of substantive law, the court may deny leave to amend. *Albrecht v.*
6    *Lund*, 845 F.2d 193, 195–96 (9th Cir. 1988).

7    b.      *Whether HIGH 5's Virtual Coins are a "Thing of Value" under Washington Law*

8            In *Kater v. Churchill Downs Incorporated*, the Ninth Circuit reversed a district court's
9    dismissal of a complaint substantially similar to Wilson's; indeed, both were filed by the same
10   firm. 886 F.3d 784, 785 (9th Cir. 2018). There, as here, the defendant's gaming app awarded
11   new players with an initial allotment of free chips that could be replenished through in-app
12   purchases or by winning games. *Id*. at 785-86. The Ninth Circuit held that the defendant's virtual
13   coins were a "thing of value" because they allow a player to "place another wager or re-spin a
14   slot machine," making them a "'credit . . . involving extension of a service, entertainment or a
15   privilege of playing at a game or scheme without charge.'" *Id*. at 787 (quoting RCW 9.46.0285).

16           High 5 challenges Wilson's Complaint on two fronts. First, High 5 argues that the use of
17   the term "without charge" in RCW 9.46.0285 means that the "previously referenced
18   'entertainment' or 'game' is not free to experience or play." Dkt. #22, at 20. Thus, because High
19   5's app can be downloaded for free and never requires players to bet their own money, the
20   statutory language cannot apply. However, High 5's construction is far from the only reasonable
21   one. While it is true that players never directly bet their own money in High 5's games, the
22   games can only be played with virtual coins, which do cost money once a player runs out of
23   them. The plain meaning of "without charge" is that the "credits" or, in this case, virtual coins
24

allow a user to continue playing the game without direct payment. This is exactly what the Ninth Circuit held in *Kater*, and there is no reason to depart from that holding here. *See* 886 F.3d at 787.

Second, High 5 argues that the facts of this case are materially different from *Kater* because High 5's apps give out additional free allotments of coins after players initially download the game. The appellee in *Kater* also raised this argument, but the court declined to address it because the complaint did not allege sufficient facts. *Id*. Here, High 5 urges the Court to go beyond the Complaint and consider High 5's publicly-available website and the declaration of its Vice President of Integrated Marketing, which describe how High 5's games distribute free coins to users.

These documents may only be considered if they fall within the exceptions to the "general rule [that] 'a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quoting *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (overruled on other grounds)). There are two such exceptions. "First, a court may consider 'material which is properly submitted as part of the complaint' on a motion to dismiss without converting the motion to dismiss into a motion for summary judgment." *Id*. (quoting *Branch*, 14 F.3d at 453). If such documents are not attached to the complaint, the documents' authenticity must be uncontested and the complaint must necessarily rely on them. *Id*. (citing *Parrino v. FHP, Inc.*, 146 F.3d 699, 705–06 (9th Cir.1998)).

"Second, under Fed. R. Evid. 201, a court may take judicial notice of 'matters of public record.'" *Id*. at 688-89 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986)). However, a court can only take judicial notice of matters that are "not subject to

reasonable dispute," which means they are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)). Consequently, disputed factual content in public records is not subject to judicial notice. *Id*. If the documents supplied by the defendant do not fall within either exception, the court must convert the motion to dismiss to a motion for summary judgment and "all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(c).[4]

A court may take judicial notice of a "publically accessible website." *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014). However, Wilson disputes the reliability of the "untested statements" on High 5's website, which are not addressed in the Complaint. Wilson is correct that High 5's own FAQ page is not a "source whose accuracy cannot reasonably be questioned." *Khoja*, 899 F.3d at 999. Even if they are generally accurate, the statements on High 5's website may leave out key information, such as how many coins are actually awarded, how much gameplay they allow, and how these free coin allotments may fluctuate based on different factors. Consequently, the Court will not take judicial notice of the FAQ page's factual assertions. For similar reasons, the Court will not consider the Declaration of Patrick Benson to supplement the allegations in the Complaint. Dkt. #23, at ¶ 7.

High 5 argues that the Court should consider its supplemental evidence because the allegations in Wilson's Complaint are false. But High 5's issues with the Complaint boil down to

---

[4] Some courts have foregone such notice where the motion to dismiss alternatively requests conversion to summary judgment and both parties rely on the same documentary evidence. *See, e.g., Silk v. Metro. Life Ins. Co.*, 477 F. Supp. 2d 1088, 1091 (C.D. Cal. 2007); *Hotel St. George Associates v. Morgenstern*, 819 F.Supp. 310, 317 (S.D.N.Y.1993). Here, however, Wilson does not rely on the same documents as High 5 and disputes the reliability of High 5's evidence.

interpretive differences. In paragraph 25, the Complaint states, "Once a player runs out of their allotment of free chips, they cannot continue to play the game without buying more chips for real money." Dkt. #1, at 7. Contrary to High 5's contention, this statement does not necessarily imply that players cannot obtain more free coins at some point after running out of the initial allotment. Instead, it merely asserts that players must buy more coins *at the moment* they run out of their free allotment if no additional free awards are available. The fact that most players opt to wait until they receive more free chips rather than pay is neither here nor there. *See* Reply, Dkt. #53, at 4-5.

c.  *Whether High 5's Games are "Bona Fide Business Transactions"*

High 5 also argues that its games are exempt from the statutory prohibition on gambling because they fall within the "bona fide business transaction" exception. This exception reads as follows:

> Gambling does not include fishing derbies as defined by this chapter, parimutuel betting and handicapping contests as authorized by chapter 67.16, bona fide business transactions valid under the law of contracts, including, but not limited to, contracts for the purchase or sale at a future date of securities or commodities, and agreements to compensate for loss caused by the happening of chance, including, but not limited to, contracts of indemnity or guarantee and life, health, or accident insurance.

RCW 9.46.0237. According to High 5, its games involve "bona fide business transactions" because players merely pay for the privilege of entertainment. The fact that players do not know how much entertainment they will receive does not make their games any different from buying tickets to a boxing match, which could last only a few rounds or many.

Wilson responds that § 9.46.0237 contains a non-exhaustive list after "bona fide business transactions valid under the law of contracts" that identifies the purchase of securities and

insurance as two examples. Wilson contends that, applying Washington principles of statutory interpretation, the exception should be limited to transactions similar to insurance and securities.

When construing a state statute, a federal court must apply that state's principles of statutory interpretation. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004). Washington courts view statutes using the "including but not limited to" language as unambiguously creating "an illustrative, not exhaustive, list." *State v. Joseph*, 416 P.3d 738, 741 (Wash. Ct. App. 2018). This list of specific items modifies the general term, such that the latter "will be deemed to 'incorporate those things similar in nature or comparable to the specific terms.'" *Id*. (quoting *State v. Larson*, 184 Wash. 2d 843, 849, 365 P.3d 740, 743 (2015)). To determine what constitutes a "similar" item, courts look to the "clearly stated legislative intent" behind the statute. *Id*. at 741-42.

Here, the list clearly contemplates excluding purchases of securities or other investments and insurance. Buying virtual coins is not "similar in nature" to either of these transactions because the buyer is not protecting themselves against a fortuitous risk or obtaining a stake in a company. High 5 argues that it is similar to buying a ticket to a sports event, which is obviously legal, but that does not mean that transactions of this nature are the object of this particular exception.

High 5 argues that "bona fide business transactions valid under the law of contracts" is a broad category that unambiguously includes the sale of credits used for amusement games. In support of this, High 5 points to RCW 9.46.010, which states that the Washington Gambling Act seeks to "avoid restricting participation by individuals in activities and social pastimes." However, the rest of this sentence limits the types of social pastimes to those that are "more for amusement rather than for profit, do not maliciously affect the public, and do not breach the

1  peace." RCW 9.46.010. While the wording is ambiguous regarding *whose* profit is at issue, High
2  5 certainly profits from its games and Wilson would argue that they have a malicious effect on
3  the public. The legislative intent therefore does not support High 5's interpretation.
4      In any case, High 5 misconstrues the nature of the "transaction" at issue in this case.
5  Whereas traditional gambling consists of a single transaction (money for a chance to win), High
6  5's apps divvy up this process between two connected transactions. Although the first transaction
7  allows a user to obtain the virtual coins, the second transaction of spending them in High 5's
8  games is what fits the statutory definition of gambling. *See* RCW 9.46.0237 (defining gambling
9  as "staking or risking something of value upon the outcome of a contest of chance or a future
10 contingent event not under the person's control or influence"). Consequently, regardless of
11 whether purchasing coins from High 5 is similar to buying securities or tickets to a baseball
12 game, buying coins and then using them to play High 5's games is not a "bona fide business
13 transaction." *Id*.
14 d.     Whether High 5's Apps Facilitate "Illegal Gambling"
15     High 5 essentially argues that the Ninth Circuit's interpretation of RCW 9.46.285 and
16 4.24.070 cannot be correct because it is contrary to RCW 9.46.010's statement of the
17 legislature's intent. 886 F.3d at 787, 789. However, as previously stated, RCW 9.46.010 is not
18 necessarily in tension with categorizing High 5's games as "illegal gambling" because they allow
19 High 5 to profit and may have a malicious effect on those predisposed to gambling addiction.
20 Furthermore, this Court will not contradict the Ninth Circuit's clearly stated interpretation in
21 *Kater* on the basis of an ambiguous statement of legislative intent.
22     Finally, High 5 argues that the Court should disregard the Ninth Circuit's ruling in *Kater*
23 as contrary the Washington Gambling Commission's statements regarding "social gaming." To
24

support its position, High 5 asks the Court to take judicial notice of a pamphlet released by the Commission in 2014, a PowerPoint presentation, minutes from a public meeting, and a recent statement by the Commissioner regarding the Ninth Circuit's holding in *Kater*. Dkt. #26-1, 26-2, 26-10, 26-11, & 26-12. These are public records that the Court can properly take judicial notice of.

However, they do not support the conclusions that High 5 hopes for. While the pamphlet offered by High 5 does state that social gaming is not gambling if there is no prize, it also purports to provide only "general guidance" to consumers. Dkt. #26-12. The Ninth Circuit already declined to defer to this pamphlet or the meeting minutes because they did not express a "formal position" of the Commission. *See Kater*, 886 F.3d at 788. The Court will not act differently here. Likewise, the Commissioner's statement regarding the Ninth Circuit's *Kater* ruling merely asserts that the Commission did not participate in the case and it may be appealed. It does not express any specific position with respect to the underlying issues. Consequently, these documents do not support dismissal.

**CONCLUSION**

Defendant High 5's Motion to Dismiss (Dkt. #34) is DENIED. To the extent that High 5's arguments rely on evidence that cannot be properly considered at the motion to dismiss stage, High 5 can raise these arguments by submitting a Motion for Summary Judgment.

IT IS SO ORDERED.

Dated this 14th day of December, 2018.

Ronald B. Leighton
United States District Judge