The Honorable Ronald B. Leighton

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

SEAN WILSON, individually and on behalf of all others similarly situated,

       *Plaintiff*,

    v.

PTT, LLC, a Delaware limited liability company, d/b/a HIGH 5 GAMES, LLC, a Delaware limited liability company,

       *Defendant*.

No. 3:18-cv-05275-RBL

**PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND FOR PRELIMINARY INJUNCTION**

**ORAL ARGUMENT REQUESTED**

**FILED UNDER SEAL**

**Noting Date: August 7, 2020**

## TABLE OF CONTENTS

**INTRODUCTION**........................................................................................................ 1

**BACKGROUND** ......................................................................................................... 5

**I.**     **Factual Background.**........................................................................................ 5

**II.**    **Legal Background.**.......................................................................................... 7

**ARGUMENT** ............................................................................................................... 8

**I.**     **THE COURT SHOULD CERTIFY AN INJUNCTION CLASS PURSUANT TO FED. R. 23(B)(2) AND A DAMAGES CLASS PURSUANT TO FED. R. 23(B)(3).**.. 8

    **A.  Both classes satisfy Rule 23(a).** ................................................................. 9

        **1. Both proposed Classes are sufficiently numerous.**.................................. 9

        **2. Both proposed Classes present common questions.**................................. 9

        **3. Sean Wilson is an appropriate representative of the proposed Classes.** ................................................................... 12

        **4. Edelson PC is more than adequate class counsel.** ................................... 15

    **B.  The Damages Class Satisfied Rule 23(b)(3).**........................................... 16

    **C.  The Injunctive Class Satisfies Rule 23(b)(2).**.......................................... 19

**II.**    **THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION.**...................... 20

    **A.  Plaintiff is likely to succeed on his injunction claim under the CPA.** ................. 20

    **B.  Defendant's continued operation of these games causes irreparable harm.** ....... 23

    **C.  The balance of equities favors an injunction.**.......................................... 24

    **D.  The requested injunction is in the public interest.**.................................... 25

**CONCLUSION** ........................................................................................................... 25

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION          ii
Case No. 18-cv-05275-RBL

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600  •  Fax: 206.682.2992

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Amchem Prods. Co. v. Windsor*,
    521 U.S. 591 (1997)........................................................................................ 12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2014)........................................................................................ 16

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)........................................................................................ 13

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016)............................................................................ 16, 17

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)............................................................... 8, 9, 11, 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................................... 20

**United States Circuit Court of Appeals Cases**

*Ah Quin v. Cty. of Kauai Dep't of Transp.*,
    733 F.3d 267 (9th Cir. 2013) ......................................................................... 13

*Antonetti v. Chipotle Mexican Grill, Inc.*,
    643 F.3d 1165 (9th Cir. 2010) ................................................................. 20, 23

*B.K. by next friend Tinsley v. Snyder*,
    922 F.3d 957 (9th Cir. 2019) ......................................................................... 19

*Chalk v. U.S. Dist. Ct. for C.D. Cal.*,
    840 F.2d 701 (9th Cir. 1988) ......................................................................... 24

*Dechert v. Cadle Co.*,
    333 F.3d 801 (7th Cir. 2003) ......................................................................... 14

*EEOC v. Chrysler Corp.*,
    733 F.2d 1183 (6th Cir. 1984) ....................................................................... 24

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ......................................................................... 15

*Hamilton v. State Farm Fire & Cas. Co.*,
    270 F.3d 778 (9th Cir. 2001) ......................................................................... 14

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998) ....................................................................... 12

*Hanon v. Dataprods., Inc.*,
    976 F.2d 497 (9th Cir. 1992) ......................................................................... 12

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

iii

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

*Hay v. First Interstate Bank of Kalispell, N.A.*,
  978 F.2d 555 (9th Cir. 1992) ....................................................................... 13

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  938 F.3d 985 (9th Cir. 2019) ....................................................................... 24

*Kater v. Churchill Downs, Inc.*,
  886 F.3d 784 (9th Cir. 2018) ....................................................................... 10

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ......................................................................... 8

*Melendres v. Arpaio*,
  784 F.3d 1254 (9th Cir. 2015) ..................................................................... 13

*Modernistic Candies v. FTC*,
  145 F.2d 454 (7th Cir. 1944) ....................................................................... 22

*Nelson v. NASA*,
  530 F.3d 865 (9th Cir. 2008) ....................................................................... 24

*Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc. (AZ)*,
  367 F.3d 1108 (9th Cir. 2004) ..................................................................... 24

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ..................................................................... 17

*Wolin v. Jaguar Land Rover N. Am., LLC*,
  617 F.3d 1168 (9th Cir. 2010) ..................................................................... 18

*Zinser v. Accufix Research Inst.*,
  253 F.3d 1180 (9th Cir. 2001) .................................................................. 8, 19

**United States District Court Cases**

*Bellinghausen v. Tractor Supply Co.*,
  303 F.R.D. 611 (N.D. Cal. 2014) ................................................................ 14

*Bess v. Ocwen Loan Servicing LLC*,
  334 F.R.D. 432 (W.D. Wash. 2020) ............................................................ 17

*Chapter 7 Petition*,
  No. 16-45252 (Bankr. W.D. Wash.) ............................................................ 13

*Diamond House of SE Idaho, LLC v. City of Ammon*,
  381 F. Supp. 3d 1262 (D. Idaho 2019) ....................................................... 20

*Fife v. Sci. Games Corp.*,
  No. 18-cv-00565-RBL, 2018 WL 6620485 (W.D. Wash. Dec. 18, 2018) ......... 5

*Kelley v. Microsoft Corp.*,
  251 F.R.D. 544 (W.D. Wash. 2008) ............................................................ 19

*Miller v. P.S.C., Inc.*,
  No. 3:17-cv-05864-RBL, 2018 WL 6249841 (W.D. Wash. Nov. 29, 2018) .................... 9

*Moeller v. Taco Bell Corp.*,
  816 F. Supp. 2d 831 (N.D. Cal. 2011) ............................................................ 20

*Reichert v. Keefe Commissary Network, LLC*,
  331 F.R.D. 541 (W.D. Wash. 2019) ............................................... 9, 12, 17, 18

*Robichaud v. SpeedyPC Software*,
  No. C 12 04730 LB, 2013 WL 818503 (N.D. Cal. Mar. 5, 2013) .................................. 14

*Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*,
  No. 2:16-cv-1211 WBS AC, 2019 WL 358517 (E.D. Cal. Jan. 29, 2019) ...................... 18

*Taylor v. Universal Auto Grp. I, Inc.*,
  No. 3:13–cv–05245–KLS, 2014 WL 6654270 (W.D. Wash. Nov. 24, 2014) ........ 8, 17, 18

*T-Mobile USA, Inc. v. Huawei Devices USA Inc.*,
  115 F. Supp. 3d 1184 (W.D. Wash. 2015) ......................................................... 7

*Troy v. Kehe Food Distributors, Inc.*,
  276 F.R.D. 642 (W.D. Wash. 2011) .............................................................. 12

*Wakefield v. Visalus*,
  No. 3:15-cv-01857 (D. Ore. Apr. 12, 2019) ................................................... 16

*Versaterm, Inc. v. City of Seattle*,
  No. 16-cv-1217, 2016 WL 4793239 (W.D. Wash. Sept. 13, 2016) ............................... 25

*Walters v. Reno*,
  No. C94-1204C, 1996 WL 897662 (W.D. Wash. Mar. 13, 1996) .................................. 19

*Yue v. Conseco Life Ins. Co.*,
  282 F.R.D. 469 (C.D. Cal. 2012) .................................................................. 24

**State Supreme Court Cases**

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
  719 P.2d 531 (Wash. 1986) ................................................................. 8, 11, 21

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*,
  170 P.3d 10 (Wash. 2007) ........................................................................ 21

*Johnson v. Collins Entm't, Inc.*,
  564 S.E.2d 653 (S.C. 2002) ...................................................................... 22

*Klem v. Washington Mut. Bank*,
  295 P.3d 1179 (Wash. 2013) ..................................................................... 21

*Panag v. Farmers Ins. Co. of Wash.*,
  204 P.3d 885 (Wash. 2009) ....................................................................... 21

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

*Proctor v. Whitlark & Whitlark, Inc.*,
    778 S.E.2d 888 (S.C. 2015) .................................................................... 22

**State Appellate Court Cases**

*Blake v. Fed. Way Cycle Ctr.*,
    698 P.2d 578 (Wash. Ct. App. 1985) ...................................................... 22

**Miscellaneous Authority**

11A Wright & Miller Fed. Prac. & Proc. Civ. § 2948.4 (3d ed.) ................................................. 25

Fed. R. Civ. P. 23 ............................................................................. 4, 16, 18, 19

FRE 1006 ................................................................................................ 1

Natasha Singer & Mike Isaac, *Facebook to Pay $550 Million to Settle Facial Recognition Suit*,
    New York Times (Jan. 9, 2020), https://nyti.ms/2GLtY6V ........................................... 16

Newberg on Class Actions § 4:49 .......................................................................... 16

RCW 4.24 ................................................................................................ 7, 11

RCW 9.46 ................................................................................................ *passim*

RCW 19.86 ................................................................................................ 8, 11, 20, 21

Tousley Brain Stephens, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600  •  Fax: 206.682.2992

1

**INTRODUCTION**

2       This lawsuit alleges that Defendant High 5 Games operates virtual casinos that are illegal

3 under Washington law. It is one of seven related cases before this Court alleging functionally

4 identical claims against a cohort of Defendant's industry peers. And it is now the bellwether for

5 class certification and poised to resolve a serious issue of public concern: whether Defendant's

6 social casinos should be immediately enjoined from selling virtual coins in Washington.

7       The at-issue casinos are "High 5 Vegas" and "High 5 Casino." These online games are

8 prohibited in Washington for good reason: players are enticed to spend real money on virtual

9 chips to wager on unregulated slot machines—a business model that has proven ruinous ███

10 ████████████. That's no hyperbole. ████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████. *See* Declaration of Todd Logan

13 ("Logan Decl.") ¶¶ 3-10, Exs. 1-A, 1-B, 1-C, 1-D, and 1-E[1]; *see also* **Figure 1** below.

14



15

16

17

18

19

20

21

22

23

24

25

26     [1]    Pursuant to FRE 1006, Plaintiff offers **Figures 1-6**, as reflected in Exhibit 1-E, into evidence. These Figures summarize, chart, and/or calculate voluminous data contained in Exhibits 1-A (High 5 Data Production 1),

27 1-B (High 5 Data Production 2), 1-C (Apple Data Production), and 1-D (Google Data Production). *See id.*

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION     1
Case No. 18-cv-05275-RBL

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600  •  Fax: 206.682.2992

These financial losses are just the tip of the iceberg. Putative class members—in this case and in the related actions—have provided sworn testimony as to how their addictions to these palm-sized slot machines have impacted their lives. Their stories range from spousal disputes to financial ruin to depression to a suicide attempt. By way of example, **Figure 7** below is an introductory excerpt of the testimony that social casino player Jill Interrante originally submitted in letter format to the Washington State Legislature. *See* Logan Decl. ¶ 11, Exhibit 2 (Declaration of Jill Interrante and Letter to Washington State Legislators) ("Interrante Letter").

**Figure 7**



House Civil Rights & Judiciary Committee
Senate Labor and Commerce Committee
Washington State Legislature
Washington State Capitol Building and Campus
416 Sid Snyder Avenue SW
Olympia, Washington 98504

To whom it may concern:

My name is Jill Interrante. I'm writing this letter because the social casino company, Big Fish Games, destroyed my life. That is not an exaggeration. For more than seven years I had a gambling addiction to Big Fish Casino. In that time:

- I spent at least $200,000 playing Big Fish Casino. Even though I asked for help over and over and over again, Big Fish's response was always the same. They just gave me more chips, which furthered my addiction.

- I was one of Big Fish's lab rats. Because I lived in Washington, Big Fish asked me to participate in two research experiments at their headquarters in Seattle. When I look back on it now, I realize that Big Fish's goal for these experiments was horrible. They were figuring out new ways to prey on people, like me, who were addicted to their social casino apps.

- Big Fish drove me to attempt suicide.

The story I'm about to tell is not unique. There are many, many people who have been ruined by Big Fish. I only hope that by sharing my full experience, people with the power to stop Big Fish, and other social casinos like it, will do something.

Here's my story.

While Ms. Interrante speaks to a social casino not at issue in this specific lawsuit, her story applies with equal force to High 5 Casino, High 5 Vegas, and a raft of other all-functionally identical social casino games, where each user base echoes Interrante's suffering:

- **High 5 Casino:** *See* Dkt. 92 ("Sealed Declaration of Barbara Lewis").

- **High 5 Casino:** "I have spent at least $10,000 on coins in High 5 Casino . . . I believe I am addicted to High 5 Casino . . . I have tried to quit but I believe three weeks is the longest amount of time I've ever been able to stop . . . Sometimes I feel guilty about playing High 5 Casino and

spending so much money. My husband does not know I have spent money on it. ***My grandkids will sometimes ask for money and I can't give it to them because I have to save it for this game***." *See* Logan Decl. ¶ 12, Exhibit 3 (Declaration of Aida Glover) ("Glover Decl.") (emphasis added).

- **DoubleDown Casino:** "I was drawn to DoubleDown because ***I could play the same games that I played when I went to real casinos***. Overall, I estimate that I have spent over $40,000 on chips in DoubleDown Casino. I am addicted to DoubleDown Casino . . . I knew being on DoubleDown Casino every day for hours was a problem, but I couldn't seem to stop. I believe that DoubleDown is taking advantage of people's addictions. ***They know that gambling is addictive, and they act exactly like a physical casino that pays out money***. I feel alone and embarrassed about spending money to do something that only feeds my addiction. DoubleDown Casino consumes you, and makes you feel like you always have to go play. ***I feel guilty because I've spent money on DoubleDown that I've needed to pay bills or buy food***." *See* Logan Decl. ¶ 13, Exhibit 4 (Declaration of Willa Moore) ("Moore Decl.") (emphasis added).

- **DoubleDown Casino:** "I believe I have spent close to $25,000 on DoubleDown Casino. I would buy the chips with a credit card which I couldn't pay in-full, so there's interest on top of that too . . . I was a well-respected, active member of my community who owned my own business for 36 years. But when I retired, and my fellow started having health problems, DoubleDown Casino made me fall into the trap of escape and adrenaline rush to cope with all my other responsibilities. When I won, it was just great. When I lost, and started buying more and more chips, I felt lower than pond scum. I was sick to my stomach, felt like a total loser, ***wondered about suicide*** (although I would never leave my partner), could not sleep, had anxiety attacks with a rushing heart, and couldn't eat. I just couldn't understand how I could let it get so out of control. ***It was as if it had a power over me that I couldn't break. I couldn't stop***." *See* Logan Decl. ¶ 14, Exhibit 5 (Declaration of Jan Saari) ("Saari Decl.") (emphasis added).

- **Jackpot Party Casino:** "Overall, I believe that I have spent between $10,000-$20,000 playing Jackpot Party Casino. I was addicted to Jackpot Party Casino and I hate that . . . ***This kind of loss put a huge strain on my ability to even buy food*** . . . I believe Jackpot Party Casino had been taking advantage of my addiction . . . This game hurt me and the worst part was that when my husband was alive, he would say, 'You're not spending money on there are you?' and I lied. I hate that I have to live with that now." *See* Logan Decl. ¶ 15, Exhibit 6 (Declaration of Laura Perkinson) ("Perkinson Decl.") (emphasis added).

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

- **Jackpot Party Casino:** I believe that I've spent at least $30,000 on Jackpot Party Casino . . . ***I am going through a divorce right now, in part because of how much money I spent on Jackpot Party*** . . . Scientific Games will provide incentives to their top spenders so that they continue to spend. I have received Christmas gifts two times. ***They have sent me a robe, oils, phone charger, bath bombs, a blanket, and more***. I know that they have sent other players flowers and candies . . . This game has changed my way of thinking and caring. I never thought I would get addicted to anything except cigarettes, but ***this has taken too much of my life away***. I don't know how my life would be different without this game, but I know that it would be better and I know that I would be much better off financially . . . I wish it didn't exist." *See* Logan Decl. ¶ 16, Exhibit 7 (Declaration of Donna Reed) ("Reed Decl.") (emphasis added).

As the Court weighs this and other evidence of High 5's conduct, the key questions presented by this motion are twofold: (i) whether this lawsuit can be resolved on a classwide basis, and (ii) whether a preliminary injunction is warranted. On both points, the answer is yes.

*First*, Plaintiff Sean Wilson's claims are rooted in Washington's Recovery of Money Lost at Gambling Act ("RMLGA" or "Act"). The Act requires proof that a plaintiff lost money or property at a gambling game. Because High 5 Casino and High 5 Vegas operate identically for each player, the central questions in this case—(1) have individuals who purchased and wagered away chips lost money, and (2) are High 5's virtual slot machines "gambling games" under the statute—apply classwide. Further still, transaction records produced by Defendant as well as by Apple and Google lay bare the contours of the class and eliminate any potential manageability problems down the road. *See* Exs. 1-A, 1-B, 1-C, 1-D, and 1-E. Put another way: this case is ripe for classwide treatment. Because the Act provides for the recovery of money lost at gambling games, and because Defendant's violations of Washington's gambling laws are *per se* violations of the Consumer Protection Act ("CPA") rendering both damages and injunctive relief appropriate, Plaintiff seeks to certify separate classes under Fed. R. Civ. P. 23(b)(3) and (b)(2).

*Second*, this case now calls for an immediate preliminary injunction. Notwithstanding Defendant's constant refrain that its virtual casinos are "free to play" [*see generally* Dkt. 34] discovery has revealed that substantially all of Defendant's revenues, and those of industry peers

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

4

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

like Scientific Games and Double Down, come from addicted gamblers. The basic outline of this business model—get as many customers in the door as possible, convert the most vulnerable of those customers into addicts, and then milk those new addicts for all they are worth—is not new. But the extent to which this business model dominates Defendant's purportedly "free-to-play" games in Washington is—in light of Defendant's prior representations that it has "limited interaction with Washington residents"—shocking. Dkt. 69 at 2. Because Plaintiff is likely to succeed in his claim for injunctive relief, and because he (and putative class members) suffer ongoing irreparable harm, this Court should likewise enter a preliminary injunction.

## **BACKGROUND**

### I. **Factual Background.**

This case is about Defendant's social casinos: High 5 Casino and High 5 Vegas. In support of this motion, Plaintiff is lodging with the Court an iPad containing current versions of these games, and respectfully requests that the Court take judicial notice of each. *See* Logan Decl. ¶ 17, Exhibit 8 (iPad containing Defendant's social casino games); *see also Fife v. Sci. Games Corp.*, No. 18-cv-00565-RBL, 2018 WL 6620485, at *3 (W.D. Wash. Dec. 18, 2018) (taking judicial notice of social casino games lodged via iPad).

High 5 Casino and High 5 Vegas are functionally identical. When the game loads, a player "enters" the casino "lobby," where he or she is presented with the option to spin several virtual slot machines. *See* Ex. 8. High 5 promises slots that are literally identical to those found on the Las Vegas Strip. *See* Logan Decl. ¶¶ 18-20, Exhibit 9 (High 5 Casino Home Page) ("High 5 Casino is the premier place . . . to play REAL authentic Vegas slots[.]"); Exhibit 10 (High 5 Vegas Homepage) ("Hit the Strip & Play Authentic Vegas Slots!"); Exhibit 11 (High 5 Press Release) ("All 275+ games are authentic slots with realistic [Return to Player] values . . . High 5 Games titles play true 100% of the time – from desktop to mobile, ***emulating that real money gaming experience***.") (emphasis added). High 5 Vegas even provides the ambient background noise of a Las Vegas casino. *See* Ex. 8.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

5

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

First time users are provided a starting allotment of virtual casino chips with which to play these slot machines. *See id*. After that, players are bombarded with flashy advertisements for sales on chips. *See id*. In both games, after a player's initial allotment of free chips runs out, they have three options: (i) stop playing, (ii) wait for some period of time before receiving more free chips, or (iii) purchase more chips to keep playing. At the outset, chip packages can cost up to $99.99 (on High 5 Vegas) or $399.99 (on High 5 Casino). *See id*. As users spend more time and money, more expensive packages become available. The purchased chips can then be used on virtual slot machines, extending gameplay once the free chips are exhausted. *See id*. And although players can "win" at these virtual slots, they can never win money. On average, ███

███████████████████████████████████████████

███████████████████████████████████████████

This business model has proven cancerous in Washington. ███████████████

███████████████████████████████████████████

███████████████████████████████████████████

The financial and emotional toll of these losses—which, to be clear, are the byproduct of carefully-groomed gambling addictions—cannot be overstated. These virtual slot machines interfere with players' relationships with their loved ones. *See, e.g.*, Glover Decl. ¶ 7; Perkinson Decl. ¶ 6. They put players into financial ruin, interfering with their ability to pay for basic needs, such as food and shelter. *See, e.g.*, Moore Decl. ¶ 6 ("I feel guilty because I've spent money on DoubleDown that I've needed to pay bills or buy food."); Perkinson Decl. ¶ 4 ("This kind of loss put a huge strain on my ability to even buy food"). They put players through debilitating anxiety and depression. *See* Saari Decl. ¶ 6 ("When I lost, and started buying more and more chips, I felt lower than pond scum . . . [I] could not sleep, had anxiety attacks with a rushing heart, and couldn't eat."). And they have even pushed players to the brink of suicide. *See* Interrante Letter ("Big Fish drove me to attempt suicide."); Saari Decl. ¶ 6 ("[I] wondered about suicide").

1    **II.    Legal Background.**

2           Plaintiff claims High 5 Casino and High 5 Vegas are illegal under Washington's

3    gambling law, and that he may recover his losses under the RMLGA. The Washington

4    legislature has declared that: "The public policy of the state of Washington on gambling is . . . to

5    promote the social welfare of the people by limiting the nature and scope of gambling activities

6    and by strict regulation and control." RCW 9.46.010. To that end, the Act establishes that "[a]ll

7    persons losing money or anything of value at or on any illegal gambling games shall have a

8    cause of action to recover from the dealer or player winning, or from the proprietor for whose

9    benefit such game was played or dealt, or such money or things of value won, the amount of the

10   money or the value of the thing so lost." RCW 4.24.070. Thus, to recover under the Act, Plaintiff

11   must show that he (1) lost money or a thing of value (2) at an illegal gambling game.

12          That burden implicates two other terms defined by the law. First, in pertinent part, the

13   Act defines "thing of value" as "any form of credit or promise . . . involving extension of . . .

14   entertainment or a privilege of playing a game or scheme without charge." RCW 9.46.0285.

15   Second, the Act defines "gambling" as the (1) staking or risking something of value (2) upon the

16   outcome of a contest of chance or a future contingent event not under the person's control or

17   influence, (3) upon an agreement or understanding that the person or someone else will receive

18   something of value in the event of a certain outcome. RCW 9.46.0237. Plaintiff's core contention

19   is that the virtual chips offered to players in the High 5 Casino and High 5 Vegas apps are things

20   of value, and that his purchase of those chips, therefore, caused him to lose money at an illegal

21   gambling game.

22          Additionally, because Washington's anti-gambling law provides a legislative declaration

23   of the public interest in strictly regulating gambling activities, *see* RCW 9.46.010, Plaintiff

24   contends that the operation of High 5's illegal gambling games constitutes an unfair practice

25   under Washington's Consumer Protection Act. *See T-Mobile USA, Inc. v. Huawei Devices USA*

26   *Inc.*, 115 F. Supp. 3d 1184, 1197 (W.D. Wash. 2015) ("As an alternative to demonstrating (or

27

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1  pleading) an impact on the public interest, a CPA plaintiff can establish a per se public interest

2  impact by 'showing that a statute has been violated which contains a specific legislative

3  declaration of public interest impact.'") (quoting *Hangman Ridge Training Stables, Inc. v. Safeco*

4  *Title Ins. Co.*, 719 P.2d 531, 538 (Wash. 1986)). The CPA permits recovery of monetary

5  damages, which may be trebled. RCW 19.86.090.

6  　　In addition to damages actions, the CPA also permits an "action . . . to enjoin further

7  violations." RCW 19.86.090. Given these available remedies, Plaintiff seeks to certify the

8  following two classes:

9  　　**Damages Class**: All individuals in Washington who purchased virtual casino chips
10  　　on either High 5 Casino or High 5 Vegas after April 9, 2014.

11  　　**Injunctive Class**: All individuals in Washington who played either High 5 Casino
　　or High 5 Vegas after April 9, 2014.

12

13  

**ARGUMENT**

14  **I.   THE COURT SHOULD CERTIFY AN INJUNCTION CLASS PURSUANT TO
　　FED. R. 23(B)(2) AND A DAMAGES CLASS PURSUANT TO FED. R. 23(B)(3).**

15  　　"Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores,*

16  *Inc. v. Dukes*, 564 U.S. 338, 345 (2011). To obtain certification, Plaintiff must demonstrate that

17  his proposals satisfy "each of the four requirements of Rule 23(a) and at least one of the

18  requirements of Rule 23(b)." *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir.

19  2001); *see Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) ("A party seeking

20  class certification must affirmatively demonstrate his compliance with the Rule—that is, he must

21  be prepared to prove that there are in fact sufficiently numerous parties, common questions of

22  law or fact, etc."). Likewise, the Court "must conduct a rigorous analysis" to determine whether

23  Plaintiff has in fact demonstrated compliance with Rule 23. *Zinser*, 253 F.3d at 1186. "Doubts

24  regarding the propriety of class certification should be resolved in favor of certification." *Taylor*

25  *v. Universal Auto Grp. I, Inc.*, No. 3:13-cv-05245-KLS, 2014 WL 6654270, at *8 (W.D. Wash.

26  Nov. 24, 2014) (quotation omitted).

27

8

Here, Plaintiff's Injunctive Class must meet the requirements of Rule 23(b)(2), and his proposed Damages Class must meet the requirements of Rule 23(b)(3). *See Wal-Mart*, 564 U.S. at 359. As demonstrated below, Plaintiff presents a straightforward case for certification that readily satisfies these prerequisites.

### A.    Both classes satisfy Rule 23(a).

Because the two proposed Classes present essentially identical grievances, their compliance with Rule 23(a) can be analyzed together.

#### 1.    Both proposed Classes are sufficiently numerous.

Rule 23(a) first requires a class to be "so numerous that joinder of all members is impracticable." There is no numerical threshold, but "40 is generally an adequate number." *Reichert v. Keefe Commissary Network, LLC*, 331 F.R.D. 541, 550 (W.D. Wash. 2019).

Both proposed Classes easily clear this hurdle. ████████████████
█████████████████████████████████████████████████████████
████ Those users comprise just a fraction of the Damages Class, and alone satisfy numerosity.
█████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████
████    *See Miller v. P.S.C., Inc.*, No. 3:17-cv-05864-RBL, 2018 WL 6249841, at *3 (W.D. Wash. Nov. 29, 2018) (noting that a party may satisfy the numerosity prerequisite with "reasonable inference" drawn from the evidence). Numerosity is satisfied.

#### 2.    Both proposed Classes present common questions.

Rule 23(a) next requires that there be "questions of law or fact common to the class." To satisfy this prerequisite, the plaintiff's claims must "depend upon a common contention" that is "capable of classwide resolution." *Wal-Mart*, 564 U.S. at 350. "Common questions are defined by the plaintiffs' ability to make a prima facie showing using the same evidence." *Reichert*, 331 F.R.D. at 552. The "same evidence" here comes essentially from High 5 Casino and High 5

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION       9
Case No. 18-cv-05275-RBL

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Vegas themselves. At least four common questions are critical to Plaintiff's ability to prevail on his claims.

*First*, are the virtual chips in the High 5 Casino and High 5 Vegas casinos "things of value"? The Ninth Circuit explored this issue in *Kater v. Churchill Downs, Inc.*, 886 F.3d 784 (9th Cir. 2018). In considering the virtual casino at issue in that case, the court concluded that, as alleged, the virtual chips were "things of value" because they were required to extend gameplay. *See id.* at 787. Plaintiff's claim is that High 5 Casino and High 5 Vegas are materially identical to the virtual casino in *Kater*. *See* Dkt. 57 at 13.

At trial, Plaintiff of course still must persuade a factfinder that his description of the casinos is correct. And while High 5 previously has suggested that its regular provision of free chips sufficiently distinguishes its casinos from the one at issue in *Kater*, *see* Dkt. 57 at 14-16, that does not change the fact that resolution of this issue will apply classwide. There is no class member who uses a version of High 5's virtual casinos in which she is not given the opportunity to purchase casino chips when she runs out (even if she doesn't). And there is no user to whom High 5 does not provide free chips every so often. *See, e.g.*, Dkt. 22 at 3. So, resolution of Plaintiff's contention that the chips are "things of value" will resolve in one stroke that issue for every member of both proposed Classes.

*Second*, and relatedly, are the casinos in High 5 Casino and High 5 Vegas "gambling games"? As the Ninth Circuit recognized in *Kater*, this question is tied to the first: if the chips are things of value, then a game at which they are wagered is a gambling game. *See Kater*, 886 F.3d at 788. What was true in *Kater* also is true here: Because chips are used in materially the same way by putative class members in both High 5 Casino and High 5 Vegas to wager at slot machines, the same common evidence about whether these chips are "things of value" also will establish whether High 5's casinos are "gambling games."

*Third*, for the Damages Class, is Plaintiff entitled to recover money under the RMLGA? This question, too, is closely related to the resolution of the first two questions and is common to

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

10

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

the Damages Class. The RMLGA permits recovery of money or the value of things lost at a gambling game. *See* RCW 4.24.070. So, if Plaintiff prevails on the gambling-game question, the factfinder will need to resolve whether members of the proposed Damages Class are entitled to recover anything. The proposed Damages Class members are similarly situated in this regard. All of them have spent money to purchase chips for gambling at High 5's virtual slot machines, which they then more or less immediately wagered and lost. ██████████████████ ███████████████████████████ Whether these transactions caused Damages Class members to "los[e] money or anything of value" at the casino, entitling class members to recover the money or value of the thing lost, *see* RCW 4.24.070, will apply classwide.

*Fourth*, again just for the Damages Class, does the legislative declaration of purpose in RCW 9.46.010 render High 5's violations of the gambling laws also an unfair practice under the Washington CPA? The CPA establishes a basic prohibition on "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020. To recover damages under the CPA, the plaintiff must show that the alleged unfair practice "affects the public interest." *Hangman Ridge*, 719 P.2d at 535. One option available to a CPA plaintiff attempting to make this showing is to demonstrate that the defendant violated a statute that contains a legislative declaration of the public interest. *See id.* at 538. At trial, Plaintiff will prove that Washington's gambling laws, which High 5 continues to flout, contain exactly that sort of legislative declaration. See RCW 9.46.010 ("The public policy of the state of Washington on gambling is . . . ."). And in any event, whether or not High 5's alleged violations of Washington's gambling law constitute per se violations of the CPA is a question of law that indisputably applies classwide.

At bottom, Rule 23(a)'s commonality prerequisite is not meant to be a demanding hurdle. As the Supreme Court has held, "even a single common question will do." *Wal-Mart*, 564 U.S. at

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

11

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

359. Given the multitude of common questions present here, both proposed classes easily satisfy this requirement.

### 3.  Sean Wilson is an appropriate representative of the proposed Classes.

Rule 23(a)(3) and (4) are aimed at ensuring that the class is appropriately represented, and analysis of the two tends to merge. *See Amchem Prods. Co. v. Windsor*, 521 U.S. 591, 626 n.20 (1997). Rule 23(a)(3) ensures that the named plaintiff is typical of the class, such that his claim is "reasonably co-extensive with those of absent class members," even if not "substantially identical." *Reichert*, 331 F.R.D. at 550 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). Class representatives must have suffered the same type of injury from the same course of conduct as the absent class they seek to represent. *See Troy v. Kehe Food Distribs., Inc.*, 276 F.R.D. 642, 654 (W.D. Wash. 2011) (citing *Hanon v. Dataproducts, Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). Moreover, to be typical, a proposed representative's claim must also not be subject to any unique defenses that threaten to become the focus of the litigation, and distract him from prosecuting the class's claims. *See Reichert*, 331 F.R.D. at 551. Rule 23(a)(4)'s adequacy requirement ensures that a class representative does not have any disabling conflicts of interest and will vigorously prosecute the action on behalf of the absent class. *See Troy*, 276 F.R.D. at 655 (citing *Hanlon*, 150 F.3d at 1020). Sean Wilson meets both criteria.

*First*, Wilson's legal claims are identical to those of the proposed class. He contends that he spent money to purchase chips, which he then wagered at Defendant's virtual casinos and lost. He, like the class members he seeks to represent, contends that he is entitled to recover that money, either through the RMLGA or in the form of damages under the CPA, and to receive injunctive relief. These are the theories that he presses on behalf of the proposed absent classes. Wilson's injuries are "of the same type and issued from the same source" as the proposed Classes, rendering him a typical plaintiff. *Reichert*, 331 F.R.D. at 551.

It bears noting that while Wilson alleges to have only played and purchased coins in High 5 Casino, his proposed classes encompass High 5 Vegas, as well. Because the two virtual casinos

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

12

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

operate essentially identically, he is typical of both groups of players. *See Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015). High 5's course of conduct includes the development and operation of both games. The games feature materially identical offerings, including a nearly identical rewards program, similar purchase offerings, the same mechanic of occasional free chip giveaways, and the fact that the games are both limited, by and large, to virtual slot machines. In other words: the games present identical (or nearly identical) legal and factual questions that can be resolved in a single merits proceeding.

One unique defense Defendant has suggested it will raise is judicial estoppel, related to the fact that Wilson went through a bankruptcy in 2016-17. But there is little substance to this defense. Wilson purchased $1.99 worth of chips at the High 5 Casino on December 16, 2016. Two weeks later, he filed for bankruptcy protection under Chapter 7 of the Bankruptcy Code. *See* Chapter 7 Petition, No. 16-45252 (Bankr. W.D. Wash.). On his schedule of assets, filed on January 16, 2017, he averred that he had no contingent claims against third parties among his assets. *See id.*, Dkt. 10. At the time, of course, this was true. Judge Pechman had granted Churchill Downs's motion to dismiss Cheryl Kater's materially identical claim in November 2015. *See Kater*, No. 15-cv-00612 at Dkt. 39. The trustee granted Wilson a discharge on February 22, 2017, and the Ninth Circuit's opinion reversing Judge Pechman's opinion in *Kater* was not issued until March 2018.

True enough, debtors who conceal contingent claims on their bankruptcy schedules may be estopped from later bringing those claims in their own right once the bankruptcy is closed. *See Ah Quin v. Cty. of Kauai Dep't of Transp.*, 733 F.3d 267, 271 (9th Cir. 2013). But the doctrine of judicial estoppel guards against litigants manipulating the judicial system to their own advantage. *See New Hampshire v. Maine*, 532 U.S. 742, 749-750 (2001). There was quite plainly no manipulation here. *See Hay v. First Interstate Bank of Kalispell, N.A.*, 978 F.2d 555, 557 (9th Cir. 1992) (pertinent inquiry is whether "enough was known to require notification of the existence of the asset to the bankruptcy court"). Nor was there any bad faith. *See Hamilton v.*

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

13

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1   *State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (judicial estoppel invoked where

2   litigants are "playing fast and loose with the courts."). And even assuming Wilson could have

3   been aware he technically had a $1.99 claim for recovery under the RMLGA and CPA in

4   December 2016, Judge Pechman's then-precedential opinion in *Kater* would have told him (or,

5   moreover, his bankruptcy attorneys) that the claim was worthless at that time.

6       At bottom, there's no credible argument that Wilson deliberately manipulated the judicial

7   system by depriving the trustee of the chance to deem worthless the opportunity to pursue, on an

8   individual basis, a sub-$2 claim that would have required a sea-change in relevant law.

9   Consequently, and particularly given that the trustee could not serve as the class representative

10  here anyway, the claim against High 5 is Wilson's to pursue. *Cf. Dechert v. Cadle Co.*, 333 F.3d

11  801, 804 (7th Cir. 2003) (holding that, absent extraordinary circumstances, a bankruptcy trustee

12  cannot serve as a class representative).[2/3]

13      *Second*, Wilson does not have any conflicts of interest that might cause him to sell out the

14  absent class. Indeed, the record thus far indicates that Wilson is committed to vigorously

15  prosecuting this action. True enough, Wilson's alleged loss here is dwarfed by the losses of some

16  absent class members, but that's of no moment to the adequacy analysis. The salient point is that

17  Wilson's conduct displays his intention to prosecute this action vigorously on behalf of the

18  absent class. In addition to agreeing to serve as a class representative here, he has searched his

19  own files for documents relevant to Defendant's discovery requests and sat for an in-person

20  deposition. *See, e.g., Bellinghausen v. Tractor Supply Co.*, 303 F.R.D. 611, 617 (N.D. Cal. 2014)

21  (finding class representative adequate when "Plaintiff's involvement in this action included

22  _____

23  [2]     Should the Court conclude that the potential defense of judicial estoppel is likely to prejudice the proposed
        absent Classes, the Court should permit substitution of a new class representative. *See, e.g., Robichaud v. SpeedyPC*

24  *Software*, No. C 12 04730 LB, 2013 WL 818503, at *8 (N.D. Cal. Mar. 5, 2013) (collecting cases and noting that "in
        class actions, where a named Plaintiff's individual claims fail or become moot for a reason that does not affect the

25  viability of the class claims, courts regularly allow or order the plaintiffs' counsel to substitute a new representative
        plaintiff").

26  [3]     To foreclose any concern that Mr. Wilson's prior bankruptcy renders him an inadequate class
        representative, Mr. Wilson has recently begun the process of engaging Bankruptcy Counsel for purposes of

27  potentially pursuing an express and/or amended discharge of his claims against High 5.

reviewing and assisting with discovery, traveling to and attending the full-day mediation, and continually conferring with his counsel regarding the case."). Indeed, Wilson's deposition testimony reflects an understanding of his role as fiduciary to the class. *See* Logan Decl. ¶ 23, Exhibit 14 (Excerpt from Deposition of Sean Wilson) at 122:8-10 ("I am here to represent the whole group as a collection of people [and] to represent everyone's best interest"); *see also* Declaration of Sean Wilson ("Wilson Decl.") ¶ 2 ("I am committed to vigorously pursuing this case on behalf of myself and the class.")

Wilson also has an interest in obtaining injunctive relief. While Wilson's loss to High 5 specifically is small, he has spent many hours playing a variety of virtual casino games and based on his experience believes that social casino games—including High 5's social casinos—are a danger to society that must be stopped. *See* Wilson Decl. ¶ 3. Thus, it is in his interests to obtain an injunction now.

For all of these reasons, Wilson satisfies both the typicality and commonality requirements of Rule 23(a) and is an appropriate champion for the proposed Classes.

### 4.     Edelson PC is more than adequate class counsel.

Rule 23(a)(4)'s adequacy prong also governs class counsel. *See Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011). Again, the Court must ask whether the proposed class counsel, Edelson PC, is unencumbered by conflicts of interest and will vigorously prosecute the action. *See id.* The answer is a clear yes.

First, the record discloses no conflicts of interest and counsel are aware of none. Edelson PC has no financial stake in the Defendant nor any connections to particular class members that might cause them to privilege certain members over others. *See* Logan Decl. ¶ 24.

Second, Edelson PC will vigorously prosecute this case. Its conduct to this point makes clear that commitment. The underlying legal theory in this case was first raised years ago by Edelson PC and has been vigorously pursued in a variety of fora since then. In that vein, lawyers at Edelson PC have litigated several complex challenges in this and related cases, including

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

15

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1  personal jurisdiction and arbitration, and are intimately familiar with the underlying facts and

2  law. The results up to this point speak for themselves: recent proposed settlements-in-principle in

3  four (4) related cases, each of which raised materially identical claims as those raised here, total

4  more than $190 million.

5      Aside from their experience in this case and the related matters, attorneys at Edelson PC

6  have a long record of successfully prosecuting consumer actions on behalf of certified classes.

7  This record includes a recent $925 million jury verdict against multilevel marketing company

8  ViSalus, *see Wakefield v. Visalus*, No. 3:15-cv-01857 (D. Ore. Apr. 12, 2019)*,* and the recently-

9  announced $550 million (all-cash) settlement with Facebook—the largest consumer privacy jury

10  verdict and settlement, respectively, to date. *See* Natasha Singer & Mike Isaac, *Facebook to Pay*

11  *$550 Million to Settle Facial Recognition Suit*, NEW YORK TIMES (Jan. 29, 2020), available at

12  https://nyti.ms/2GLtY6V. *See also* Logan Decl. ¶ 25, Exhibit 15 (Edelson PC Firm Resume).

13  Edelson PC is clearly adequate to serve as class counsel.

14      **B.      The Damages Class Satisfied Rule 23(b)(3).**

15      Plaintiff's proposed Damages Class must satisfy Fed. R. Civ. P. 23(b)(3), which permits

16  certification when common questions predominate over individual questions affecting particular

17  class members, and when a class action is a superior way of resolving the dispute.

18      First, it is clear that common questions predominate. The Supreme Court has made clear

19  that predominance is a qualitative inquiry: "The predominance inquiry 'asks whether the

20  common, aggregation-enabling, issues in the case are more prevalent or important than the non-

21  common, aggregation-defeating, individual issues.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.

22  Ct. 1036, 1045 (2016) (quoting *2 Newberg on Class Actions* § 4:49 (5th ed.)). When considering

23  whether common issues predominate, the court should begin with "the elements of the

24  underlying cause of action." *Reichert*, 31 F.R.D. at 553 (quoting *Erica P. John Fund, Inc. v.*

25  *Halliburton Co.*, 563 U.S. 804, 809 (2014)). "More important questions apt to drive the

26  resolution of the litigation are given more weight in the predominance analysis over

27

individualized questions which are of considerably less significance to the claims of the class." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016). As these cases, and the text of the rule make clear, individual questions need not be absent, but merely must occupy less importance to the litigation than common questions.

　　This inquiry is especially straightforward in this case. As explained above, each of the showings needed for Wilson to prevail on the elements of his claims under the RMLGA and the CPA depend on evidence or legal argument that is common to the class—principally the operation of High 5's virtual casinos. A factfinder's resolution of questions related to the operations of those casinos—for example, whether the chips sold in the games are "things of value"—will resolve questions central to the claims of every class member in one fell swoop, driving the litigation forward. *See Reichert*, 331 F.R.D. at 554-55 (finding predominance satisfied when all or nearly all elements of the class's prima facie case presented common questions); *Taylor*, 2014 WL 6654270, at *16 (predominance satisfied where "predominant" issue contested by the parties was common to the class). And assessment of each class member's out-of-pocket damages will be accomplished by a common and straightforward method: summing their spending evidenced in Exhibits 1-A, 1-B, 1-C, 1-D, and an anticipated future data production by Facebook. *Cf. Bess v. Ocwen Loan Servicing LLC*, 334 F.R.D. 432, 436 (W.D. Wash. 2020) (quotation omitted) ("[T]he need for individualized findings as to the amount of damages does not defeat class certification."). By contrast, the record does not reveal the existence of any individualized questions affecting particular class members, either as it relates to the Class's ability to make a prima facie showing of Defendant's liability, or with respect to potential affirmative defenses. And, in any event, the Supreme Court has made clear that the existence of "affirmative defenses peculiar to some individual class members" does not defeat predominance, even if those defenses must be tried separately. *Tyson Foods*, 136 S. Ct. at 1045. Predominance is therefore satisfied.

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

17

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

The superiority criterion encompasses at least four considerations: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3). The first and second factors plainly point in favor of certification. "There is no indication that any [class members] have an interest in pursuing their own claims—in fact, it would likely be uneconomical for them to do so. There is also no evidence that certain [class members] have already initiated their own individual actions." *Reichert*, 331 F.R.D. at 556. Although certain class members have lost substantial sums of money, many of the Damages Class members have lost far smaller sums such that an individual action is unlikely. Indeed, given the substantial amount of work Plaintiff's counsel have invested in this case, it seems clear that a contingency-fee lawyer would hesitate to take on even a $50,000 claim. And, of course, many claims are far smaller, and unlikely to be vindicated outside the context of a class action. *See Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168,1175 (9th Cir. 2010) ("Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification."). Moreover, the huge number of individuals in both classes would overwhelm the judicial system if forced to litigate individually. *See Taylor*, 2014 WL 6654270, at *19 ("Generally, when a large number of plaintiffs are seeking a small amount of damages, class certification is appropriate.").

Next, this forum is the clear choice in which to concentrate the litigation. The claims arise under a Washington law, and the proposed classes are limited to players who patronized High 5's virtual casinos in Washington. *See Shasta Linen Supply, Inc. v. Applied Underwriters, Inc.*, No. 2:16-cv-1211 WBS AC, 2019 WL 358517, at *6 (E.D. Cal. Jan. 29, 2019) ("The fact that all remaining claims are brought under California law weighs in favor of a California federal court adjudicating the dispute."). Moreover, the Court is already intimately familiar with the

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

18

**TOUSLEY BRAIN STEPHENS, PLLC**
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

facts and law underlying this action because it presides not only over this action but also six (6) related cases. It would make little sense to force the parties to start over elsewhere. *See Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 560 (W.D. Wash. 2008) (finding the forum superior because "the Court is already familiar with Plaintiffs' claims").

Finally, there are no intractable manageability issues. Detailed transaction records will help streamline both identification of Damages Class members and any damages calculations. *See* Ex. 1. Moreover, there are no individual issues which promise to unduly detain the Court or a special master in follow-on proceedings. In other words, the "complexities of class action treatment" are outweighed by the benefits of "considering the common issues in one trial," rending a class action a superior means of resolving this dispute. *Cf. Zinser*, 253 F.3d at 1192.

### C.     The Injunctive Class Satisfies Rule 23(b)(2).

Because it seeks only injunctive relief, Plaintiff's proposed Injunctive Class must satisfy Fed. R. Civ. P. 23(b)(2), which permits certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." The rule requires the targeted conduct of the defendant be "indivisible . . . such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360. Rule 23(b)(2) certification is appropriate when a single injunction would address the claims of every class member. *See B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 971 (9th Cir. 2019).

Such an indivisible injunction would be appropriate here. Again, the key is the uniform conduct of the Defendant through its operation of two nearly identical virtual casinos. *See Walters v. Reno*, No. C94-1204C, 1996 WL 897662, at *8 (W.D. Wash. Mar. 13, 1996) (noting that Rule 23(b)(2) certification is appropriate when "the opposing party has acted consistently towards members of the class") (quotation omitted). Plaintiff's core contention is that these virtual casinos are illegal gambling games. If a factfinder agrees with Plaintiff, the games—the "targeted conduct" as *Wal-Mart* put it—are then nuisances under Washington law, and subject to

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION     19
Case No. 18-cv-05275-RBL

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1   abatement by injunction or otherwise. And if that is so, it is so for every member of the proposed

2   Injunctive Class. A single, indivisible injunction is therefore appropriate for all proposed

3   Injunctive Class members, satisfying Rule 23(b)(2).

4   **II.     THE COURT SHOULD ISSUE A PRELIMINARY INJUNCTION.**

5       In addition to requesting certification of the proposed Injunction Class, Plaintiff moves

6   for entry of the following preliminary injunction:

7               Pending final disposition of this case, Defendant is enjoined from
                selling—from within Washington or to individuals located in
8               Washington—virtual casino chips or coins, or other virtual tokens
                or credits, for use in virtual slot machines or other simulated
9               gambling in internet-based casino-style apps, including, but not
10              limited to, High 5 Casino and High 5 Vegas.

11      "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on

12  the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

13  balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v.*

14  *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). But when injunctive relief is authorized by

15  statute, irreparable harm is presumed when the plaintiff demonstrates a likelihood of success on

16  the merits. *See, e.g.*, *Antonetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165, 1175-76 (9th Cir.

17  2010); *Diamond House of SE Idaho, LLC v. City of Ammon*, 381 F. Supp. 3d 1262, 1278 (D.

18  Idaho 2019); *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 859-60 (N.D. Cal. 2011). Plaintiff

19  here alleges a statutory claim for relief under which injunctive relief is authorized: Washington's

20  Consumer Protection Act, *see* RCW 19.86.090 (permitting an "action . . . to enjoin further

21  violations"). As Plaintiff demonstrates below, because he is likely to succeed on this claim, he is

22  entitled to a presumption of irreparable harm.

23      **A.     Plaintiff is likely to succeed on his injunction claim under the CPA.**

24      Plaintiff is likely to succeed on his claim for injunctive relief under Washington's

25  Consumer Protection Act. A person injured by an "unfair or deceptive act[] or practice[]" under

26  the act can seek an injunction against further violations. RCW 19.86.020; 19.86.090. Plaintiff is

27

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION          20
Case No. 18-cv-05275-RBL

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1   likely to succeed on this injunctive claim because he will be able to show that Defendant's

2   conduct is a prohibited "unfair practice" that harmed him.

3        "To prevail on a CPA action, the plaintiff must prove an '(1) unfair or deceptive act or

4   practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in

5   his or her business or property; (5) causation.'" *Klem v. Washington Mut. Bank*, 295 P.3d 1179,

6   1185 (Wash. 2013) (quoting *Hangman Ridge*, 719 P.2d at 533). Plaintiff easily satisfies these

7   requirements.

8        First, an "injury to plaintiff" includes monetary losses, which each member of the

9   proposed Injunction Class has suffered given that each has purchased chips from High 5 Casino

10  or High 5 Vegas and that purchased chips are lost, on average, within one day. *See Panag v.*

11  *Farmers Ins. Co. of Wash.*, 204 P.3d 885, 889-90 (Wash. 2009). Second, there should be little

12  dispute that the class's financial injury was the proximate cause of Defendant's operation of

13  (unregulated) virtual slot machines, which is the practice Plaintiff alleges is unfair. *See Indoor*

14  *Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 170 P.3d 10, 22 (Wash.

15  2007) (establishing proximate cause as the standard of causation). Third, the "public interest

16  impact" element can be met by showing "that additional plaintiffs have been or will be injured in

17  exactly the same fashion." *Hangman Ridge*, 719 P.2d at 538. ██████████████████

18  ███████████████████████████████████ The Washington gambling statute

19  also contains a clear legislative declaration that "the public policy of the state of Washington on

20  gambling is . . . to promote the social welfare of the people by limiting the nature and scope of

21  gambling activities and by strict regulation and control[,]" RCW 9.46.010, further evidencing the

22  public interest impact of Defendants' activities. *See Hangman Ridge*, 719 P.2d at 538 (noting

23  that the public interest element could be satisfied where the relevant conduct is prohibited by a

24  statute that contains a declaration of public impact). And, fourth, there can be little doubt that

25  Defendant's conduct occurs in "trade" or "commerce," an element satisfied by, among other

26  things, their sale of virtual casino chips. *See* RCW 19.86.010(2), (3).

27

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION                    21
Case No. 18-cv-05275-RBL

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

Fifth, and finally, Plaintiff is likely to show that Defendant's operation of their gambling games is an unfair practice. "Unfair" practices are those that cause substantial injury to the public without countervailing benefits, or which are immoral, unscrupulous, or offensive to public policy. *See Blake v. Fed. Way Cycle Ctr.*, 698 P.2d 578, 583 (Wash. Ct. App. 1985).

As explained above, Plaintiff is likely to establish that the operation of these games is offensive to Washington public policy, and, indeed, unlawful under Washington law absent a license from the State. *See* RCW 9.46.010. Plaintiff is also likely to establish that Defendant's unregulated slot machines produce few if any benefits to society. And as the evidence offered in support of this motion already demonstrates, these gambling apps are horrifyingly effective at exploiting the power of addiction to separate consumers from their money. As Plaintiff will prove at trial, that's exactly the sort of "unfair" practice that the Washington legislature intended to legislate against in passing the CPA. *See Johnson v. Collins Entm't, Inc.*, 564 S.E.2d 653, 665-67 (S.C. 2002) (operation of video poker machines was an "unfair practice" under equivalent South Carolina statute), *overruled on other grounds by Proctor v. Whitlark & Whitlark, Inc.*, 778 S.E.2d 888 (S.C. 2015); *Modernistic Candies v. FTC*, 145 F.2d 454, 455 (7th Cir. 1944) ("The device used in the case at bar is too apparently allied with the purpose of merchandising by gambling to appeal to a court as being a fair trade practice").

Of course, it isn't just that, at the end of the day, these gambling apps accomplish little more than moving money from individuals to the companies that run them. Instead, it is the way they accomplish this that renders them an unfair practice. As Professor Natasha Dow Schüll laid out for the Washington Gambling Commission, the games are designed to mimic the addictive experience of a real casino, and, indeed, are designed to give the addict the one thing he or she most wants: more time on a gambling machine. *See* Logan Decl. ¶ 26, Exhibit 16 (Letter from Professor Natasha Dow Schüll) at 2; *see also* Ex. 11 ("High 5 Games titles play true 100% of the time – from desktop to mobile, ***emulating that real money gaming experience***.") (emphasis added). ███████████████████████████████████████████

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

22

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1

2

3

4

5                                *See* Glover Decl. ¶ 6 (discussing

6 how High 5 Casino manipulates players to encourage more chip purchases); Interrante Letter at 2

7 (social casino left Interrante in "financial ruins"); Saari Decl. ¶¶ 5-6 (noting the high an addict

8 gets from winning, and how a social casino manipulates players into more chip purchases).

9         At bottom, High 5's games are as pernicious and predatory as it gets. Plaintiff is likely to

10 succeed in showing that Defendant's sale of chips in these games constitutes an unfair practice,

11 and that Plaintiff is therefore entitled to an injunction under the CPA.

12          **B.**      **Defendant's continued operation of these games causes irreparable harm.**

13         As noted above, the need to demonstrate irreparable harm is obviated by that fact that the

14 CPA specifically allows for injunctive relief. *See Antonetti*, 643 F.3d at 1175-76. But there exists

15 irreparable harm here in any event. The declarations submitted in this case—as well as those in

16 the related actions—demonstrate that the costs of social casinos go well beyond money. The

17 addiction these games cause and that these companies feed interferes with a player's relationship

18 with their loved ones. *See* Glover Decl. ¶ 7; Reed Decl. ¶ 6; Perkinson Decl. ¶ 6. The games

19 cause addicts to suffer from anxiety, and although chip purchases can be recovered through this

20 action, it is clear that by preying on addicts, these virtual slot machines are stressing the finances

21 of vulnerable people. This has significant downstream effects for the individual who may have

22 difficulty providing for their family (*see, e.g.*, Glover Decl. ¶ 7) or even affording basic needs,

23 like food (*see, e.g.*, Moore Decl. ¶ 6, Perkinson Decl. ¶ 4).

24         These kinds of harms are irreparable. Ongoing interference with one's familial and

25 personal relationships is not easily quantified and cannot be remedied by an award of monetary

26 damages. The Ninth Circuit also has held that "emotional and psychological" injuries—like

27

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION      23
Case No. 18-cv-05275-RBL

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

those suffered by putative class members here and in related cases—"cannot be adequately compensated for by a monetary award after trial." *Chalk v. U.S. Dist. Ct. for C.D. Cal.*, 840 F.2d 701, 710 (9th Cir. 1988); *see also EEOC v. Chrysler Corp.*, 733 F.2d 1183, 1186 (6th Cir. 1984) (listing as irreparable harms "such problems as emotional distress, depression, increased drug use, decrease in feelings of a useful life, . . . and a reduced sense of well-being"); *Yue v. Conseco Life Ins. Co.*, 282 F.R.D. 469, 483 (C.D. Cal. 2012) (finding that plaintiffs faced irreparable injury on account of "stress, anxiety, and uncertainty").

And while one major type of injury every class member suffers is monetary, the law recognizes that crippling economic damages can be irreparable. The loss of a business, for instance, is irreparable even though traditional monetary damages theoretically compensate the plaintiff. *See hiQ Labs, Inc. v. LinkedIn Corp.*, 938 F.3d 985, 993 (9th Cir. 2019). Putative class members are at risk of an analogous loss every day Defendant is allowed to continue operating its games, as the financial pressures placed on players by Defendant threatens players' financial solvency. *See Nelson v. NASA*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds* 562 U.S. 134 (2011) ("Moreover, the loss of one's job does not carry merely monetary consequences; it carries emotional damages and stress, which cannot be compensated by mere back payment of wages."). Merely recouping their direct losses from Defendant will not help cure the crippling economic problems faced by addicts who cannot put Defendant's casino games down.

Plaintiff—and the class members he seeks to represent—are suffering irreparable harms.

### C.  The balance of equities favors an injunction.

The equities favor Plaintiff. As before, when a statute dictates injunctive relief upon proof of a violation, as Washington's CPA does, the Court need not rigorously engage in a discretionary balancing, because the legislature already has accomplished that task. *See Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc. (AZ)*, 367 F.3d 1108, 1111 (9th Cir. 2004). Regardless, the equities favor the preliminary relief Plaintiff seeks here.

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992

1
2   ████████████████████████████████████████████████████████

████████████████████████████████████   Indeed, High 5 has insisted from the beginning of

3   this litigation that its games are "free to play." Plaintiff's requested injunction would merely

4   ensure that Defendant's words about its games are meaningful, and that Defendant's ongoing

5   illegal gambling scheme is halted. Given that Plaintiff is likely to succeed on his claims anyway,

6   a preliminary injunction would simply prevent Defendant from continuing to add to the damages

7   it will ultimately owe to the class at the close of this litigation.

8       But from Plaintiff's perspective, preliminary relief would be especially meaningful. It

9   would provide consumers with a reprieve from the stress and anxiety Defendant's games are

10  causing and would prevent crippling personal and financial ruin from occurring before Plaintiff's

11  likely ultimate success on the merits.

12      Given the significant harm an injunction would prevent, and the lack of any

13  corresponding harm one would cause, the equities plainly favor preliminary injunctive relief.

14      **D.      The requested injunction is in the public interest.**

15      An injunction is also plainly in the public interest. In fact, Washington law specifically

16  deems the operation of a gambling game to be a nuisance subject to mandatory abatement. *See*

17  RCW 9.46.250. Moreover, unlicensed gambling is plainly illegal in Washington, so an injunction

18  to prevent such gambling serves the public interest. *See* 11A Wright & Miller Fed. Prac. & Proc.

19  Civ. § 2948.4 (3d ed.) (noting that "the public interest also may be declared in the form of a

20  statute"); *Versaterm, Inc. v. City of Seattle*, No. 16-cv-1217, 2016 WL 4793239, at *8 (W.D.

21  Wash. Sept. 13, 2016) (concluding that injunction that furthered policy set forth in Washington

22  statute was in the public interest).

23                              **CONCLUSION**

24      The Court should (1) certify the Injunctive Class (2) certify the Damages Class (3)

25  appoint Sean Wilson to represent both Classes (4) appoint Edelson PC as counsel to both Classes

26  and (5) enter the proposed preliminary injunction.

27

Respectfully Submitted,

**SEAN WILSON**, individually and on behalf of all others similarly situated,

Dated: June 26, 2020

By: /s/ Todd Logan
*One of Plaintiff's Attorneys*

EDELSON PC
Rafey Balabanian
rbalabanian@edelson.com
Todd Logan
tlogan@edelson.com
Brandt Silver-Korn
bsilverkorn@edelson.com
123 Townsend Street, Suite 100
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

By: /s/ Cecily C. Shiel
*One of Plaintiff's Attorneys*

TOUSLEY BRAIN STEPHENS, PLLC
Cecily C. Shiel
cshiel@tousley.com
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600
Fax: 206.682.2992

*Attorneys for Plaintiff and the Putative Class*

PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
Case No. 18-cv-05275-RBL

26

TOUSLEY BRAIN STEPHENS, PLLC
1700 Seventh Avenue, Suite 2200
Seattle, Washington 98101-4416
Tel: 206.682.5600 • Fax: 206.682.2992