The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| RICK LARSEN, individually and on behalf of all others similarly situated,<br><br>       *Plaintiff,*<br><br>   *v.*<br><br>PTT, LLC (d/b/a HIGH 5 GAMES, LLC), a Delaware limited liability company,<br><br>       *Defendant.* | Case No. 18-cv-05275-RSL<br><br>**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**Noting Date:** February 16, 2024<br><br>**FILED PARTIALLY UNDER SEAL**<br><br><br>**ORAL ARGUMENT REQUESTED** |

**Edelson PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9495

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

STATEMENT OF UNDISPUTED FACTS ................................................................. 3

ARGUMENT ............................................................................................................... 9

    I.      Legal Standard. ............................................................................................ 9

    II.     The Undisputed Material Facts Establish that High 5 is Liable to the Class Under the RMLGA. ....................................................................................... 10

          A.  Under *Kater*, Consumers Losing Money in Social Casino Apps Have a Claim Under the RMLGA. ................................................................... 11

          B.  Undisputed Evidence Shows that the Analysis in *Kater* Applies Squarely to High 5's Social Casinos, and that High 5 Is Therefore Liable Under the RMLGA. ............................................................................................... 13

    III.    High 5's Violations of the Gambling Act Offend Public Policy and so Violate the CPA as a Matter of Law. ........................................................................ 17

    IV.    The Court Should Determine the Class's Aggregate Actual Damages, To Date. ........................................................................................................... 19

    V.    The Court Should Order Abatement of the Nuisance and Enjoin Ongoing Statutory Violations. ................................................................................... 22

CONCLUSION ......................................................................................................... 23

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................ 9, 10

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) .................................................................................................. 9

**United States Court of Appeals Cases**

*C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*,
  213 F.3d 474 (9th Cir. 2000) .................................................................................. 9

*Hilao v. Est. of Marcos*,
  103 F.3d 767 (9th Cir. 1996) ................................................................................ 20

*Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*,
  973 F.2d 688 (9th Cir. 1992) ................................................................................ 12

*Kater v. Churchill Downs Inc.*,
  886 F.3d 784 (9th Cir. 2018) .........................................................................*passim*

*Retuta v. Holder*,
  591 F.3d 1181 (9th Cir. 2010) ................................................................................ 9

**United States District Court Cases**

*Benson v. Double Down Interactive, LLC*,
  No. 18-cv-525-RBL, 2020 WL 4607566 (W.D. Wash. Aug. 11, 2020) ........................ 10

*Benson v. Double Down, Interactive, LLC*,
  No. 18-cv-525-RBL, 2021 WL 1117766 (W.D. Wash. Mar. 24, 2021) ......................... 10

*Bund v. Safeguard Props. LLC*,
  No. 16-cv-920-MJP, 2018 WL 3917930 (W.D. Wash. Aug. 16, 2018) .......................... 18

*Fife v. Sci. Games Corp.*,
  No. 18-cv-00565-RBL, 2018 WL 6620485 (W.D. Wash. Dec. 18, 2018) .......... 3, 4, 12, 15

*Forcellati v. Hyland's, Inc.*,
  No. 12-cv-1983-GHK MRWX, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ................. 20

*G.G. v. Valve Corp.*,
  No. 16-cv-1941, 2020 WL 7385710 (W.D. Wash. Dec. 16, 2020) ................................ 18

*Jordan v. Nationstar Mortg., LLC*,
    No. 2:14-CV-0175-TOR, 2017 WL 5616362 (E.D. Wash. Nov. 21, 2017) .................... 18

*Price v. City of Seattle*,
    No. 03-cv-1365-RSL, 2006 WL 2691402 (W.D. Wash. Sept. 19, 2006) .................. 20, 21

*Valladon v. City of Oakland*,
    No. 06-cv-07478-SI, 2009 WL 3401263 (N.D. Cal. Oct. 20, 2009) ................................ 22

*Wilson v. Playtika, Ltd.*,
    349 F. Supp. 3d 1028 (W.D. Wash. 2018) ......................................... 12, 13, 15

*Wilson v. PTT, LLC*,
    No. C18-5275RSL, 2020 WL 1674151 (W.D. Wash. Apr. 6, 2020) .............................. 10

*Wilson v. PTT, LLC*,
    No. C18-5275RSL, 2021 WL 211532 (W.D. Wash. Jan. 21, 2021) ......................... *passim*

**Washington Supreme Court Cases**

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
    719 P.2d 531 (Wash. 1986) .................................................................. 17

*Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*,
    170 P.3d 10 (Wash. 2007) .................................................................. 17

*Klem v. Washington Mut. Bank*,
    295 P.3d 1179 (Wash. 2013) ............................................................ 17, 18

*Mellon v. Reg'l Tr. Servs. Corp.*,
    334 P.3d 1120 (Wash. 2014) ................................................................ 18

*Panag v. Farmers Ins. Co. of Wash.*,
    204 P.3d 885 (Wash. 2009) ................................................................. 17

*Rousso v. State*,
    239 P.3d 1084 (Wash. 2010) ................................................................ 11

**Washington Court of Appeals Cases**

*Bullseye Distrib. LLC v. State Gambling Comm'n*,
    110 P.3d 1162 (Wash. Ct. App. 2005) ................................................. 12, 14, 15

**EDELSON PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300  •  Fax: 415.373.9495

**Statutes and Rules**

Fed. R. Civ. P. 56 ...................................................................................................9, 10

RCW 4.24.070 ................................................................................. 10, 11, 16, 19, 21

RCW 9.46.010 .............................................................................................................. 18

RCW 9.46.0237 ........................................................................................................... 11

RCW 9.46.0249 ........................................................................................................... 22

RCW 9.46.250 ............................................................................................................. 22

RCW 9.46.0285 ................................................................................... 1, 12, 14, 16

RCW 19.86.010 ........................................................................................................... 17

RCW 19.86.090 ........................................................................................... 19, 21, 22

**INTRODUCTION**

In the years since the Ninth Circuit's landmark holding in *Kater v. Churchill Downs*, this Court has repeatedly noted that the *Kater* opinion reflected "straightforward" statutory interpretation and that the application of the plain language of Washington's gambling law to social casinos is neither novel nor complex.

What is now clear, after the close of discovery in this case, is that Defendant High 5's social casino apps function, in all material aspects, exactly as alleged—and exactly as alleged for the social casino at issue in *Kater*. Consequently, it is now clear that this is one of the rare cases that should be resolved at summary judgment based on the undisputed facts.

The Court has already found that Plaintiff stated a claim under the RMLGA in his Complaint. With the discovery period now closed, the following four uncontroverted facts, just as alleged in Plaintiff's Complaint, render summary judgment appropriate here:

1. The Class[1] has played High 5's social casinos, titled High 5 Casino and High 5 Vegas, both of which principally offer various slot machine games.

2. Class Members have purchased virtual chips within High 5 Casino and High 5 Vegas, using real money that is remitted to High 5 (net of fees collected by a Platform Provider).

3. Class Members have used purchased virtual chips to place bets on slot machine games within High 5 Casino and High 5 Vegas.

4. The virtual chips can be used to keep playing the slot machine games in High 5 Casino and High 5 Vegas without additional charge.

These facts, which are self-evident in the games themselves and are not subject to dispute, show that the virtual chips in High 5 Casino and High 5 Vegas are inherently "things of value" under Washington law because those virtual chips—however they are received, whether purchased by the player for real money, received through a winning spin, or received as a free bonus within the app—are a "credit that allows a user to place another wager or re-spin a slot machine." *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 787 (9th Cir. 2018) (citing RCW 9.46.0285). In both High 5

---

[1] Unless otherwise noted, references to the "Class" in this Motion refer to the Damages Class certified by the Court. Dkt. #170.

Casino and High 5 Vegas, therefore, players stake something of value (their virtual chips) on the outcome of a contest of chance (spins on the virtual slot machines) with the understanding that they might receive something of value (more virtual chips) if they win. The online apps are therefore illegal gambling games under the plain language of RCW 9.46.0237 and RCW 9.46.240, and as conclusively established in *Kater*.

As discussed further below, High 5 has offered testimony in discovery averring that players have the option to obtain some amount of free virtual chips within the apps at all times. *But even accepting that contention as true for purposes of summary judgment*, virtual chips in High 5's social casinos are "things of value" under Washington law, the games constitute illegal online gambling, and the Class has lost money at illegal gambling games. Thus, the above four facts allow the Court to enter a finding of RMLGA liability as a matter of law. That finding, in turn, allows for a finding of CPA liability as a matter of law since violations of the RMLGA offend Washington public policy as expressed through Washington's gambling statutes.

Finally, the Court's liability findings should apply classwide, since it is undisputed that the mechanics of gameplay are common to every member of the previously certified Classes. And the third-party platform providers—which make High 5 Casino and High 5 Vegas available to players and facilitate the transactions for virtual chips—have produced computerized data, kept in the ordinary course of business, showing all purchases of virtual chips within the apps from 2014-2023 by Washington-based users. This data—which is not subject to reasonable dispute—not only confirms that every member of the Damages Class has spent money purchasing virtual chips within High 5's social casino apps, but also allows the Court to determine the Class's aggregate actual damages (to date) as a matter of law. Based on its liability findings, the Court can and should determine that baseline damages amount at this stage, in addition to granting the injunctive relief requested in the Complaint and authorized by statute.

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      During the period from 2014 to the present, High 5 (or its subsidiary)[2] has owned and operated the casino-themed applications High 5 Casino and High 5 Vegas, along with other social casino products. *See* Declaration of Amy B. Hausmann ("Hausmann Decl."), Ex. 1 (Singer Dep.) at 18:19-23; Ex. 2 (Fratto Dep.) at 55:17-24, 63:4-19; Dkt. #82 (Declaration of Philip Welty, High 5's Director of Game Design) ¶ 2.

2.      High 5's social casino apps are designed as virtual representations of real-life slot machines. *See* Dkt. #144-12 (iPad previously lodged with the Court (judicial notice previously requested), containing copies of High 5 Casino and High 5 Vegas apps)[3]; *see also* Dkt. #23 (Declaration of Patrick Benson, High 5's VP of Integrated Marketing) ¶¶ 6, 9 ("High 5 Casino and High 5 Vegas provide entertainment based on the concept of a slot machine and a casino theme. . . . For example, on any spin, a player decides the number of lines on the virtual slot machine to play and the number of virtual coins to play on each spin."); Dkt. #144-13 (High 5 Casino Home Page, as of May 2021) ("High 5 Casino is the premier place . . . to play REAL authentic Vegas slots[.]"); Dkt. #144-14 (High 5 Vegas Homepage, as of May 2021) ("Hit the

---

[2]      On December 5, 2023, Defendant High 5 Games, LLC ("High 5 Games") disclosed for the first time that it had transferred ownership and operation—including all revenues—of all its social casino products to its majority-owned subsidiary, High 5 Entertainment, over a year prior, in October 2022. Plaintiff has filed a pending Motion for Leave to Amend to add High 5 Entertainment as a (late-disclosed) Defendant in the case. *See* Dkt. #251.

[3]      Plaintiff previously lodged with the Court an iPad containing the High 5 Casino and High 5 Vegas apps, and requested that the Court take judicial notice of each. *See* Dkt. #144-12 (iPad lodged with the Court); Dkt. #143 (requesting judicial notice). The Class respectfully renews the request for judicial request here. *See Fife v. Sci. Games Corp.*, No. 18-cv-00565-RBL, 2018 WL 6620485, at *2 (W.D. Wash. Dec. 18, 2018) (taking judicial notice of social casino games lodged via iPad, and noting that "it does not matter whether the screenshots or videos may depict a different approach to gameplay than [plaintiff's]. The only issue is whether they in any way distort the inherent properties of the game. The game, videos, and screenshots do not do this because they are direct depictions of gameplay.").
If helpful to the Court, the Class will promptly lodge another copy of an iPad containing the apps, and will likewise file another request for judicial notice.

Pl's Mot. for Partial Summ. J.
Case No. 18-cv-05275-RSL

3

**Edelson PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9495

Strip & Play Authentic Vegas Slots!"); Dkt. #144-15 (High 5 Press Release) ("All 275+ games are authentic slots with realistic [Return to Player] values. . . . High 5 Games titles play true 100% of the time – from desktop to mobile, emulating that real money gaming experience.").

3.      High 5 Vegas even provides the ambient background noise of a Las Vegas casino. *See* Dkt. #144-12 (iPad).

4.      There is no skill or strategy involved in these games; the outcomes are random, and the odds governing the outcome of any given spin made through High 5's casinos never change. Hausmann Decl., Ex. 3 (Ishikawa 30(b)(6) Dep.) at 119:15-120:8; Ex. 1 (Singer Dep.) at 97:9-11.

5.      The gameplay is self-evident.[4] First-time players of either application are given an initial allotment of virtual chips (which cannot be exchanged for cash), which are used to bet on and spin High 5's virtual slot machines. Dkt. #23 (Benson Decl.) ¶ 7; Dkt. #144-12 (iPad). To do so, the player first makes a wager and, assuming he has enough virtual chips to cover the bet, hits a button to spin a slot machine. Dkt. #23 (Benson Decl.) ¶ 9 ("[O]n any spin, a player decides the number of lines on the virtual slot machine to play and the number of virtual coins to play on each spin."); Dkt. #144-12 (iPad).



**Figure 1**

---

[4]      Figures 1-3 are screenshots taken from the version of High 5 Casino made available through the Apple App Store as of May 3, 2021, and are included herein for illustrative purposes. *See Sci. Games Corp.*, 2018 WL 6620485, at *2.

EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9495

6.    After the user hits the "spin" button, the virtual reels turn and the user awaits the results. Dkt. #144-12 (iPad). Just like a physical slot machine, users have no control over the outcome of a spin. Ex. 1 (Singer Dep.) at 97:9-11.

7.    If a user "wins" on a spin, he or she is awarded with more virtual chips, which can then be used to make additional bets on additional spins. Ex. 2 (Fratto Dep.) at 81:8-11 (agreeing "that if you win coins spinning one of High 5's social casino slots, you can use those coins towards another spin"); Dkt. #144-12 (iPad). If the user loses, they can keep spinning as long as they have enough virtual chips to satisfy a selected bet. Dkt. #144-12 (iPad).

8.    As users continue to play, they are offered the option to purchase virtual chips. Dkt. #23 (Benson Decl.) ¶ 10. Chip packages are offered at various price points and can be purchased using real money. *Id.* ¶ 13.



**Figure 2**

Pl's Mot. for Partial Summ. J.
Case No. 18-cv-05275-RSL

5



**Figure 3**

9.    Purchased chips can be used to make additional bets on additional spins. Dkt. #23 (Benson Decl.) ¶ 10 ("For example, if [a player] finds it more entertaining to put large numbers of virtual coins in play on a spin or she does not want to take the actions needed or let a few hours pass to get more free virtual coins," she might make an in-app purchase of virtual chips.); Ex. 2 (Fratto Dep.) at 81:4-7 (agreeing "that a user can play slots in High 5 social casinos with the virtual coins that they purchase"); Dkt. #144-12 (iPad).

10.    On average, players of High 5's virtual casino use the virtual chips they have purchased (*i.e.*, wager them on slot machine spins) within a single day. Hausmann Decl., Ex. 4 (Tangara 30(b)(6) Dep.) at 7:8-12; Ex. 5 (Tangara 30(b)(1) Dep.) at 34:20-36:2 (testifying "[w]e determined that players would consume the virtual coins they purchased shortly after they made that purchase," meaning that if a player "bought a hundred dollars worth [of virtual coins], they would go through a hundred dollars worth of spins within a day on a weighted average basis.").

11.    Both High 5 Casino and High 5 Vegas also provide users with complimentary chips on an ongoing basis. For High 5 Casino, this is done when the application is opened, on a

rotating basis (i.e., every four hours), and after users spin a "daily wheel." Dkt. #82 (Welty Decl.) ¶ 5. For High 5 Vegas, users also receive complimentary chips through a daily bonus and, in addition, are also slowly provided with virtual chips over time through an on-screen counter that must be "emptied" from time to time. *Id.* ¶ 4. These free chips are simply added to a user's stash: they, just like the chips players purchase, are used to spin High 5's virtual slot machines. Ex. 1 (Singer Dep.) at 116:12-22 (testifying that the chips a player "wins" on a successful spin are "commingled with all the free coins they get").

12.     High 5 contends that users can always play "for free." *See id.* at 14:21-25. However, if a user's rate of play exceeds the virtual chips they have at any given time—e.g., if they use up all of their virtual chips, or simply want to place a bet that "costs" more than what they have stashed away—he or she must either stop playing and await free chips, place a lower bet, or purchase additional chips. Ex. 2 (Fratto Dep.) at 68:15-21 (testifying that users who "want to bet more than they are currently able to bet with their bankroll" must "buy points"); Dkt. #23 (Benson Decl.) ¶ 10. And the apps' features are engineered to encourage purchases to continue play: for instance, when a user's chip tally runs low, High 5 pushes them an "upsell" message inquiring whether they would like to buy more to continue their play. Ex. 2 (Fratto Dep.) at 78:15-18.

13.     High 5 earns revenue from the sale of virtual chips to users of High 5 Casino and High 5 Vegas. Ex. 5 (Tangara 30(b)(1) Dep.) at 33:21-34:24 (testifying that High 5 "recognize[d] the revenue from the purchase of virtual coins in the social casinos" as soon as it "received the cash from the intermediary, from the platform provider," based on High 5's determination "that players would consume the virtual coins they purchased shortly after they made that purchase").

14.     When a player purchases virtual chips within High 5 Casino or High 5 Vegas, the player's money is generally collected by the platform provider (e.g., Apple, Google, Facebook, or Amazon), and then the platform remits the money (less the platform's fee) to High 5. *Id.* at

31:10-32:5; *see also id.* at 27:23-28:22 (testifying that players could access High 5's social casino games on Facebook, Google, Apple, Amazon, and a "substantially smaller" internal platform).

15.    Plaintiff served subpoenas on Apple on January 13, 2020; October 22, 2021; and November 22, 2023. Hausmann Decl., Exs. 6-8. In response to each, Apple produced data showing all purchases of virtual chips in High 5 Casino and High 5 Vegas, on the Apple platform, made by Washington-based users. Hausmann Decl., Exs. 9-11 (Apple's transaction data); Ex. 12 (Apple's custodian declaration); *see also* Dkt. #132 (Order granting protective order with respect to data reflecting purchases outside of Washington). Together, Apple's productions show purchases from April 1, 2014 to November 28, 2023.

16.    Plaintiff served a subpoena on Google on November 22, 2023. Hausmann Decl., Ex. 13. In response, Google produced data showing all purchases of virtual chips in High 5 Casino and High 5 Vegas, on the Google platform, made by Washington-based users from August 20, 2014 to November 29, 2023. Hausmann Decl., Ex. 14 (Google's transaction data); Ex. 15 (Google's custodian declaration).

17.    Plaintiff served a subpoena on Meta (f/k/a Facebook) on November 22, 2023. Hausmann Decl., Ex. 16. In response, Meta produced data showing all purchases of virtual chips in High 5 Casino and High 5 Vegas, on the Facebook platform, made by Washington-based users from April 6, 2014 to November 12, 2023. Hausmann Decl., Ex. 17 (Meta's data); Ex. 18 (Meta's custodian declaration).

18.    Plaintiff served a subpoena on Amazon on November 22, 2023. Hausmann Decl., Ex. 19. In response, Amazon produced data showing all purchases of virtual chips in High 5 Casino and High 5 Vegas, on the Amazon platform, made by Washington-based users from November 18, 2015 to December 29, 2023. Hausmann Decl., Ex. 20 (Amazon's data); Ex. 21 (Amazon's custodian declaration).

19.    In total, the data provided by the Platforms shows $21,601,064.29 in virtual chip

1  purchases made in High 5 Casino or High 5 Vegas by Washington-based users since April 1,

2  2014. Davis Decl. ¶ 16. Over $3 million of those purchases occurred after October 1, 2022. *Id.*

3       20.     Plaintiff Rick Larsen has purchased virtual chips within High 5 Casino while in

4  Washington, after April 9, 2014. He has spent at least $5,655.50 on virtual chip purchases in

5  High 5 Casino, and has spent at least $7,470.50 across High 5's games. *E.g.*, Hausmann Decl.,

6  Ex. 22 (HIGH5_151083-87 at HIGH5_151083-84).

## ARGUMENT

## I.    Legal Standard

9       Summary judgment is proper where there is no genuine issue as to any material fact and

10 the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v.*

11 *Catrett*, 477 U.S. 317, 322-24 (1986); *Retuta v. Holder*, 591 F.3d 1181, 1184 (9th Cir.

12 2010) ("Questions of law include not only pure issues of statutory interpretation, but also

13 application of law to undisputed facts." (internal quotation marks omitted)). A genuine issue of

14 material fact exists if the evidence would allow a reasonable trier of fact to find the underlying

15 fact in favor of the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

16 255-56 (1986). The Court is authorized to grant partial summary judgment to dispose of less than

17 the entire case or even just portions of the claim or defense. Fed. R. Civ. P. 56(c)

18      The moving party bears the initial burden of demonstrating that no genuine issue of

19 material fact exists. *Celotex*, 477 U.S. at 323. Where the moving party also bears the burden of

20 proof at trial, it can meet this initial burden by "'com[ing] forward with evidence which would

21 entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *C.A.R. Transp.*

22 *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000). Once a party has met its

23 burden of showing that no reasonable jury could find for the non-moving party as to all essential

24 elements of its claim, "the burden then moves to the opposing party, who must present

25 significant probative evidence tending to support its claim or defense." *Id.* The non-moving party

26 must then present some significant, probative evidence indicating that a genuine issue of material

27

28 PL'S MOT. FOR PARTIAL SUMM. J.
   CASE NO. 18-CV-05275-RSL

EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9495

1    fact exists as to each element of that claim. *Anderson*, 477 U.S. at 256-57; Fed. R. Civ. P. 56(e).

2    A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252. If the Court concludes

3    that a fair-minded jury could not return a verdict in favor of the non-moving party based on the

4    evidence presented, summary judgment is warranted. *Id.* at 251-52.

5    **II.     The Undisputed Material Facts Establish that High 5 Is Liable to the Class Under**
     **the RMLGA.**

6

7            In *Kater v. Churchill Downs Inc.*, 886 F.3d 784 (9th Cir. 2018), the Ninth Circuit

8    definitively established that social casino games violate Washington gambling law, RCW

9    9.46.010 *et seq.*, and that consumers who purchase virtual chips within social casino applications

10   are eligible to recover their money under the Recovery of Money Lost at Gambling Act

11   ("RMLGA"), RCW 4.24.070. This seminal decision undertook a straightforward statutory

12   analysis, and this Court has repeatedly held that *Kater*'s analysis is dictated by the plain language

13   text of the RMLGA and Washington gambling law. *See, e.g.*, *Wilson v. PTT, LLC*, No. 18-cv-

14   05275-RBL, 2020 WL 1674151, at *2 (W.D. Wash. Apr. 6, 2020) (Dkt. #134) ("[T]he Ninth

15   Circuit's decision in *Kater* was a straightforward exercise in statutory interpretation . . . .");

16   *Benson v. Double Down Interactive, LLC*, No. 18-cv-525-RBL, 2020 WL 4607566, at *2 (Aug.

17   11, 2020) (finding *Kater* was a "straightforward application of RCW 9.46.0285's language");

18   *Benson*, 2021 WL 1117766, at *2 (W.D. Wash. Mar. 24, 2021) (finding that "the issues of

19   statutory interpretation presented here are not particularly complex or novel"). This precedent

20   leaves no unsettled question as to the legal framework governing High 5's liability for illegal

21   gambling. And while *Kater* was decided on the pleadings, discovery has now provided

22   undisputed evidence that the slot machine games in High 5 Casino and High 5 Vegas operate just

23   as alleged for the social casino app in *Kater*, and just as alleged in Plaintiff's Complaint here.

24   Because none of the game mechanics are subject to dispute, the Court can find as a matter of law

25   that High 5 has violated Washington gambling law and is liable to the Class under the RMLGA.

26

27

28

### A. Under *Kater*, Consumers Spending Money in Social Casino Apps Have a Claim Under the RMLGA.

Since this Court is very familiar with *Kater*, Washington gambling law, and social casino litigation, Plaintiff will only briefly summarize the elements of a RMLGA claim regarding social casinos. The RMLGA authorizes recovery for losses from "illegal gambling games," establishing that "[a]ll persons losing money or anything of value" in any such game may recover "the amount of the money or the value of the thing so lost." RCW 4.24.070. Thus, under the RMLGA, a plaintiff must establish: (1) he lost "money or anything of value" (2) at an "illegal gambling game[ ]." *See also Kater*, 886 F.3d at 789.

Taking the second element first, the *Kater* court assumed the following facts about the social casino in that case, Big Fish Casino: (i) Big Fish Casino is a free-to-play online casino game platform where users can play various casino games, including slot machines; (ii) users download the app for free and receive an initial allotment of free virtual chips; (iii) they use these chips to play various games within the app; (iv) users may purchase additional chips to extend gameplay, and if users run out of chips, they must purchase more chips with real money in order to keep playing; and (v) the Terms of Use state that the virtual chips have no monetary value and cannot be exchanged for cash. *Id.* at 785-86. Taking those facts as true, the *Kater* court concluded that Big Fish Casino was a gambling game under Washington law because (1) users stake something of value (virtual chips) (2) upon the outcome of a contest of chance (slot machine spins) (3) with the understanding that they might receive something of value (more virtual chips) if they win. *Id.* at 785-86; RCW 9.46.0237. And because all online or virtual gambling is illegal in Washington, Big Fish Casino, as alleged, was an illegal gambling game. *Kater*, 886 F.3d at 786-87 (citing *Rousso v. State*, 239 P.3d 1084, 1086 (2010)); RCW 9.46.240.

Central to this analysis is the finding that the virtual chips in Big Fish Casino, as alleged by the *Kater* plaintiffs, are a "thing of value" under Washington gambling law because they are a "form of credit . . . involving extension of . . . entertainment or a privilege of playing [Big Fish

Pl's Mot. for Partial Summ. J.
Case No. 18-cv-05275-RSL

11

Edelson PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9495

Casino] without charge." *Kater*, 886 F.3d at 787 (citing RCW 9.46.0285). Specifically, the court noted:

> The virtual chips, as alleged in the complaint, permit a user to play the casino games inside the virtual Big Fish Casino. They are a credit that allows a user to place another wager or re-spin a slot machine. Without virtual chips, a user is unable to play Big Fish Casino's various games. Thus, if a user runs out of virtual chips and wants to continue playing Big Fish Casino, she must buy more chips to have "the privilege of playing the game." Likewise, if a user wins chips, the user wins the privilege of playing Big Fish Casino without charge.

*Id.* (internal citations omitted). This analysis comports with the Washington Court of Appeals' holding in *Bullseye Distributing LLC v. State Gambling Commission*, 110 P.3d 1162, 1166-67 (Wash. Ct. App. 2005), the only Washington court that has interpreted RCW 9.46.0285 to date.[5] *Id.* In *Bullseye*, the electronic "play points" on an "electronic vending machine" were things of value even though they "lack[ed] pecuniary value on their own" and were not exchangeable for cash or merchandise because they extended the privilege of playing on the machine. *Kater*, 886 F.3d at 787. Notably, even though players in *Bullseye* could also obtain "play points" via free promotional vouchers, the *Bullseye* court still found that they were things of value. 110 P.3d at 1166. This Court has reached the same conclusion multiple times in the time since the *Kater* decision, finding that a social casino's allotment of free virtual chips (in addition to the option to purchase virtual chips) does not change the fact that the virtual chips are "things of value." *See Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028, 1041 (W.D. Wash. 2018) ("Additional free coin allotments do not change the role of coins from 'extension' to 'enhancement' as [Defendant] argues."); *Sci. Games Corp.*, 2018 WL 6620485, at *4 (same). If purchased virtual chips extend the privilege of gameplay, then those chips constitute "things of value" notwithstanding a lack of

---

[5]    And without any contrary state court decision since *Bullseye* or *Kater*, the Ninth Circuit's analysis in *Kater* remains the final word on the matter. *See Jones-Hamilton Co. v. Beazer Materials & Servs., Inc.*, 973 F.2d 688, 696 n.4 (9th Cir. 1992) (holding that the Ninth Circuit's "interpretation of [state] law is 'binding in the absence of any subsequent indication from the [state] courts that [the Circuit's] interpretation was incorrect.'") (internal citation omitted).

1  independent pecuniary value or the provision of some free chips on the side. *Accord Kater*, 886

2  F.3d at 787.

3      *Kater* also established that players who spend money purchasing virtual chips have a

4  right of action to recover that money under the RMLGA. *Id.* at 789 (holding that because

5  plaintiffs can "recover 'money or anything of value' lost from an illegal gambling game" under

6  the RMLGA, they can recover the "value of the virtual chips [] purchased"); *id.* at 786, 789

7  (interpreting allegation that Kater had "b[ought], and then los[t], over $1,000 worth of chips" to

8  establish a loss under the RMLGA). This Court has since offered additional clarification that

9  because social casino virtual chips are "things of value," plaintiffs who have bought and lost

10  virtual chips have lost something of value and may recover that value under the RMLGA.

11  *Playtika*, 349 F. Supp. 3d at 1043 ("Playtika also re-argues that Wilson cannot recover 'the value

12  of the thing . . . lost' under RCW § 4.24.070 because he did not 'lose' anything. However, this

13  argument rises or falls on the strength of Playtika's prior argument that its coins are not valuable

14  because they are periodically given out for free. Because this argument has failed, it follows that

15  Wilson did in fact lose something of value by playing Playtika's games and may now recover its

16  value."); *Wilson v. PTT, LLC*, No. C18-5275RSL, 2021 WL 211532, at *2 (W.D. Wash. Jan. 21,

17  2021) (Dkt. #170) ("Plaintiff lost $1.99 on an allegedly illegal gambling application developed

18  and maintained by defendant. The alleged injury is fairly traceable to defendant's conduct and

19  can be redressed by pursuing this RMLGA claim.").

20  **B. Undisputed Evidence Shows that the Analysis in *Kater* Applies Squarely to High 5's**
21     **Social Casinos, and that High 5 Is Therefore Liable Under the RMLGA.**

22      While *Kater* was decided on the pleadings, the undisputed record evidence in this case

23  shows that High 5's social casinos operate in all material aspects exactly as the *Kater* court

24  assumed. Therefore, the legal framework set forth above, as applied to the undisputed facts,

25  makes clear as a matter of law that High 5's social casino apps are illegal gambling games, and

26  that High 5 is therefore liable to the Class under the RMLGA.

27

28

First, the record evidence shows that High 5's virtual chips are "things of value," under the RMLGA as they "extend the privilege of playing the game[s] without charge," *Bullseye*, 110 P.3d at 1166. Just as assumed in *Kater*, High 5 Casino and High 5 Vegas are online casino game platforms where users can play various casino games, including slot machines. Stmt. of Undisputed Material Facts ("SUMF") ¶¶ 2-6. Players receive an initial allotment of free virtual chips (which cannot be exchanged for cash), which they use to bet on and spin High 5 Casino's and High 5 Vegas's slot machine games. *Id.* ¶¶ 5, 11. If a player "wins" on a spin, they are awarded with more virtual chips, which can be used to make additional bets on spins. *Id.* ¶ 7. Players may also purchase additional virtual chips (using real money) in order to make additional bets on spins. *Id.* ¶¶ 8-9. On average, players of High 5's virtual casino use virtual chips they purchase within a single day. *Id.* ¶ 10.

These facts—none of which is subject to reasonable dispute—are alone sufficient to establish that High 5 Casino and High 5 Vegas are illegal gambling games, since the virtual chips—regardless of whether they are received for free or purchased by the player using real money—are a "credit that allows a user to place another wager or re-spin a slot machine" and are therefore "things of value." *Kater*, 886 F.3d at 787 (quoting RCW 9.46.0285); *see also* Dkt. #57 (Order denying Mot. To Dismiss) at 13-14 (finding that "[t]he plain meaning of 'without charge' is that the 'credits' or, in this case, virtual coins allow a user to continue playing the game without direct payment"). In both High 5 Casino and High 5 Vegas, users stake or risk something of value (their virtual chips) on the outcome of a contest of chance (spins on the virtual slot machines) with the understanding that they might receive something of value (more virtual chips) if they win. SUMF ¶¶ 4-5, 7, 9. The apps are therefore illegal gambling games under RCW 9.46.0237.

High 5 has suggested that its provision of free chips to players changes the calculus because a player might play for free by waiting for more chips instead of making a purchase. *See* SUMF ¶ 12. Even taking this testimony as true, this argument has no bearing on whether High

14

5's chips are "things of value." In both apps, free chips are simply added to a user's stash: they, just like purchased virtual chips, are used to spin High 5's virtual slot machines. *Id.* ¶ 11. As set forth above, the relevant question is not whether *some* of a user's chips were provided free of charge. Rather, it is whether virtual chips in High 5's social casino games "extend the privilege" of playing, and it cannot be disputed that they do, since virtual chips—however acquired—allow players to continue making bets and spinning the slot machine in the game they were playing. *See id.* ¶¶ 9, 11-12; *see also Playtika*, 349 F. Supp. 3d at 1041; *Sci. Games Corp.*, 2018 WL 6620485, at *4.)

Courts have repeatedly rejected the notion that whether virtual chips are "things of value" depends on a transaction-by-transaction analysis of the player's chip balance or their motivation for purchasing virtual chips. For example, the *Bullseye* court did not conclude that the at-issue machine (the "Freespin II") was a gambling device only when a player played using their own money. Nor did the court conclude that purchased "play points" were "things of value" only when purchased at a time when the player had a balance of less than the minimum bet level of eight play points. 110 P.3d at 1163-64. Instead, the Freespin II was always a gambling device, and purchased play points were "things of value" without regard to the purchaser's balance of play points at the time of purchase. *Id.* at 1166-67. Similarly, this Court has found that "what prompted [players'] purchase of coins" is not a material, individualized issue, *High 5*, 2021 WL 211532, at *7 n.5 (Dkt. #170), and that "[a]dditional free coin allotments do not change the role of coins from 'extension' to 'enhancement'." *Playtika*, 349 F. Supp. 3d at 1041; *Sci. Games Corp.*, 2018 WL 6620485, at *4 (same).

Nor is it of consequence that, as High 5 has suggested, a user may play *different* games when his virtual chip balance dwindles. *See, e.g.*, Hausmann Decl., at Ex. 27 (Larsen Dep.) at 58:22-23 (asking Plaintiff "[d]id you know that you could play the games in what's called demo play mode?"). Even assuming a user could stop playing and shift to a different game when their chip balance dips (for instance, if a user could, as High 5 has suggested, visit High 5's website to

play a different game in "demo" mode where unlimited chips are available), what's relevant is that when a user's chips fall below the threshold required to place the user's desired bet, that user can purchase more chips to enjoy the "privilege of playing" that game at that moment. *See* SUMF ¶¶ 8-9*; see also* Dkt. #157 (Def.'s Opp. to Pl.'s Mot. for Class Certification) at 16 (representing that High 5 Casino "[u]sers can temporarily expend all of their free virtual coins and then must wait for more free coins or purchase coins before continuing to play") (citing Dkt. #82 (Welty Decl.)). Moreover, the addition of a single "free" slot machine on a casino floor with hundreds of other slots would not mean that the chips at that casino no longer "extend the privilege of playing [the casino's games] without charge." *Bullseye*, 127 Wash. App. at 1166 (citing RCW 9.46.0285). Likewise, the fact that High 5 may offer a free option within its apps does not mean that the virtual chips—which can be used to make more bets and more spins—are not "things of value."

Because it is clear as a matter of law that High 5 Casino and High 5 Vegas are illegal gambling games, the Class "can recover the value of the thing so lost" from High 5 under the RMLGA. *See Kater*, 886 F.3d at 788 (internal quotations omitted); RCW 4.24.070. Here, the certified Damages Class comprises "[a]ll individuals in Washington who purchased virtual casino chips on either High 5 Casino or High 5 Vegas after April 9, 2014." *High 5*, 2021 WL 211532, at *9 (Dkt. #170). And High 5 itself admits that players typically use their virtual chips within a day. SUMF ¶ 10. Therefore, the Court can find based on the undisputed evidence (i) that each and every Class member has purchased (and lost within a day) virtual casino chips in illegal gambling games, and (ii) that each and every Class member has therefore "los[t] money or anything of value" at illegal gambling games. *See Kater*, 886 F.3d at 786, 789; *High 5*, 2021 WL 211532, at *2 (Dkt. #170).

Because the Class has thus established its RMLGA claim as a matter of law, the Court should enter summary judgment on liability. The amount of the Class's damages under the RMLGA is discussed further below.

III.    **High 5's Violations of the Gambling Act Offend Public Policy and so Violate the
        CPA as a Matter of Law.**

Because the undisputed facts in this case make clear that High 5 has violated Washington gambling law and the RMLGA, those undisputed facts also establish that High 5 has offended Washington public policy in violation of the Washington Consumer Protection Act ("CPA").

"To prevail on a CPA action, the plaintiff must prove an '(1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest impact; (4) injury to plaintiff in his or her business or property; [and] (5) causation.'" *Klem v. Washington Mut. Bank*, 295 P.3d 1179, 1185 (Wash. 2013) (quoting *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986)). Factors (2), (4), and (5)—injury to the Class caused by conduct occurring in trade or commerce—are straightforward. High 5's operation of virtual slot machines and their sale of virtual chips to feed those slots occurs in trade or commerce. *See* RCW 19.86.010(2) ("'Trade' and 'commerce' shall include the sale of assets or services . . . ."); RCW 19.86.010(3) ("'Assets' shall include any property, tangible or intangible, . . . and any other thing of value."). This conduct caused all members of the Damages Class to lose money purchasing virtual chips, which satisfies both the injury and causation elements. *See Panag v. Farmers Ins. Co. of Wash.*, 204 P.3d 885, 889-90 (Wash. 2009) ("[T]he injury requirement is met upon proof the plaintiff's . . . money is diminished[.]" (internal quotations omitted)); *Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc.*, 170 P.3d 10, 22 (Wash. 2007) (causation element satisfied where "but for the defendant's unfair or deceptive practice, the plaintiff would not have suffered an injury"); *High 5*, 2021 WL 211532, at *2 (Dkt. #170) (finding that alleged loss of $1.99 on illegal gambling application "clearly alleged a cognizable injury to business or property that is both actual and concrete").

Factor (3)—the "public interest impact" element—is likewise established as a matter of law since the factor is satisfied simply by "showing that a statute has been violated which contains a specific legislative declaration of public interest impact." *Hangman Ridge*, 719 P.2d at 538. The Washington gambling statute—which, as explained above, High 5 has violated as a

matter of law—has such a declaration. *See* RCW 9.46.010 (setting forth "[t]he public policy of the state of Washington on gambling"); *G.G. v. Valve Corp.*, No. 16-cv-1941, 2020 WL 7385710, at *7 (W.D. Wash. Dec. 16, 2020) (noting that public policy declarations in gambling statute "serve only to establish that a violation of the statute has a public interest impact").

Turning lastly to Factor (1), the Court can find that High 5's operation of social casino apps is an "unfair" act or practice as a matter of law. The CPA does not define "unfair," but caselaw has established that business practices are unfair under the CPA if they "offend[] public policy as established by statutes." *Mellon v. Reg'l Tr. Servs. Corp.*, 334 P.3d 1120, 1126 (Wash. 2014) (internal quotations omitted). Here, the Gambling Act expressly states that "[t]he public policy of the state of Washington on gambling is . . . to promote the social welfare of the people by limiting the nature and scope of gambling activities," and "to restrain all persons from seeking profit from professional gambling activities in [Washington]." RCW 9.46.010. As explained above, the undisputed facts show that High 5's social casino apps fall outside the "nature and scope of gambling activities" authorized by the statute. And, as shown more fully below, High 5 makes handsome profits on the backs of Washington consumers—primarily from a small segment of its users. Such conduct offends the explicit Washington public policy of restraining gambling profiteers and promoting social welfare. On that basis alone, the conduct is "unfair" under the CPA.[6] *See also Jordan v. Nationstar Mortg., LLC*, No. 2:14-CV-0175-TOR, 2017 WL 5616362, at *7 (E.D. Wash. Nov. 21, 2017) (granting class's motion for summary judgment on

---

[6]    To be clear, this theory of CPA liability is distinct from a theory of "*per se* unfair" trade practices. *See Mellon*, 334 P.3d at 1125-27 (distinguishing between "per se unfair or deceptive" acts (¶ 14) and those that "offend[] public policy as established by statutes" (¶¶ 16-17) (internal quotation marks omitted)). A "*per se* unfair" theory of liability looks only to whether a defendant violated a statute containing a specific declaration invoking the CPA. *See Klem*, 295 P.3d at 1186. The Class is not arguing CPA liability on this basis here. Rather, the Class asserts CPA liability based on conduct that *offends a public policy* that's been established in the Gambling Act and RMLGA. *See, e.g.*, *Mellon*, 334 P.3d at 1125-27; *Bund v. Safeguard Props. LLC*, No. 16-cv-920-MJP, 2018 WL 3917930, at *5 (W.D. Wash. Aug. 16, 2018). In the event that the Court denies summary judgment, the Class intends to pursue additional theories of CPA liability at trial.

CPA claim because defendant's practice was illegal and against public policy and thus unfair).

Because each of the elements of liability is satisfied based on undisputed facts, the Class is entitled to summary judgment on their CPA claim, and the Court should grant the relief outlined below.

**IV.     The Court Should Determine the Class's Aggregate Actual Damages, To Date.**

Once liability is established, both the RMLGA and the CPA authorize injured persons to recover actual damages. The Class's aggregate actual damages here—like High 5's liability under both statutes—are not subject to reasonable dispute. Under the RMLGA, Class members are entitled to recover "the amount of the money . . . lost" to High 5's "illegal gambling games," RCW 4.24.070, and that aggregate amount of money is proved for the entire Class in the transaction data produced by the Platforms and described above. The Class's "actual damages" under the CPA are the same, since the injury to Class members' property is the money they lost playing unlawful social casino games that offend public policy. RCW 19.86.090; *see also High 5*, 2021 WL 211532, at *2 (Dkt. #170).

While the Court may reserve for a later proceeding the precise allocation to each Class member (*e.g.*, matching Player IDs to specific Class members)[7], it can determine the Class's aggregate actual damages thus far at the summary judgment phase.[8] This Court approved a very

---

[7]     As the Court is aware based on its experience in this case and overseeing class settlements of similar social casino class actions, there is a straightforward method for determining individual damages that can be applied across the entire Class. Specifically, the Platform data allows an arbiter (whether the Court, a jury, or a claims administrator) to tally all spending associated with each Class member—typically by matching Class members to specific Player IDs in the relevant Platforms and apps, and then totaling all transactions associated with those Player IDs.

[8]     Based on the Platform data, the Court may determine a floor for the Class's aggregate actual damages based on spending from April 2014 through November 2023. However, the Class's spending is ongoing, so damages continue to accrue. Therefore, if the Court grants this Motion for Summary Judgment, the Class proposes to seek updated data from the Platforms on spending through the date that a liability judgment is entered. That additional damages amount can be determined at a later proceeding.
       The Court may also reserve for a later proceeding whether to exercise its discretion, under the CPA, to award treble damages. RCW 19.86.090.

1    similar method of determining aggregate class damages in *Price v. City of Seattle*, No. 03-cv-

2    1365-RSL, 2006 WL 2691402 (W.D. Wash. Sept. 19, 2006). In *Price*, following the plaintiffs'

3    successful motion for partial summary judgment on liability, the sole remaining issue was "the

4    amount of damages that class members are entitled to receive." *Id.* at *1. The plaintiffs proposed

5    "to prove an aggregate amount of damages for the entire class at trial, with allocation to

6    particular class members to be accomplished after trial through a claims procedure," in which

7    "any isolated individual questions can be addressed through challenges to particular claims or

8    similar procedural devices following the class trial on damages." *Id.* at *2. For damages based on

9    reimbursement of unlawful fees paid by class members, the Court found that plaintiffs' proposal

10   was "an acceptable formulaic method for proving classwide damages," and that individuals

11   could later "submit proof of claim forms through a claims administration process." *Id.* at *3.

12   Importantly, the Court found that classwide determination of aggregate damages was a superior

13   method even though there was a "relatively small number of class members for whom complete

14   electronic data are not available." *Id.* Other courts have similarly concluded that aggregate

15   damages can be determined separately from individual allocations. *See Hilao v. Est. of Marcos*,

16   103 F.3d 767, 786 (9th Cir. 1996) (finding that defendant's "interest is only in the total amount

17   of damages for which it will be liable," not in individual allocations); *Forcellati v. Hyland's,

18   Inc.*, No. 12-cv-1983-GHK MRWX, 2014 WL 1410264, at *6 (C.D. Cal. Apr. 9, 2014) (similarly

19   noting that "whether any given individual is or is not a rightful class member is entirely

20   immaterial to Defendants' monetary liability in this case") (citing *Hilao*, 103 F.3d at 786).

21       Just as in *Price*, and as the Court anticipated when granting class certification, the Class's

22   aggregate damages here are proved in a formulaic way based on the Platform data. *High 5*, 2021

23   WL 211532, at *7 (Dkt. #170) ("[D]amage calculations will utilize information that is entirely

24   computerized and available from third parties: the damages issues will not overwhelm the

25   common issues."). As set forth above and in the Davis Declaration, the Platform data shows that

26   Washington-based users of High 5 Casino and High 5 Vegas aggregately spent at least

27

28

$21,601,064.29 on the purchase of virtual chips in those apps from April 2014 to the present. Davis Decl. ¶ 16. And because those apps are "illegal gambling games" under the Gambling Act, every dollar spent on virtual chips within those games is money "lost" at gambling and money that the Class is entitled to recover under the RMLGA. RCW 4.24.070. The Class's aggregate actual damages are the same under the CPA as well since the injury to Class members' property is the money they lost playing unlawful social casino games that offend public policy. RCW 19.86.090. In other words, the Class's aggregate spending within High 5 Casino and High 5 Vegas is equal to the Class's aggregate actual damages—here, $21,601,064.29.

High 5 may argue that determining damages in this case requires analyzing each player's rationale for purchasing virtual chips on a transaction-by-transaction basis. But the Court already rejected this contention during the class certification phase. *High 5*, 2021 WL 211532, at *7 (finding that "what prompted [individual users'] purchase of coins" was not a material individualized issue). Rather, under *Kater*, and as set forth above, the virtual chips inherently constitute "things of value." Therefore, High 5's social casino apps are illegal gambling games, and players are entitled to recover the amount of money they lost purchasing chips. RCW 4.24.070; *Kater*, 886 F.3d at 789. Furthermore, High 5's own testimony reveals no functional difference between the amount of money players paid for chips and the amount wagered on illegal gambling games, as most users use (i.e., wager) all purchased chips within a day. SUMF ¶ 10. The Class is therefore entitled to recover the full amount they spent on virtual chips in High 5's illegal social casino games.

In the alternative, in the event the Court determines that it cannot decide the amount of the Class's aggregate damages as a matter of law on summary judgment, the Court may still grant summary judgment on High 5's liability under the RMLGA and CPA. At the very least, the Platform transaction data establish as a matter of law that the Class was injured within the meaning of both the RMLGA and the CPA, since the data show Washington users losing money through the purchase of virtual chips. *Price*, 2006 WL 2691402, at *1-3 (approving plan to

establish aggregate class damages at trial after liability was established at summary judgment phase); *Valladon v. City of Oakland*, No. 06-cv-07478-SI, 2009 WL 3401263, at *4 (N.D. Cal. Oct. 20, 2009) (recognizing that even when there is "a dispute regarding the exact amount of the *damages* to which plaintiffs may be entitled, that dispute does not preclude summary judgment on the issue of defendant's *liability*." (emphases in original)).

## V.    The Court Should Order Abatement of the Nuisance and Enjoin Ongoing Statutory Violations.

In addition to awarding compensatory damages, the Court should also issue the injunctive relief authorized under both the Gambling Act and the CPA. RCW 9.46.250 provides:

> All gambling premises are common nuisances and shall be subject to abatement by injunction or as otherwise provided by law. The plaintiff in any action brought under this subsection against any gambling premises, need not show special injury and may, in the discretion of the court, be relieved of all requirements as to giving security.

"Gambling premises," as used in Chapter 9.46, "means any . . . place used or intended to be used for professional gambling," and "any place where a gambling device is found shall be presumed to be intended to be used for professional gambling." RCW 9.46.0249. Therefore, because High 5's social casino apps are "gambling devices" under Washington law, as set forth above, the apps should also be considered "gambling premises." Plaintiff's Complaint, on behalf of the Class, asks the Court to issue an order "requiring Defendant to cease the operation of its gambling game," Dkt. #217 (Am. Compl.) ¶ 53, so the Court should do so as authorized by RCW 9.46.250.

In addition, the Court should grant Plaintiff's request, on behalf of the Class, "to enjoin further violation" of the CPA. *Id.* ¶ 65; RCW 19.86.090 ("Any person who is injured in his or her business or property by a violation of RCW 19.86.020 . . . may bring a civil action . . . to enjoin further violations."). For the reasons stated above, High 5's sale of virtual chips in its social casinos violates RCW 19.86.020 as a matter of law, so the Court should enjoin further violations.

High 5 may argue that the Class's request for injunctive relief is moot because (i) High 5

Entertainment, a majority-owned subsidiary of Defendant High 5 Games, now owns and operates the High 5 Casino and High 5 Vegas apps, and (ii) "since October 2022, High 5 Entertainment has sought to prevent Washington State players from accessing its social casinos" using "geolocation to block players within Washington's borders" and "requir[ing] players to provide their full address to confirm they are not Washington residents." *See* Dkt. #258 (Def.'s Opp. to Pl.'s Mot. to Amend) at 2. On the first point, Plaintiff has moved to add High 5 Entertainment as a Defendant in this case, since High 5 Games should not be able to avoid liability for the Class's harms by transferring the at-issue apps to a 93.5%-owned subsidiary, four years into this case. *See* Dkt. #250 (Pl.'s Mot. to Amend) at 4. On the second point, as explained in the same motion and above, the Platform data show sales of virtual chips—totaling millions of dollars—to Washington users throughout 2023. *Id.* at 5. Even if it's true that High 5 is making efforts to prevent Washington users from accessing its social casino apps, those efforts are clearly not sufficient to block huge volumes of virtual chip sales. Therefore, the Class is still suffering ongoing harms from the continued operation of High 5's illegal gambling games, and the Court should grant injunctive relief under both the Gambling Act and the CPA by entering the injunction set forth below and in the attached Proposed Order:

> As of the date of the entry of this Order, Defendant is permanently enjoined from selling—from within Washington or to individuals located in Washington—virtual casino chips or coins, or other similar virtual tokens or credits, for use in High 5 Casino and High 5 Vegas.

## CONCLUSION

For all the foregoing reasons, the Court should grant this Motion and enter the attached Proposed Order.

Respectfully submitted,

**RICK LARSEN**, individually and on behalf of all others similarly situated,

Dated: January 19, 2024                By: /s/ Todd Logan

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Todd Logan, WSBA #60698
tlogan@edelson.com
Brandt Silver-Korn*
bsilverkorn@edelson.com
Lauren Blazing*
lblazing@edelson.com
Max Hantel*
mhantel@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9495

Amy B. Hausmann*
abhausmann@edelson.com
EDELSON PC
350 N LaSalle Street, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

By: /s/  Cecily C. Jordan

Cecily C. Jordan, WSBA #50061
cjordan@tousley.com
TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Tel: 206.682.560

*Admitted *pro hac vice*

*Attorneys for Plaintiff and Class Counsel*

## CERTIFICATION

I certify that this memorandum contains 8,394 words, in compliance with the Local Civil Rules.

/s/ Todd Logan

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2024, I caused a true and correct copy of the foregoing to be served via email on all counsel of record.

/s/ Todd Logan

Pl's Mot. for Partial Summ. J.
Case No. 18-cv-05275-RSL

25

**Edelson PC**
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9495