1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9

10

11

12

13

14

| | |
|---|---|
| RICK LARSEN, individually and on behalf of all others similarly situated, | Case No. 3:18-cv-05275-TMC |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT |
| v. | |
| PTT, LLC, doing business as High 5 Games, LLC; HIGH 5 ENTERTAINMENT LLC, | |
| Defendants. | |

15

16

17

18

19

20

21

22

Defendant High 5 Games is a developer of "social casino" applications that, at least until 2022, were offered to customers in Washington State. In this class action, Plaintiff Rick Larsen[1] alleges that two of the apps, High 5 Casino and High 5 Vegas, are illegal under Washington law because they amount to unlicensed gambling, violate the Washington Consumer Protection Act, and have unjustly enriched High 5. After six years of litigation, High 5 moved for summary judgment and Larsen moved for partial summary judgment. Dkt. 269, 275. Having considered the parties' briefing and the relevant record, the Court concludes the undisputed material facts as to liability show that High 5's games violate Washington's gambling laws and the Consumer

23

24

---

[1] When the case was filed, the named plaintiff was Sean Wilson, for whom Rick Larsen was substituted as class representative on March 6, 2023 (Dkt. 216). The Court will refer to Plaintiff throughout this order as "Larsen" or "Plaintiff" for clarity.

Protection Act. The parties' factual disputes over damages, however, must be resolved by a jury; and further briefing is required for the Court to rule on Larsen's request for permanent injunctive relief. The Court therefore GRANTS IN PART and DENIES IN PART Larsen's motion for partial summary judgment and DENIES High 5's cross motion for summary judgment.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

High 5 develops and licenses software used in physical gambling machines operated in casinos and for online gambling. *See* Dkt. 270 ¶¶ 3–7; Dkt. 277-1 at 6. Beginning in 2012, High 5 decided to enter the "social gaming" market. Dkt. 270 ¶ 8. The social gaming market encompasses video game applications that are free to download or play online but present players with access to in-application purchases over the course of gameplay. *See* Dkt. 23 ¶¶ 6–7, 10; Dkt. 270 ¶ 8. "Social casino" games are social gaming applications that emulate video slot machines used for gambling in physical casinos. *See* Dkt. 23 ¶¶ 6, 9.

High 5 developed multiple social casino applications, including High 5 Casino and High 5 Vegas. Dkt. 270 ¶¶ 8–11. High 5 originally offered its social casino games in Washington. *See* Dkt. 250-1 at 22–24. According to High 5's CEO, sometime around 2022 High 5 began efforts to block Washington-based players by geolocating their devices and by asking them to fill out personal information forms with their full addresses. *Id*. In October 2022, High 5 transferred all ownership, operations, and revenue streams of its social casino applications to a subsidiary, High 5 Entertainment LLC. *See* Dkt. 252-1 at 4–6, 8–10.

### A.     High 5's Social Casino Game Mechanisms and Virtual Coin Sales

High 5 Casino and High 5 Vegas have similar user interfaces and game design. *See id*. Players play on virtual representations of slot machines and select the number of lines they would like to "play" and the number of virtual coins to bet on each spin of the machine. *See* Dkt. 23 ¶ 9. The visual interface and gameplay of the applications are identical to what can be

found on physical slot machines located in traditional casinos. *See* Dkt. 275-1 at 7; Dkt. 275-4 at 5. Both applications can be downloaded and played from an individual's mobile device (like an iPad or smartphone) or played directly on a web browser through a "platform." This includes third-party portals such as gaming on Facebook, platforms provided by vendors such as Google and Amazon, and High 5's own internal platform. *See* Dkt. 270 ¶ 9; Dkt. 275-4 at 5–6.

When a player first starts up either High 5 Casino or High 5 Vegas, they create an account and are given a free "initial allotment" of virtual coins. Dkt. 23 ¶ 7; Dkt. 270 ¶ 13, 20. These coins are required for gameplay, which consists of players betting the coins to spin the simulated slot machines found in both games. *See* Dkt. 270 ¶ 18. The chance for a player to win more coins or lose their bet on a spin is a fixed random chance and not skill-based. *See* Dkt. 275-2 at 5–6. Both games require a "minimum bet" of coins before a player can "spin" the virtual slot machines. Dkt. 270 ¶ 23. If a player runs out of coins or has less than the amount required for a minimum bet, they cannot play the game until they replenish their supply. *See id*.

Players can purchase additional virtual coins through the game application. Dkt. 23 ¶ 10. The applications prompt players with a message to buy more virtual coins when they are low on coins with a "low coin upsell." *See, e.g.*, Dkt. 275-1 at 8. Players can buy different "packages" of virtual coins for real currency. *See* Dkt. 275-4 at 7. The virtual coins can only be used for the bets required to spin the virtual slots in the High 5 games and cannot be transferred or redeemed for real money or prizes. *See* Dkt. 270 ¶ 15.

Separately from purchasing coins, the games also periodically grant players coins free of charge. *See* Dkt. 23 ¶ 10; Dkt. 82 ¶ 3–5. High 5 Casino and High 5 Vegas give out free coins through different mechanisms. *See* Dkt. 82 ¶ 3–5. High 5 Casino gives out free coins via a daily grant, allows players to collect free coins every four hours, and allows occasional free spins of a prize wheel to win coins, among other methods. *Id*. ¶ 5. High 5 Vegas also gives out a free daily

grant of coins and additionally has a constantly increasing pot of free coins that stops accumulating after reaching a set maximum amount; players can collect this virtual supply of coins and reset the counter by clicking a button in the game. *Id.* ¶ 4. Players can also take various other actions to receive free coins such as a referral bonus or a "VIP bonus" based on how frequently a player plays or the size of their bets, among other options. *See* Dkt. 270 ¶ 20.

**B.     Records of High 5's Virtual Coin Sales by Third Party Platform Providers**

High 5 earns revenue from the sale of virtual coins to players of High 5 Casino and High 5 Vegas. *See* Dkt. 275-4 at 7–8. When players buy coins through High 5 Casino or High 5 Vegas, their money is collected by the platform hosting their app—such as Apple, Google, Facebook, or High 5's own platform. *See id.* at 5–8. The third-party providers take some percentage of the price as a platform fee and remit the rest to High 5. *Id.* at 7–10.

As part of this litigation, Larsen served subpoenas on Amazon, Apple, Google, and Meta (formerly known as Facebook) seeking their platform data recording purchases of virtual coins in High 5 Casino and High 5 Vegas between 2014 and 2023. *See* Dkt. 275-5–7; Dkt. 277-13, 16, 19. The platform providers produced transaction data showing a total of $21,601,064.29 in virtual coin purchases made in High 5 Casino and High 5 Vegas by players based in Washington between April 1, 2014, and December 29, 2023. *See* Dkt. 277-6–8, 13–21; Dkt. 278 ¶ 16. High 5 asserts that its own records show much lower revenue figures. *See* Dkt. 318 at ¶ 30. In a sworn declaration, High 5's CEO specifically claims that a remittance document from Meta shows approximately $95,000 in national revenue paid out for High 5 Casino on November 15, 2023, while Meta produced data showing over $3 million in revenue up to November 12. *Id.*

**C.     Rick Larsen's Experience Playing High 5's Games**

Larsen played virtual slots in High 5 Casino (*see* Dkt. 319-6 at 3) and possibly High 5 Vegas. *See* Dkt. 275-11 at 2 (showing Larsen's profile with High 5 and listing player levels of

7,668 in "High5Casino" and 19 in "Vegas"). He played on a variety of different virtual slot machines in High 5's applications, more than he could remember. *See* Dkt. 319-6 at 3. High 5's player record of Larsen shows total purchases of $7,470.50 of virtual coins, with $5,655.50 spent in High 5 Casino specifically. *See* Dkt. 275-11 at 2–3. Larsen received free coins through various methods but typically spent between $10 and $50 on virtual coins each day. *See* Dkt. 319-6 at 4–5. Larsen was aware that the virtual coins could not be cashed out for real money, but "by playing the games and winning, [he] would get free coins." *See id.*

### D.    Procedural History

On April 6, 2018, Plaintiff filed his complaint against High 5 seeking certification of a class of all persons in Washington who purchased and lost virtual coins playing High 5's social casino games and alleging that High 5's operation of social casino applications in Washington (1) constitutes an illegal gambling operation—meaning that High 5 is liable for damages under the state's Recovery of Money Lost at Gambling Act, RCW 4.24.070 ("RMLGA"), (2) violates the state's Consumer Protection Act, RCW 19.86.010, *et seq.* ("CPA") because the games are illegal gambling harmful to the public interest, and (3) unjustly enriches High 5 with the sale of virtual coins. *See* Dkt. 1 at 9–16. The complaint was amended on March 8, 2023 (Dkt. 217) to substitute Larsen in place of the original plaintiff, who had moved to Finland. *See* Dkt. 196 at 1.

On January 21, 2021, the Court granted Larsen's motion to certify two classes (Dkt. 142): one "Damages Class" comprising all Washington individuals who had purchased virtual coins in High 5 Casino or High 5 Vegas after April 9, 2014, and one "Injunctive Class" of all Washington individuals who had played either game after April 9, 2014. *See* Dkt. 170. The Court later denied High 5's motion to decertify the Plaintiff classes. *See* Dkt. 385.

On February 29, 2024, Larsen amended his complaint a second time (Dkt. 354) to include High 5's subsidiary, High 5 Entertainment LLC, as an additional defendant because High 5 had

1   transferred all social casino operations and revenues to the subsidiary. *See* Dkt. 285 at 1. The

2   Court has allowed additional discovery into High 5 Entertainment's creation and operations and

3   set a later deadline for dispositive motions concerning High 5 Entertainment. *See* Dkt. 286, 393.

4   On January 19, 2024, Larsen moved for partial summary judgment on the grounds that

5   (1) High 5 is liable for damages under the RMLGA for operating illegal gambling games,

6   (2) High 5's social casino operations also violated the CPA, and (3) the Court should determine a

7   "baseline" amount of damages owed under the RMLGA and CPA. Dkt. 275. Larsen also sought

8   a permanent injunction on High 5's sale of virtual coins in Washington. On the same day, High 5

9   cross-moved for summary judgment on all claims in Larsen's complaint. Dkt. 269. The parties

10  then filed responses and replies to the respective motions. Dkt. 317, 322, 323, 331, 337.

## II.      DISCUSSION

### A.      Jurisdiction and Applicable Law

13  The Court has diversity jurisdiction over this action under 28 U.S.C. § 1332(d)(2). At

14  least one member of the class is a citizen of a state different from Defendants. Plaintiff Larsen is

15  a citizen of Washington (Dkt. 198 at 2), Defendant High 5 is a Delaware limited liability

16  company headquartered in New York and none of its members are Washington citizens (*see*

17  Dkt. 23 at 2–3), and Defendant High 5 Entertainment LLC is a limited liability company formed

18  in and with a principal place of business in New Jersey and none of its members are Washington

19  citizens. *See* Dkt. 369 ¶ 8; 28 U.S.C. § 1332(d)(2)(A); *Johnson v. Columbia Props. Anchorage,*

20  *LP*, 437 F.3d 894, 899 (9th Cir. 2006) (stating that the citizenship of a limited liability company

21  is determined by the domicile(s) of its members). And the aggregated claims of individual class

22  members exceed $5,000,000, exclusive of interest and costs. Transaction data produced in

23  discovery shows potentially $21,601,064.29 in purchases made by class members between April

24  1, 2014, and December 29, 2023. *See* Dkt. 277-6–8, 13–21; Dkt. 278 ¶ 16. The required

jurisdictional amount is met. *See* 28 U.S.C. § 1332(d)(6). The Court has previously ruled that it

has personal jurisdiction over High 5. Dkt. 57. Because the Court is sitting in diversity,

substantive claims are governed by state law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).

### B.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281

F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). And a fact dispute is "material" "only if it could affect the outcome of the suit under the

governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008). The moving party is entitled

to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on

an essential element of a claim for which the nonmoving party has the burden of proof. *Celotex

Corp. v. Catrett*, 477 U.S. 317, 323 (1985). The Court can grant partial summary judgment on

portions of a claim or defense. *See* Fed. R. Civ. P. 56(a).

The evidence relied upon by the nonmoving party must be able to be "presented in a form

that would be admissible in evidence." *See* Fed. R. Civ. P. 56(c)(2). "An affidavit or declaration

used to support or oppose a motion must be made on personal knowledge, set out facts that

would be admissible in evidence, and show that the affiant or declarant is competent to testify on

the matters stated." Fed. R. Civ. P. 56(c)(4); *see also* Fed. R. Evid. 602 ("A witness may testify

to a matter only if evidence is introduced sufficient to support a finding that the witness has

personal knowledge of the matter. Evidence to prove personal knowledge may consist of the

witness's own testimony."). Conclusory, nonspecific statements in affidavits are not sufficient,

and "missing facts" will not be "presume[d]." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889

(1990). However, "'[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255). Consequently, "a District Court must resolve any factual issues of controversy in favor of the non-moving party only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan,* 497 U.S. at 888 (internal quotations omitted).

      **C.**      **High 5 is liable for damages under the RMLGA.**

      Larsen moves for summary judgment on his claim that High 5 is liable for damages to the class pursuant to the RMLGA. He asserts that High 5's social casino applications High 5 Casino and High 5 Vegas are unlawful gambling games. And Larsen claims that because the virtual coins required to play are considered "things of value" under Washington law—and since the RMLGA allows all persons to recover anything of value lost to an illegal gambling game—High 5 is therefore liable for the value of coins purchased by all class members. *See* Dkt. 275 at 21.

      The RMLGA states that all "persons losing money or anything of value . . . on any illegal gambling games shall have a cause of action to recover . . . from the proprietor for whose benefit such game was played . . . the value of the thing so lost." RCW 4.24.070. Washington law defines gambling as staking or risking "something of value" on the outcome of a contest of chance not under the wagerer's control, in the "understanding that the person . . . will receive something of value in the event of a certain outcome." RCW 9.46.0237. Gambling is illegal in Washington unless specifically authorized by state law. RCW 9.46.010; *see also Kater v. Churchill Downs Inc.*, 886 F.3d 784, 786 (9th Cir. 2018) ("All online or virtual gambling is illegal in Washington." (citing *Rousso v. State*, 170 Wash.2d 70, 74–75, 239 P.3d 1084 (2010)).

      The Ninth Circuit determined in *Kater* that virtual casino coins "are a 'thing of value' pursuant to Washington's definition of gambling." 886 F.3d at 787. Washington defines a "thing

of value" as any:

> token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge.

RCW 9.46.0285. The *Kater* court held that because virtual coins "permit a user to play the casino games inside the virtual [casino,] . . . [t]hey are a credit that allows a user to place another wager or re-spin a slot machine" and therefore "extend the privilege of playing." *See Kater*, 886 F.3d at 787. *Kater* agreed with a Washington Court of Appeals decision which had held that a machine emulating video slot gameplay where "players utilized play points that they obtained by purchase, by redeeming a once-a-day promotional voucher, or by winning a game on the machine" was a gambling device, and that the "game's play points were 'things of value' because they extended the privilege of playing the game without charge, even though they lacked pecuniary value on their own." *Id*. (citing *Bullseye Distrib. LLC v. State Gambling Comm'n*, 127 Wash. App. 231, 234, 110 P.3d 1162 (2005)).

High 5's virtual coins function identically to the coins at issue in *Kater*. In *Kater*, players played in a social casino application called Big Fish Casino which emulated casino games such as blackjack, poker, and slots. 886 F.3d at 785. Players could download Big Fish Casino for free and received a free set of coins as first-time users. *Id*. When players bet coins in order to play the virtual casino games—including betting to spin virtual slot machines—they could "earn more chips as a reward for winning the games," but if they ran out after losing their bets, they would have to "purchase more chips to continue playing." *See id*. at 785–86. These mechanics are identical in High 5 Casino and High 5 Vegas. High 5's players can access the games for free and receive a free "initial allotment" of virtual coins. *See* Dkt. 23 ¶ 7, 9; Dkt. 270 ¶ 9, 13, 20. If players lack coins to continue gameplay, they must either wait to receive free coins or spend real

money to purchase more virtual coins. *See* Dkt. 270 ¶ 23. In addition to the free initial grant, High 5's games also distribute free coins via various mechanisms: a daily grant, every four hours, and random prize spins among others. *See* Dkt. 82 ¶ 3–5. *Kater* addresses that even when games provide regular free coin distributions such as a "once-a-day promotional voucher," the value of the virtual coins derives not from any intrinsic "pecuniary value" but rather from the fact that they extend "the privilege of playing the game." *Kater*, 886 F.3d at 787 (citing *Bullseye Distrib. LLC*, 127 Wash. App. at 234).

Under Washington law as interpreted in *Bullseye* and *Kater*, High 5's virtual coins are "things of value." And, since the virtual coins are wagered to spin the virtual slot games in High 5 Casino and High 5 Vegas, the applications are illegal gambling games because the coins are things of value being staked on "a contest of chance not under the wagerer's control" (*see* Dkt. 275-2 at 5–6), with the player's understanding that they may win more of the same virtual coins with a successful spin. *See* RCW 9.46.010 (gambling involves a wagerer's understanding that they "will receive something of value in the event of a certain outcome"); Dkt. 319-6 at 4–5. Because High 5's players cannot recover the value of the virtual coins they have purchased (*see* Dkt. 270 ¶ 15) and have lost those coins through the course of gameplay, they are "persons losing money or anything of value" on illegal gambling games and therefore "have a cause of action to recover . . . from the proprietor for whose benefit such game was played . . . the value of the thing so lost." *See* RCW 4.24.070. The Court therefore holds that High 5 is liable as a matter of law for damages pursuant to the RMLGA—for the cumulative value of coins purchased by the Damages Class.

High 5 asserts three arguments in its cross motion against Larsen's claim that its social casino apps are illegal gambling games under Washington law. *See* Dkt. 269 at 13–22. The Court rejects High 5's arguments and addresses each in turn below.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

### 1.     High 5's virtual coins are "things of value" even though they are occasionally granted for free.

First, High 5 argues that there is no violation of the RMLGA because: (1) players can "continue to play all of the games without purchasing additional virtual coins" by creating "an unlimited number of new, free accounts" to receive the free initial grant of coins and (2) the previous class representative had stipulated in other settlements that virtual coins are not "things of value" so long as an app allows "players who run out of sufficient virtual coins to continue to play slot games within the Application they are playing without needing to purchase additional virtual coins or to wait until they would have otherwise received free additional virtual coins in the ordinary course," so Larsen is estopped from claiming that High 5's virtual coins are "things of value." Dkt. 269 at 14. The Court fully addresses High 5's first point with its above discussion of *Kater*. The value of High 5's virtual coins derives not from any intrinsic "pecuniary value" but from the fact they extend "the privilege[2] of playing the game." *Kater*, 886 F.3d at 787. Without enough virtual coins to meet a game's minimum bet, players cannot continue playing that game. And even if players can create new accounts to receive free coins, or wait for free coins to be awarded, other courts in this District have held that it "does not matter that a player may obtain more free coins at some future time" (such as by taking the time to create a new account) "because, until then, they must pay to extend their privilege of playing." *Wilson v. Playtika, Ltd.*,

---

[2] High 5 also asserts that its virtual coins "cannot be a 'thing of value' under RCW 9.46.0285" and *Kater*, because *Kater* states that virtual coins have value because they extend the "privilege" of gameplay. And High 5 argues that playing its games is not a "privilege," citing a Washington state appellate decision discussing the meaning of the word "privilege" in the context of licensure for highway driving where "privilege" means a "qualified right . . . beyond the common advantages of other citizens." Dkt. 269 at 20 (citing *City of Spokane v. Port*, 43 Wash. App. 273, 275, 716 P.2d 945 (1986) (citing *Black's Law Dictionary* 1077 (5th rev. ed. 1979)). High 5's use of an inapplicable definition of "privilege" taken from an irrelevant context is unpersuasive. It is clear that the Ninth Circuit in *Kater* used "privilege" in a colloquial manner, not in any specialized sense as High 5 suggests.

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT - 11

349 F. Supp. 3d 1028, 1041 (W.D. Wash. 2018).[3] This is, of course, the underlying premise that allows High 5 to make money by selling virtual coins. *See, e.g.*, Dkt. 275-1 at 8 (describing a "low coin upsell" as "[w]hen the player's running out of coins, we will give a message to see if they would like to buy more").

And to High 5's second point, even if the ability to open unlimited new accounts brought High 5's apps within the terms of stipulations from a previous settlement agreement between a different plaintiff and a different app developer, Larsen is not estopped from claiming that High 5's virtual coins are "things of value." Judicial estoppel requires a party to have "succeeded in persuading a court to accept that party's earlier position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). A court's approval of a class-action settlement does not mean the court accepted, as a matter of statutory interpretation, stipulations contained within the agreement. The terms of settlement agreements, which by their nature involve compromise, do not create the "risk of inconsistent court determinations" that the application of judicial estoppel is designed to prevent. *See Hamilton*, 270 F.3d at 783 (internal quotation marks omitted).

### 2. High 5's virtual coins are "things of value" even though players cannot exchange coins for real money.

Second, High 5 argues that players do not stake or risk "real money" on virtual slot gameplay because they have "no opportunity to win back the money spent on virtual coins"—

---

[3] High 5 seemingly reaches this same conclusion in its cross motion, writing that the *Playtika* court concluded that free coin awards did not stop virtual coins from being "things of value" "because the 'privilege of playing' could still be 'lost when a player runs out of free coins,' even if the privilege was not permanently lost." Dkt. 269 at 19–20 (discussing *Wilson v. Playtika, Ltd.*, 349 F. Supp. 3d 1028 at 1041). High 5 acknowledges the same point when discussing *Fife v. Sci. Games Corp.*, stating that the *Fife* court "concluded that additional free coin awards throughout play did not remove the coins from being 'things of value' because these additional free coins did not 'indicat[e] that players can continue playing for free when they no longer have enough coins to bet.'" *Id.* at 20 (quoting *Fife v. Sci. Games Corp.*, No. 2:18-CV-00565-RBL, 2018 WL 6620485, at *4 (W.D. Wash. Dec. 18, 2018)). The option of creating new accounts to receive new free coins is a distinction without a difference.

they can only win more virtual coins. *See* Dkt. 269 at 16. High 5 contends that the coins have no value because they have no "monetary value of their own and cannot be exchanged for anything, won back, or cashed out." *Id*. High 5 also argues that the *purchase* of a virtual chip is one complete transaction and the *wager* of the chip is a separate transaction, so that there is no "risk" in the wager because the chip no longer has value after it is one step removed from its purchase. *See id*. at 15–16.

This Court is not bound by the Fifth Circuit case High 5 cites (*In re Mastercard International Inc. Gambling Litigation*, 313 F.3d 257 (5th Cir. 2002)) and Washington law does not limit a virtual chip's value to whether it can be exchanged for cash or goods. As explained in *Kater*, the coins need no intrinsic pecuniary value—their value derives from their *usability* in enabling *gameplay*. *See* 886 F.3d at 787. When High 5's virtual coins are wagered on its games, they are "things of value" being gambled.

### 3. High 5's apps are gambling even if its virtual slots may not always pay out virtual coins.

Third, High 5 argues that because RCW 9.46.0237 defines gambling to involve an "understanding that the player or someone else . . . will receive something of value in the event of a certain outcome," its games are not gambling because players might *not* receive anything of value "at the conclusion of a spin." *See* Dkt. 269 at 20. High 5 further argues that since a player might *lose* a spin and therefore not win "any additional [virtual] coins," it is impossible for them to be gambling under the statute. *See id*. at 22. High 5 ignores the first half of RCW 9.46.0237 which defines gambling as when someone stakes or *risks* something of value on a contest of chance outside their control in the understanding that they "will receive something of value in the event of a *certain* outcome." RCW 9.46.0237 (emphasis added). That "certain" outcome resulting in a reward of value is the "winning" outcome. The inverse of that outcome is the

losing outcome—and the *risk* of *losing* the player's bet. High 5's statutory interpretation is nonsensical and would redefine gambling as solely the act of *winning* without risk.

To the extent High 5 is arguing that the phrase "someone else" in the statute means High 5 must win something on each spin if the player does not, that too ignores the phrase "in the event of a certain outcome." *See* Dkt. 269 at 22 ("the statute requires that either the player or the application—at least one or both—receive something of value upon the conclusion of the game"). This argument also makes little sense. High 5's revenue from virtual slot machines is just like electronic slot machines in physical casinos: when a player purchases virtual coins, they have already paid the house for the credits needed to spin, and if the gambler loses, they have lost the value of their wager which the house retains. Even if virtual coins used for a particular spin were received for free, a losing spin means the player has fewer coins with which to continue playing. *See Kater*, 886 F.3d at 787 (virtual coins are things of value because they extend the privilege of playing the game). To place the minimum bet, the player may need to wait to earn more free coins, take the time to create a new user account, or—as High 5's business model hinges on—accept High 5's invitation to purchase coins to keep playing. The *application* doesn't need to "win" the coins for the player to have lost something of value.

> **D.    High 5's operation of unlawful gambling games is against the public interest and violates Washington's Consumer Protection Act.**

Larsen also moves for summary judgment on his claim that High 5 violated the CPA. He asserts that High 5's operation of its social casino applications harms the public interest by violating the public policy declaration in Washington's gambling statute at RCW 9.46.010. *See* Dkt. 275 at 22–23. Larsen must establish five elements to succeed on his CPA claim, showing that there was:

1) An unfair or deceptive act or practice
2) in trade or commerce,

3) which affects the public interest,
4) an injury to the plaintiff's business or property, and
5) a causal link between the unfair or deceptive act or practice and the injury.

*Schiff v. Liberty Mut. Fire Ins. Co.*, 2 Wn.3d 762, 771, 542 P.3d 1002 (2024). The CPA does not define "unfair" or "deceptive" but "a statutory violation can demonstrate that an action violates public policy and is unfair for the purposes of a non-per-se-CPA violation." *Id*. at 772 (citing *Klem v. Washington Mut. Bank*, 176 Wash. 2d 771, 787, 295 P.3d 1179 (2013)). "Whether an act or practice qualifies as unfair or deceptive is a question of law." *Id.* An action need not be both unfair *and* deceptive in violating the CPA because the "'or' between 'unfair' and 'deceptive' is disjunctive" in the statute. *Klem*, 176 Wash. 2d at 787.

In this case, the first and third element are related. Larsen asserts that High 5's operation of social casinos in violation of the public policy established by Washington's gambling statute (RCW 9.46.010) shows those game operations affect the public interest *and* are an unfair act. Washington's legislative declaration regarding gambling states that the "public policy of the state of Washington on gambling is to . . . promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control." *Id*. As a result, "All online or virtual gambling is illegal in Washington." *Kater*, 886 F.3d at 786. As Larsen persuasively argues, because they amount to illegal virtual gambling, High 5's social casino games violate this public policy. *See supra* Section C; *see also* RCW 9.46.0237. The "social welfare of the people" was harmed when members of the Damages Class lost money purchasing nonreturnable and nonredeemable virtual coins that can only be unlawfully gambled away in High 5's applications. And High 5 unfairly makes this money from Washington consumers by evading the "strict regulation and control" of the gambling statutes. *See* RCW 9.46.010. This is a clear example of what the Washington Supreme Court meant when it held in *Schiff* that a statutory violation can "demonstrate that an action violates public policy and is unfair for the

purposes of a non-per-se CPA violation." *Schiff*, 542 P.3d at 1007. Larsen has therefore

established the first and third elements of his CPA claim—that High 5's social casino operations

are unfair acts affecting the public interest.

The second, fourth, and fifth elements are straightforward. For the second element, High

5's social casino operations occur in trade or commerce because they involve the sale of virtual

coins to people in Washington. *See* RCW 19.86.010(2) (defining "trade" and "commerce" to

"include the sale of assets or services, and any commerce directly or indirectly affective the

people of the state of Washington"); RCW 19.86.010(3) (defining "assets" to include "any

property, tangible or intangible, . . . and any other thing of value"). For the fourth element, the

Damages Class lost money purchasing virtual coins from High 5. And for the fifth element, a

causal link to Larsen's injury exists because, but for High 5's illegal social casino operations, he

would not have lost money purchasing their virtual coins. *Panag v. Farmers Ins. Co. of

Washington*, 166 Wn.2d 27, 57, 204 P.3d 885 (2009) ("[T]he injury requirement is met upon

proof the plaintiff's property interest or money is diminished because of the unlawful

conduct . . . ." (internal quotation marks omitted)); Dkt. 170 (finding at class certification stage

that loss of $1.99 purchasing virtual coins sufficiently alleged an injury to business or property

under the CPA).

High 5 asserts two arguments in its cross motion against Larsen's CPA claim. *See*

Dkt. 269 at 23–25. The Court rejects High 5's arguments and addresses each in turn below.

### 1.     Larsen is not claiming a "per se" CPA violation.

First, High 5 argues that Larsen makes a per se CPA claim which must fail because the

Washington gambling statute and RMLGA do not specify their violation constitutes an unfair or

deceptive act under the CPA. *See* Dkt. 269 at 23–24. As discussed above, Larsen does not make

a per se CPA claim, but rather argues that High 5's statutory gambling violation demonstrates

that its conduct negatively affects the public interest and is an unfair act or practice. *See supra* Section D. High 5's argument regarding per se CPA claims does not apply.

### 2. High 5 cannot escape liability under the CPA by arguing the injuries are "reasonably avoidable."

Second, High 5 argues that Larsen cannot succeed on a non per se CPA claim because High 5's practices are not "unfair" or "deceptive." High 5 asserts that none of its players *need* to purchase virtual coins to play High 5's games and thus any injury is "reasonably avoidable" and therefore not unfair. *See* Dkt. 269 at 25. As discussed above, the Court's ruling that High 5's social casinos are an "unfair" act or practice stems not from whether consumers have a choice to play the games, but from the fact that High 5 operates the games in violation of Washington's strict gambling laws, contrary to the public policy and social welfare interests expressed by those statutes. *See supra* Section D; *see also Schiff*, 542 P.3d at 1007 ("a statutory violation can demonstrate that an action violates public policy and is unfair for the purposes of a non-per-se CPA violation"). High 5 also argues that Larsen does not claim the social casino operations are "deceptive." It is sufficient for a CPA violation that an act is *either* unfair *or* deceptive. *Klem*, 176 Wash. 2d at 787. Because it is an unfair practice for High 5 to earn money from Washington consumers by circumventing state gambling laws, the "unfair or deceptive" element is met.

Because Larsen has established all five elements of his CPA claim as a matter of law, the Court grants his motion for partial summary judgment and holds that High 5's social casino operations violate the CPA.

### E. The Court defers ruling on Plaintiff's request for injunctive relief.

Larsen also moves to enjoin High 5 from selling the virtual coins used to play its social casino applications, High 5 Casino and High 5 Vegas, from within Washington or to Washington individuals. *See* Dkt. 275 at 28. Both the RMLGA and the CPA allow for injunctive relief. The

1    RMLGA provides that "[a]ll gambling premises are common nuisances and shall be subject to
2    abatement by injunction or as otherwise provided by law." RCW 9.46.240. The CPA states that
3    "[a]ny person who is injured in his or her business or property by a violation of RCW
4    19.86.020 . . . may bring a civil action . . . to enjoin further violations, to recover the actual
5    damages sustained by him or her, or both, together with the costs of the suit, including a
6    reasonable attorney's fee." RCW 19.86.090.

7            High 5 makes just two arguments against injunctive relief. First, it argues that there is no
8    basis for an injunction because "Plaintiff has not proved liability for any of his claims." Dkt. 317
9    at 33. But the Court has now concluded that High 5's games violate both the RMLGA and the
10   CPA. Second, High 5 argues that an injunction is unnecessary because "High 5 no longer does
11   business in Washington," citing testimony from its officers and employees claiming that since
12   2022, High 5 has taken steps to prevent users in Washington from playing High 5 Casino or High
13   5 Vegas. *Id.* at 11, 33. But the transaction data obtained by Plaintiff from Apple, Meta, and
14   Google *all* show ongoing revenue after 2022, strongly suggesting the existence of ongoing harm.
15   *See* Dkt. 252-2, 252-3, 252-4; Dkt. 278.

16           But neither party addresses the traditional test for whether a federal court may enter
17   permanent injunctive relief. "According to well-established principles of equity, a plaintiff
18   seeking a permanent injunction must satisfy a four-factor test before a court may grant such
19   relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). A plaintiff must show:
20   "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary
21   damages, are inadequate to compensate for that injury; (3) that, considering the balance of
22   hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the
23   public interest would not be disserved by a permanent injunction." *Id.* "The decision to grant or
24   deny permanent injunctive relief is an act of equitable discretion by the district court." *Id.*

ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY
JUDGMENT AND DENYING DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT - 18

Given the lack of briefing on this standard, as well as ongoing discovery into High 5's transfer of its social gaming business to High 5 Entertainment and the scope of the companies' operations in Washington state, the Court finds the record is not sufficiently developed to rule on Larsen's request for a permanent injunction. Instead, should Larsen continue to seek injunctive relief, he may file a motion for permanent injunction addressing (1) how the traditional four-factor test discussed in *eBay* applies in the context of state statutes that authorize specific injunctive relief; (2) whether, to the extent it applies, Larsen can satisfy the four-factor test; (3) the scope of permanent injunctive relief, including to which Defendant(s) it should apply; and (4) whether an evidentiary hearing is necessary for the Court to resolve the parties' factual disputes as to whether Defendants continue to operate in Washington. This motion must be filed no later than the deadline for dispositive motions concerning High 5 Entertainment, and should be noted as a 28-day motion under Local Civil Rule 7(d)(4).

### F.    There are genuine factual disputes as to the amount of damages.

As explained above, because Larsen has prevailed on his claims under the RMLGA and the CPA as a matter of law, the Damages Class members are entitled to actual damages. Under the RMLGA, the Class members are entitled to recover "the amount of the money or the value of the thing so lost" on the "illegal gambling game." RCW 4.24.070. Under the CPA, they are entitled to recover "the actual damages sustained." RCW 19.86.090. Larsen argues this too should be measured by the amount of money the class members lost playing High 5's illegal games. Dkt. 275 at 24. Larsen proposes that the Court determine—whether through summary judgment or trial—the aggregate amount of damages for the class, with allocation of the damages to particular class members completed after trial through a claims procedure. *Id.* at 24–25; *see Price v. City of Seattle*, No. 03-cv-1365-RSL, 2006 WL 2691402 at *3 (W.D. Wash. Sept. 19. 2006). High 5 does not contest this measure of damages or general procedure in its

opposition. *See* Dkt. 317 at 27–33. The Court agrees with Larsen and concludes that (1) the aggregate damages should be measured by the cumulative value of coins purchased by the Damages Class, and (2) the individual allocations can be handled through a claims procedure after the aggregate amount is proved. *See also* Dkt. 170 at 12 (finding at class certification that common issues predominate in the calculation of damages); Dkt. 385 at 8 (denying motion to decertify class based on High 5's challenges to the "full refund" damages model).

The Court agrees with High 5, however, that the aggregate amount of damages cannot be determined on summary judgment. Larsen asks that the Court determine a "baseline" amount of damages as a matter of law based on the transaction data produced by the third-party platform providers. Dkt. 275 at 24–27. High 5 contests the reliability of this data, arguing that (1) the data is inadmissible; and (2) even if admissible, there are genuine factual disputes about the data's accuracy, based on a sworn declaration from its CEO. Dkt. 317 at 27–33.

High 5's arguments that the platform data is inadmissible are unpersuasive. At summary judgment, a party may object "that the material cited to support or dispute a fact *cannot be presented* in a form that would be admissible in evidence." Federal Rule of Civil Procedure 56(c)(2) (emphasis added). Here, Larsen has cited to transaction data for the High 5 Casino and High 5 Vegas apps produced by Amazon, Apple, Google, and Meta in response to third-party subpoenas. *See* Dkt. 277, Exhibits 6–21. Although High 5 objects that some of the data was received after the close of the discovery, there is no question that Larsen served the third-party subpoenas during the discovery period.[4] The spreadsheets containing the data can be

---

[4] High 5's protestations that Larsen should have produced the third-party data earlier in discovery are also unpersuasive given that the data represents sales from High 5's own apps, and should be within High 5's possession, custody, or control. *See* Federal Rule of Civil Procedure 34(a)(1). High 5 instead forced Larsen to rely on third-party discovery by steadfastly maintaining that it has no records of its own tracking revenue by state. *See* Dkt. 281 at 1–2 (summarizing

presented at trial by using either certifications or live testimony from the records custodian of each platform provider to establish their authenticity and lay the foundation for their admission as records of regularly conducted activity. *See* Fed. R. Evid. 803(6), 902(11).

That the records were created by exporting data into Excel spreadsheets from a "complex internal database," as High 5 argues, does not prevent their admission. "[E]vidence that has been compiled from a computer database is also admissible as a business record." *U-Haul Intern., Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040, 1043–44 (9th Cir. 2009). "Printouts prepared specifically for litigation from databases that were compiled in the ordinary course of business are admissible as business records to the same extent as if the printouts were, themselves, prepared in the ordinary course of business." *Id.* at 1044 (quotation marks and citation omitted). And the Court has previously rejected High 5's objections to the testimony of Shawn Davis, an employee of Plaintiff's counsel who submitted a declaration summarizing the totals of transaction amounts from the spreadsheets. Dkt. 366, 385. This testimony consists of simple arithmetic to summarize "the content of voluminous writings." Fed. R. Evid. 1006. It is admissible lay testimony and did not require expert disclosure.

But even if the platform data is admissible, High 5 has—barely—offered sufficient evidence to create a genuine factual dispute as to the data's reliability. High 5 relies on a sworn declaration from its CEO, Anthony Singer. Dkt. 318. Mr. Singer states that since October 1, 2022, because "[b]oth High 5 Games and High 5 Entertainment have not permitted any users based in Washington to play the games, neither High 5 Games nor High 5 Entertainment received any revenue from Washington users after 2022, including from High 5 Casino or High 5 Vegas." *Id.* ¶ 29. Mr. Singer thus goes on to declare that "the purported revenue reflected in

---

discovery responses). At the very least, High 5 was equally capable of seeking the third-party transaction data on its own at any point in this litigation.

Plaintiff's spreadsheets from Amazon, Google, Meta, and Apple is inaccurate and vastly overstated." *Id.* ¶ 30. Mr. Singer says that the numbers from the platforms for transactions based in Washington "are close to our overall, national revenue on some occasions." *Id.* As an example, he states that for the month of November 2023, while the spreadsheets from Meta "show in excess of $3 million in revenue for that month alone in Washington . . . High 5's nationwide statement of account for Meta shows approximately $100,000." *Id.* Mr. Singer also points out that the spreadsheets do not account for the 30% fee taken by the platforms for each in-app purchase. *Id.* ¶ 31.

Although Mr. Singer's statements are somewhat vague, and he does not submit any documents to back them up, given his position at the company they are arguably facts within the scope of his personal knowledge. At summary judgment, the Court cannot weigh the relative strength of the parties' evidence or assess Mr. Singer's credibility, and discovery into post-2022 revenue remains ongoing. *See, e.g.*, Dkt. 396, 402. Construing the facts in the light most favorable to High 5, and drawing all reasonable inferences in its favor, the Court concludes that the amount of actual damages cannot be determined from the platform data as a matter of law, and instead must be decided by a jury.

### G.     The Court rejects High 5's arguments that (1) Larsen cannot pursue claims based on High 5 Vegas and (2) High 5 was not unjustly enriched.

High 5 argues that Larsen cannot pursue any claims based on High 5 Vegas because he did not play games through the High 5 Vegas application. *See* Dkt. 269 at 11. The Court has already determined that Larsen's claims are sufficiently representative of the classes, and that he can therefore bring claims for players of both High 5 Casino and of High 5 Vegas. *See* Dkt. 385. The Court will not belabor the points made in its prior orders but notes Larsen's claims are typical of and sufficient to represent the classes because the facts and claims related to both High

5 Casino and High 5 Vegas are materially similar. *See supra* Sections I.A.–C.; Dkt. 385 at 6–7. High 5's argument against Larsen as class representative fails.

High 5 also moves for summary judgment on Larsen's unjust enrichment claim because he received "everything he expected" when spending money on High 5's virtual coins. *See* Dkt. 269 at 26–27. High 5 argues that because Larsen (and other players) purchased virtual coins expecting only to receive those coins in the transaction, High 5 was not unjustly enriched because it performed a valid "straightforward" quasi-contract of exchanging virtual coins for the players' money. *Id.* This argument is also unpersuasive.

"It is a general rule that where the contract grows immediately out of, and is connected with, an illegal act, a court of justice will not lend its aid to enforce it." *Hederman v. George*, 35 Wash.2d 357, 361, 212 P.2d 841 (1949). And a "contract in conflict with statutory requirements is illegal and unenforceable as a matter of law." *Failor's Pharmacy v. Dep't of Soc. & Health Servs.*, 125 Wash.2d 488, 499, 886 P.2d 147 (1994). This Court has concluded that High 5's sale of virtual coins and operation of its social casino games are illegal under Washington's gambling statute. *See supra* Section II.C.–D. Any quasi-contract growing immediately out of and connected with those operations, such as the sale of virtual coins, is also illegal and unenforceable under Washington law.

An unjust enrichment claim has three elements: (1) the defendant received a benefit, (2) at the plaintiff's expense, (3) under circumstances that make it unjust for the defendant to retain the benefit without payment. *Young v. Young*, 164 Wash.2d 477, 485, 191 P.3d 1258 (2008). In this case, High 5 received the benefit of Larsen and other players' money in exchange for High 5's unlawful sale of virtual coins, *see supra* Section II.C.–D, and there are at least triable questions of fact whether it is unjust for High 5 to retain the benefits of conducting illegal sales. *See Young*, 164 Wash. 2d at 485; *see also Nelson v. Appleway Chevrolet, Inc.*, 160 Wash.

2d 173, 188, 157 P.3d 847 (2007) (holding that a car dealer was unjustly enriched by retaining illegally added charges from its buyers). High 5's motion for summary judgment on the unjust enrichment claim is denied.

### III.    CONCLUSION

For the foregoing reasons, Larsen's motion for partial summary judgment (Dkt. 275) is GRANTED IN PART and DENIED IN PART and High 5's cross motion for summary judgment (Dkt. 269) is DENIED.

The Court concludes that:

1) High 5 is liable to the Damages Class for violating the RMLGA.

2) High 5 is liable to the Damages Class for violating the CPA.

3) There remain triable issues of fact as to the amount of damages owed by High 5 to the Damages Class under Larsen's RMLGA and CPA claims. Aggregate damages will be determined by the jury at trial, and individual allocations to class members will be made through a claims procedure after trial.

4) To the extent Larsen still seeks a permanent injunction, he must file a motion for permanent injunction addressing the issues identified by the Court in this order, no later than the deadline for filing dispositive motions with respect to the liability of High 5 Entertainment.

Dated this 11th day of June, 2024.

Tiffany M. Cartwright
United States District Judge