UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICK LARSEN, individually and on behalf of all others similarly situated,<br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>PTT, LLC, doing business as High 5 Games, LLC; HIGH 5 ENTERTAINMENT LLC,<br>　　　　　　　　Defendant. | Case No. 3:18-cv-05275-TMC<br><br>ORDER ON MOTIONS FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND EXCLUSION OF TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT SHAWN DAVIS |

## I.　INTRODUCTION

On June 11, 2024, this Court held on summary judgment that Defendant High 5 Games (H5G), a developer of "social casino" games, violated Washington's Recovery of Money Lost at Gambling Act ("RMLGA") and Consumer Protection Act ("CPA"), and is liable to Plaintiff Rick Larsen[1] in this class action suit. Dkt. 408. The Court also concluded that a jury must decide the amount of damages H5G owes to the Class under the RMLGA and CPA. *Id.*

Before the summary judgment ruling, but after the Class was certified, H5G transferred all assets related to its social casino games to a subsidiary, High 5 Entertainment LLC (H5E).

---

[1] When the case was filed, the named plaintiff was Sean Wilson, for whom Rick Larsen was substituted as class representative on March 6, 2023 (Dkt. 216). The Court will refer to Plaintiff throughout this order as "Larsen" or "Plaintiff" for clarity.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND EXCLUSION OF TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT SHAWN DAVIS - 1

Upon learning of the asset transfer, Larsen moved to amend his complaint to add H5E as a defendant for the existing RMLGA and CPA claims based on the same facts alleged against H5G. Dkt. 250. The Court granted Larsen leave to amend and authorized supplemental discovery into H5E's liability to Larsen and the Class. Dkt. 285. During the supplemental discovery period, Larsen disclosed Shawn Davis as an expert to offer testimony supporting Plaintiff's assertion that H5E continues to operate its social casino games in Washington, against state law.

After the close of supplemental discovery, H5E and Larsen filed cross-motions for summary judgment on H5E's liability. Dkt. 426, 435. Larsen argued that H5E "owns and operates the exact same illegal social casino business" as H5G and therefore should be liable to the Class based on the reasoning of the Court's summary judgment ruling against H5G. Dkt. 435. Larsen also moved for permanent injunctive relief to prevent H5E's operation of the games in Washington state. Dkt. 438. H5E countered that "[f]rom the day H5E took over the operation of the games, it has endeavored to prevent residents of Washington state from playing them," that the Court lacks personal jurisdiction over H5E, and that Larsen lacks standing to sue H5E for its own operation of the social casino games because Larsen admits he never played the games after their operation was transferred to H5E. Dkt. 426. H5E also moved to exclude Shawn Davis's proposed expert testimony. Dkt. 431.

The Court held oral argument on November 13, 2024. Dkt. 511. Having considered the parties' briefing, oral argument, and the relevant record, the Court concludes that Larsen lacks standing to sue H5E for violations of the RMLGA and CPA arising from H5E's own operation of the social casino games after October 1, 2022. For the same reason, Larsen lacks standing to seek injunctive relief for H5E's alleged ongoing operation of the games in Washington. The Court therefore GRANTS Defendant H5E's motion for summary judgment (Dkt. 426); DENIES Larsen's motion for partial summary judgment (Dkt. 435); and DENIES Larsen's motion for

permanent injunctive relief (Dkt. 438). Larsen's claims against H5E under the RMLGA and CPA arising from H5E's own operation of its social casino games after October 1, 2022 and his claims for injunctive relief are DISMISSED WITHOUT PREJUDICE.[2] Because those claims are now dismissed, the Court DENIES Defendant H5E's motion to exclude the opinions of Shawn Davis (Dkt. 431) as moot.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. High 5's Social Casino Games and Virtual Coin Sales

High 5 Games (H5G), a developer and licenser of software used in physical gambling machines and in online gambling, entered the "social gaming" market in 2012. *See* Dkt. 270 ¶¶ 3–8; Dkt. 277-1 at 6. The social gaming market encompasses video game applications that are free to download or play online but present players with access to in-application purchases over the course of gameplay. *See* Dkt. 23 ¶¶ 6–7, 10; Dkt. 270 ¶ 8. H5G developed multiple social casino applications, including High 5 Casino and High 5 Vegas. Dkt. 270 ¶¶ 8–11.

High 5 Casino and High 5 Vegas have similar user interfaces and game design, identical to what can be found on physical slot machines located in traditional casinos. *See* Dkt. 275-1 at 7; Dkt. 275-4 at 5. When a player first starts up either High 5 Casino or High 5 Vegas, they create an account and are given a free "initial allotment" of virtual coins. Dkt. 23 ¶ 7; Dkt. 270 ¶ 13, 20. These coins are required for gameplay, which consists of players betting the coins to spin the simulated slot machines found in both games. *See* Dkt. 270 ¶ 18. If a player runs out of coins or has less than the amount required for a minimum bet, they cannot play the game until they replenish their supply. *Id*. ¶ 23. Players can purchase additional virtual coins for real currency through the game application. Dkt. 23 ¶ 10. The virtual coins can only be used for the

---

[2] Because the Court also grants Plaintiff's motion to amend the complaint to add different claims against H5E, Dkt. 515, H5E remains a defendant in this lawsuit.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND EXCLUSION OF TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT SHAWN DAVIS - 3

bets required to spin the virtual slots in the High 5 games and cannot be transferred or redeemed for real money or prizes. See Dkt. 270 ¶ 15. High 5 earns revenue from the sale of virtual coins to players of High 5 Casino and High 5 Vegas. *See* Dkt. 275-4 at 7–8.

**B.     Rick Larsen's Experience Playing High 5 Games**

Larsen played virtual slots in High 5 Casino and possibly High 5 Vegas. *See* Dkt. 319-6 at 3; Dkt. 275-11 at 2. Larsen purchased virtual coins while in Washington after April 9, 2014, but before October 1, 2022. Dkt. 467 ¶ 1; Dkt. 481 ¶ 1. Larsen's last social casino game transaction appears to be June 23, 2022. *See* Dkt. 426 ¶ 13; Dkt. 427-7 ¶ 2; Dkt. 427-7 at 2. H5G's player record of Larsen shows total purchases of $7,470.50 of virtual casino coins, with $5,655.50 spent in High 5 Casino specifically. *See* Dkt. 275-11 at 2–3.

**C.     High 5 Games' Transfer of Social Casino Business to High 5 Entertainment**

On October 1, 2022, H5G transferred all assets related to its social casino games to a subsidiary, High 5 Entertainment LLC (H5E). Dkt. 435 at 5, 7; *see* Dkt. 454 at 8. The asset transfer was accompanied by a $3 million investment into H5E from a gaming-focused firm, Acies Investment, to launch a new "sweepstakes" product. Dkt. 466 at 10. Whereas H5G had operated business-to-business products (licensing software in physical gambling machines operated in casinos) and business-to-consumer products (social casino games), H5E operates a consumer business only, which includes the "legacy operations of social casinos" like High 5 Casino and High 5 Vegas. *See id;* Dkt. 481 at 6. Since October 1, 2022, H5E receives all revenue from High 5's social casino games. Dkt. 435 at 9; *see* Dkt. 454 at 9.

H5E and H5G share executive leadership and significant aspects of their operations. Anthony Singer, the founder and CEO of High 5, is the managing member of H5G and H5E. Dkt. 466 at 6. Singer and his wife, Lisa Singer, an H5G employee, make all corporate decisions for H5E. *Id.* at 6–7. The two companies work out of the same H5G office space. *Id.* at 7. And

many of the H5G employees who worked on social casino games before the asset transfer continue to work on the games post-transfer under a service contract with H5E. *Id.*

Although most aspects of the gameplay remain the same, the summary judgment record shows that H5E has implemented changes to the onboarding experience, including attempts to discourage Washington players from registering or playing. *See* Dkt. 466 at 13; Dkt. 426 at 10–13. In the account registration process, H5E has removed Washington as an option for players to select when they self-identify the state they are in. Dkt. 426 at 10; Dkt. 486 at 8. H5E's terms of use, which players must accept to play the games, includes the following statement: "HIGH 5 CASINO IS NOT AVAILABLE IN THE STATE OF WASHINGTON . . . . ALL HIGH 5 CASINO COINS AND IN-GAME PURCHASES MADE FROM WITHIN THE STATE OF WASHINGTON . . . WILL BE VOIDED AND REFUNDED . . . ." Dkt. 426 at 10–11. H5E's terms of use also include a mandatory arbitration provision, requiring players to affirmatively opt out if they do not want to arbitrate their claims, including if they wish to participate in the present lawsuit. *Id.* at 12–13. H5E has also attempted to identify and block Washington players by their IP addresses, although it concedes the limited efficacy of that technique. *Id.* at 11–12; Dkt. 486 at 7.

Despite H5E's efforts, there is also evidence that transactions from Washington users continue to occur. High 5 employees have identified Washington players making in-app purchases in the games after October 1, 2022. Dkt. 437-15 at 4–5; Dkt. 435 at 14; Dkt. 454 at 12. H5E identified $155,939.07 in revenue linked to IP address logins "it could reasonably identify as being in Washington" since October 1, 2022. *See* Dkt. 435 at 14; Dkt. 437-14 at 2; Dkt. 454 at 11–12. And although the parties dispute the data's accuracy, platform data produced by Meta, Apple, Google, and Amazon also shows that H5E received revenue from Washington-based players after October 1, 2022. *See* Dkt. 408 at 18; Dkt. 435 at 14; Dkt. 454 at 11; Dkt. 437-12 at

4. In short, there are numerous factual and legal disputes over the extent to which H5E has operated its social casino games in Washington since taking over their operation and how that more limited operation affects class certification, the Court's jurisdiction over H5E, and H5E's potential liability under the RMLGA and CPA. It is undisputed, however, that Plaintiff Larsen, the class representative, has not played the games since before their transfer to H5E. *See* Dkt. 467 ¶ 1; Dkt. 481 ¶ 1.

**D.     Procedural History**

On April 6, 2018, Plaintiff filed his original complaint against H5G seeking certification of a class of all persons in Washington who purchased and lost virtual coins playing H5G's social casino games. *See generally* Dkt. 1. He alleged that H5G's operation of social casino applications in Washington (1) constitutes an illegal gambling operation—meaning that H5G is liable for damages under the state's Recovery of Money Lost at Gambling Act, RCW 4.24.070 ("RMLGA"), (2) violates the state's Consumer Protection Act, RCW 19.86.010, et seq. ("CPA") because the games are illegal gambling harmful to the public interest, and (3) unjustly enriches H5G with the sale of virtual coins. *See* Dkt. 1 at 9–16. The complaint was first amended on March 8, 2023 (Dkt. 217) to substitute Larsen in place of the original named plaintiff, who had moved out of the country. *See* Dkt. 196 at 1.

On January 21, 2021, the Court granted Plaintiff's motion to certify two classes (Dkt. 142): one "Damages Class" comprising all Washington individuals who had purchased virtual coins in High 5 Casino or High 5 Vegas after April 9, 2014, and one "Injunctive Class" of all Washington individuals who had played either game after April 9, 2014. *See* Dkt. 170.

On December 5, 2023, Plaintiff deposed CEO Singer and learned for the first time that H5G had transferred all social casino assets to a subsidiary, H5E, on October 1, 2022, more than a year before this disclosure. *See* Dkt. 285 at 1; Dkt. 250 at 4. Larsen moved to amend the

complaint to add H5E as a defendant because "High 5 Entertainment was a proper and necessary defendant in this Action, operating the at-issue social casinos and receiving all of the revenue from spending on virtual chips [since October 2022]." Dkt. 250 at 2. Larsen argued amendment would not impede progress on the case because the requested amendment "does not add any new legal claims or theories[.]" *Id.* at 3.

The Court granted Larsen's motion to add H5E as a defendant and allowed Larsen to conduct limited supplemental discovery regarding H5E's relationship to H5G, as well as H5E's ongoing presence in Washington. Dkt. 285 at 1–2. On February 29, 2024, Larsen filed the second amended complaint ("SAC") adding H5E as a defendant for the existing RMLGA, CPA, and unjust enrichment claims based on the same facts alleged against H5G. *See* Dkt. 354 at 1, 4. The SAC refers to H5G's transfer of social casino assets to H5E in 2022 and H5E's corporate form and membership. Dkt. 354 ¶¶ 8, 23. It does not contain new legal claims or theories as to H5E's liability to the Class. *See id;* Dkt. 481 at 10–11.

While his motion to amend was pending, Larsen moved for partial summary judgment against H5G on his RMLGA and CPA claims, asking the Court to find H5G liable and establish a "baseline" amount of damages under both claims. Dkt. 275. On June 11, 2024, the Court granted Larsen's summary judgment motion in part, concluding that H5G is liable to the Damages Class for violating the RMLGA and CPA. Dkt. 408 at 8–19. Because genuine factual disputes remained on damages owed, the Court ordered a jury trial to determine the amount of damages. *Id.* at 19–23.

On July 25, 2024, H5E moved for summary judgment or to compel arbitration of Larsen's claims on several grounds, including that Larsen lacks standing to pursue claims against H5E on behalf of the Class because his alleged injuries, while traceable to H5G, are not traceable to H5E. *See* Dkt. 426 at 7. H5E also moved to exclude Plaintiff's expert Shawn Davis under

Federal Rule of Evidence 702. *See* Dkt. 431. The same day, Larsen cross-moved for partial summary judgment, arguing that H5E is liable to the Damages Class under the RMLGA and CPA for the same conduct as H5G once H5E took over the games in October 2022. Dkt. 435 at 5. Larsen also moved for permanent injunctive relief based on his evidence that H5E continues to operate the illegal social casino games in Washington. Dkt. 438. After several briefing extensions negotiated by the parties, the Court heard oral argument on November 13, 2024. Dkt. 511. The motions for summary judgment, permanent injunction, and exclusion of Plaintiff's expert Shawn Davis are fully briefed and ripe for the Court's consideration.

### III.    LEGAL STANDARDS

#### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party may fulfill its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), or by producing "evidence negating an essential element of the nonmoving party's claim." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry their ultimate burden of persuasion, the movant "must persuade the court that there is no genuine issue of material fact." *Id.* The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323.

ORDER ON MOTIONS FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND EXCLUSION OF TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT SHAWN DAVIS - 8

**B.    Standing**

Article III of the U.S. Constitution limits the Court's jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2. For a case or controversy to exist, the party bringing the case must have standing. *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021). Standing is "an indispensable part of the plaintiff's case . . . [and] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In response to a summary judgment motion, the plaintiff "must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true." *Id.* (cleaned up).

The "irreducible constitutional minimum" of Article III standing requires the plaintiff to show the following three elements: "(1) [the plaintiff] suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). "That a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" *Martinez v. Newsom*, 46 F.4th 965, 970 (9th Cir. 2022) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 40 n.20 (1976)). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). To establish standing to seek injunctive relief, a plaintiff must demonstrate "a risk of future harm" that "is sufficiently imminent and substantial." *Id.* at 435; *see also Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999) ("Unless

the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief.").

IV.    DISCUSSION

A.    **Larsen does not have standing to sue H5E for the current claims.**

H5E argues that Larsen lacks Article III standing to sue it for his claims in the operative complaint because his injuries under the CPA and RMLGA are not traceable to H5E. For an injury to be traceable to the challenged conduct, "there must be a causal connection between the injury and the conduct complained of[.]" *Lujan*, 504 U.S. at 560. The analysis is no different for class actions. *See Martinez*, 46 F.4th at 970. "To satisfy the traceability requirement, a class action plaintiff must 'allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'" *Easter v. American West Financial*, 381 F.3d 948, 961 (9th Cir. 2004)) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Larsen does not have standing to sue H5E because he never purchased virtual coins from High 5 Casino or High 5 Vegas, let alone played the games, while H5E operated them. Larsen purchased over $7,000 worth of virtual coins playing High 5 Casino and possibly High 5 Vegas over several years in Washington. *See* Dkt. 275-11 at 2–3; Dkt. 467 at 10; Dkt. 481 at 6. But none of Larsen's purchases occurred while the games were operated by H5E. Dkt. 467 at 10; Dkt. 481 at 6; *accord* Dkt. 427-7 at 2 (Larsen's last casino game purchase appears to be June 23, 2022). Larsen also states that he has not played High 5 Casino—the only High 5 game he claims to have played—after October 2022 when H5G transferred ownership of the casino games to H5E. *See* Dkt. 427-4 at 3; Dkt. 427-5 at 2.

Larsen also cannot meet the standing requirements by alleging injuries suffered by other Class members as his own. In *Martinez*, the Ninth Circuit considered standing requirements for class claims by a group of students and parents alleging that every school district in California

failed to adequately accommodate special needs students during COVID-19 remote instruction. 46 F.4th at 968. While noting that the named plaintiffs had traceable injuries to sue the school districts in which they or their students were enrolled, the court dismissed plaintiffs' claims against the "hundreds of school districts in which they [were] not enrolled . . . without alleging that those defendants harmed them personally." *Id.* at 970. Here, Larsen argues that "Washington users have bought, wagered, and lost virtual coins in H5E's social casinos" after October 2022 when the games were operated by H5E. Dkt. 435 at 6. But Larsen acknowledges that he is not one of those Washington users. *See* Dkt. 467 at 10. Like the named plaintiffs in *Martinez*, Larsen "lack[s] standing to sue defendants that have not injured [him] personally, even if [he] allege[s] that those defendants injured absent class members." *Martinez,* 46 F.4th at 970 (cleaned up); *see also Easter* 381 F.3d at 961–62 (although plaintiffs could trace their injury to investment trusts holding the named plaintiffs' notes, they lacked standing to sue trusts operating similarly that did not hold their notes).

Nor can Larsen argue that his injury from H5G's actions confers standing to sue a related but separate entity. In *Lee v. Am. Nat'l Ins. Co.*, *superseded by statute on other grounds*, the Ninth Circuit held that a plaintiff who purchased life insurance policies from American National Insurance Company (ANI) lacked standing to represent a putative class of plaintiffs who had bought similar policies from American National Life Insurance Company of Texas (ANTEX), a wholly owned subsidiary of ANI. 260 F.3d 997, 1001–02 (9th Cir. 2001). The Court explained that "because [plaintiff] had not purchased an ANTEX policy, he could not demonstrate that he had suffered an actual injury and therefore could not establish standing to bring suit in federal court." *Id.* at 999.

Larsen does not dispute that H5E had not been formed when he last purchased virtual coins. Instead, he argues that it does not matter "because H5E and H5G should be treated as a

single entity." See Dkt. 466 at 21–22; Dkt. 486 at 10–11. Larsen's argument relies on an "alter ego" theory through which courts can disregard separate corporate entities if plaintiffs establish that: (1) the corporate form is intentionally used to violate or evade a duty; and (2) disregard is necessary and required to prevent unjustified loss to the injured party. *See Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wash.2d 403, 410, 645 P.2d 689 (Wash. 1982) (en banc).

Larsen alleges that H5E is an alter ego of H5G, arguing for the first time in his opposition to H5E's motion for summary judgment that there is "substantial overlap between the two entities" and that "maintain[ing] the fiction of corporate separateness" is inequitable. Dkt. 466 at 8, 14; Dkt. 481 at 5. Larsen asserts that "not only have the 'two' entities carried on the relevant business unchanged, but they are controlled by the same individuals, and share employees, officers, and offices." Dkt. 466 at 7. Because the two entities are the same, Plaintiff continues, "[t]here is no need . . . to analyze whether Larsen might have standing to assert a distinct individual claim against H5E[.]" *Id.* at 8. In briefs opposing H5E's motion for summary judgment, supporting his own cross motion, and during oral argument, Plaintiff cites to only two out-of-jurisdiction legal authorities to support his standing argument. *Id.* at 22; Dkt. 435 at 10–11; Dkt. 513 at 31.

Larsen cites first to *Nicks v. Koch Meat Co. Inc.*, 260 F. Supp. 3d 942 (N.D. Ill. 2017). There, a former employee of a Koch poultry processor sued his employer, its parent company, and several of its out-of-state subsidiaries alleging minimum wage and overtime violations of the Fair Labor Standards Act (FLSA). *Id.* at 945–46. The court declined to dismiss the employee's claims against the out-of-state subsidiaries for lack of standing even though "they did not work in those states and suffered no injuries in those states." *See id.* at 963. The court acknowledged there were only two cases it identified in the FLSA context that "considered alter ego as a basis for standing" and neither had allowed it. *Id.* The court distinguished these precedents, reasoning

that unlike in those cases, plaintiffs "sufficiently alleged" alter ego liability in the operative complaint and that they "suffered injuries that are traceable to the Koch entity as a whole," including its out-of-state subsidiaries. *Id.* at 963–64.

Larsen then cites *Stewart v. Bureaus Inv. Grp. No. 1, LLC*, 24 F. Supp. 3d 1142 (M.D. Ala. 2014). There, a consumer brought a putative class action against related debt collection LLCs ("the Bureaus") and their members and officers, alleging that the entities filed lawsuits against consumers without proper registration as Alabama businesses. *Id.* at 1146. While plaintiff dealt with only one Bureaus entity, the court found, based on Alabama law, that plaintiff could maintain her suit against certain other Bureaus entities whom she alleged were alter egos of the LLC that unlawfully attempted to collect her debt. *Id.* at 1153–54. But the court noted that plaintiff's alter ego theory did "not confer standing" to sue Bureaus entities not traceable to her alleged injury, the unlawful debt collection.[3] *See id.* at 1154.

---

[3] Although it did not find standing on an alter ego theory, the court declined to dismiss these Bureau entities on standing grounds based on the "juridical link" doctrine. *Stewart*, 24 F. Supp. 3d at 1154–56. In *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461, 466 (9th Cir.1973), the Ninth Circuit held that a named plaintiff might be able to satisfy their class representation requirement, despite not being injured themselves by the defendant, where "all injuries are the result of a conspiracy or concerted schemes between the defendants" or where "all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." *Id.* While the court in *Stewart* found that the plaintiff's "injuries are [arguably] the result of a . . . concerted scheme[]" between the Bureau entities so as to survive a motion to dismiss, *Stewart*, 24 F. Supp. 3d at 1156, other district courts have emphasized that the Rule 23 analysis in *La Mar* does not provide an end run around standing requirements. *See Lindquist v. Farmers Ins. Co.*, No. CV 06-597TUC-FRZ, 2008 WL 343299, at *n. 6 (D. Ariz. Feb. 6, 2008) ("[T]he juridical-link doctrine has been held not to apply to standing questions at the pleading stage. The doctrine, developed in the context of class certification analysis under [Rule] 23, should properly remain in the analysis of adequacy and typicality of plaintiffs for which it was originally conceived.") (cleaned up); *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 544 n. 2 (D. Nev. 2004) ("The Court declines to import *La Mar's* 'juridical link' doctrine into an Article III analysis. A doctrine developed under Rule 23 based on judicial efficiency and expedience does not play a role in an Article III standing analysis.").

Even if *Nicks* and *Stewart* were controlling precedent, Larsen's alter ego theory for standing to sue H5E based on its own operation of the social casinos post-October 2022 is distinguishable. Unlike in *Nicks*, Larsen did not "sufficiently allege[]" alter ego in the operative complaint, the SAC.[4] Instead, Larsen's allegations that H5G and H5E should be treated as a "single entity" first appear in his opposition to H5E's summary judgment motion. *See* Dkt. 466 at 17; Dkt. 481 at 5. "[E]ven courts that apply the less stringent standard [for alter ego pleading] require that the theory be pled in the complaint and supported with factual allegations." *Diamondstar Ent. Holdings, LLC v. THH, LLC*, 641 F. Supp. 3d 849, 860 (C.D. Cal. 2022) (citations omitted); *see, e.g.*, *Wady v. Provident Life & Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1066–67 (C.D. Cal. 2002) (finding plaintiff could not defeat a motion for summary judgment by parent of the insurance company that held her policy because her complaint did not allege alter ego); *EEOC v. Recession Proof U.S. LLC*, NO. 2:21-CV-00753 RAJ, 2013 WL 6328000, at *8–9 (D. Ariz. Aug. 19, 2013) (denying EEOC's attempt to make liable a member of an LLC sued in his personal capacity under an alter ego theory because EEOC's complaint did not include any such allegations until it was raised in support of its motion for default judgment); *Northstar Marine, Inc. v. Huffman*, No. 13–0037–WS–C, 2014 WL 4854843, at *8 (S.D. Ala. Sept. 29, 2014) (dismissing claims against defendant in his individual capacity because "nothing in [plaintiff's] Complaint would reasonably have placed [defendant] on notice that the claims against him were rooted in a theory of piercing the corporate veil, much less identified any supporting factual allegations.").

---

[4] By separate order, the Court grants Larsen's motion to amend his complaint (Dkt. 463) to add alter ego and Uniform Voidable Transactions Act (UVTA) allegations pertaining to H5E's liability for H5G's violations of the RMLGA and CPA before the October 1, 2022 transfer—claims which relate to Larsen's concrete injuries. Dkt. 515. As explained in that order, the amended claims against H5E will be bifurcated and stayed until the damages trial against H5G concludes. *Id.*

ORDER ON MOTIONS FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND EXCLUSION OF TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT SHAWN DAVIS - 14

Finally, even if alter ego were properly alleged, *Nicks* and *Stewart* both highlight that Article III's traceability requirement still must be met by a plaintiff purporting to represent a class. *See Nicks*, 260 F. Supp. 3d at 963–64; *see Stewart*, 24 F. Supp. 3d at 1154. The RMLGA and CPA claims against H5E in the operative complaint arise not from H5E's potential role as an alter ego of H5G, but from H5E's own independent conduct once it took control of the social casino games—what the parties referred to at oral argument as the "direct liability" claims. *See* Dkt. 513 at 20–22; 26, 32. To pursue relief on behalf of the class, Larsen must have standing for these specific claims. *TransUnion LLC*, 594 U.S. at 431 ("[P]laintiffs must demonstrate standing for each claim that they press[.]").

Undisputed evidence shows that Larsen stopped playing H5G's casino games on June 23, 2022, at least three months before H5E's formation and the transfer of the games from H5G to H5E. *See* Dkt. 426 at 9–10; Dkt. 427-7 at 2. Even assuming H5E operated in Washington—despite their alleged efforts to avoid the state—H5E only operated in the state after October 1, 2022. Dkt. 435 at 7; Dkt. 454 at 8. Therefore, Larsen cannot be one of the "Washington users [that] have bought, wagered, and lost virtual coins in H5E's social casinos." *See* Dkt. 435 at 6. And because Larsen cannot trace his injuries playing the casino games to H5E, even a "sufficiently alleged" alter ego theory does not confer standing for Larsen, as the sole Class representative, to sue H5E for its conduct in operating the games after October 1, 2022. *See Nicks*, 260 F. Supp. 3d at 963–64. Like the Bureaus entities whom the plaintiff in *Stewart* lacked standing to sue on an alter ego theory because they collected the debts of other Class members but not plaintiff, Larsen lacks standing to sue H5E on an alter ego theory because H5E's operations of the games may make it liable to other Class members, but not Larsen. *See Stewart*, 24 F. Supp. 3d at 1154; *see also Easter*, 381 F.3rd at 961 ("[A] class action plaintiff must 'allege

a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants.'") (quoting *Warth*, 422 U.S. at 501).

Because Larsen did not play or purchase virtual coins from High 5 Casino or High 5 Vegas when H5E owned and operated the games, he does not have standing to sue H5E for alleged injuries to the Class after October 1, 2022.[5] *See* Dkt. 467 at 10; Dkt. 481 at 6. Accordingly, H5E's motion for summary judgment (Dkt. 426) is GRANTED and Larsen's claims against H5E for its own violations of the CPA and RMLGA after October 1, 2022 are dismissed without prejudice. *See Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 569 F.3d 1328, 1332–33 (9th Cir. 2009) (collecting cases) (explaining that dismissal for lack of jurisdiction is not an adjudication on the merits and should be dismissed without prejudice). Larsen's cross motion for summary judgment (Dkt. 435) is DENIED as moot.

**B.      Larsen lacks standing to pursue injunctive relief.**

The same analysis governs Larsen's motion for a permanent injunction (Dkt. 438). "[P]laintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion*, 594 U.S. at 431. "[C]lass representatives must have Article III standing," and it is "the named plaintiffs' burden—as it would be any other plaintiff's—to support each standing element 'in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.'" *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 966–67 (9th Cir. 2019) (quoting *Lujan*, 504 U.S. at 561). "[W]hen we measure a plaintiff's standing, regardless of whether the plaintiff sues individually or as class

---

[5] As the accompanying Order granting Larsen's Motion to Amend (Dkt. 515) indicates, this ruling does not bear on whether, and to what extent, H5E is liable to the Class for pre-October 1, 2022 transactions. These claims will be bifurcated and stayed until H5G's damages trial concludes. *Id.*

ORDER ON MOTIONS FOR SUMMARY JUDGMENT, PERMANENT INJUNCTION, AND EXCLUSION OF TESTIMONY AND OPINIONS OF PLAINTIFF'S EXPERT SHAWN DAVIS - 16

representative, we look concretely at the facts that pertain to that plaintiff." *Id.* at 967; *see also Hodgers-Durgin*, 199 F.3d at 1045 ("Unless the named plaintiffs are themselves entitled to seek injunctive relief, they may not represent a class seeking that relief."). "While the proof required to establish standing increases as the suit proceeds . . . the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (citation omitted).

To establish standing to seek injunctive relief, a plaintiff must demonstrate "a risk of future harm" that "is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 435. "[A] past injury does not provide standing to seek prospective injunctive relief 'absent a sufficient likelihood that the plaintiff will again be wronged in a similar way.'" *Gonzalez v. United States Immigr. & Customs Enf't*, 975 F.3d 788, 803 (9th Cir. 2020) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)) (internal alterations omitted). The evidence presented at summary judgment contains undisputed testimony from Larsen that, while he experienced addiction to Defendants' games in the past, Dkt. 438-5 at 7–9, he "stopped playing video games" around the time he contacted attorneys about this litigation, Dkt. 459-4 at 3–4, and he has not played High 5 Casino or High 5 Vegas since June 2022, Dkt. 427-7 at 2. In other words, even viewing the evidence in the light most favorable to Larsen, he stopped playing Defendants' games six months before Plaintiff's counsel moved to amend the complaint to make him the named plaintiff. Dkt. 196. Larsen has not presented any evidence or argument that he faced a "sufficiently imminent and substantial" risk of future harm from Defendants' products as of the date he sought to represent the class. *TransUnion*, 594 U.S. at 435; *see Davis*, 554 U.S. at 734. Without that evidence, Larsen has not established standing to seek injunctive relief, and his motion for a permanent injunction (Dkt. 438) is DENIED.

**C.     H5E's motion to exclude Shawn Davis is denied as moot.**

As a result of H5E's dismissal from claims for its alleged operation of the games in Washington after October 2022, the testimony of Larsen's proposed expert Shawn Davis is moot. At the conclusion of supplemental discovery into H5E and its relationship to the games at issue, Larsen disclosed Shawn Davis as an expert. *See generally* Dkt. 432-1; Dkt. 453 at 6; Dkt. 285 at 2. Davis is employed by Plaintiff's counsel as the Chief Information Officer and Director of Technical Investigations. Dkt. 432-1. Larsen disclosed Davis to offer testimony proving the amount of damages—via IP geolocation data —attributable to H5E's ongoing operation of the games. *See* Dkt. 453 at 6, 14. The testimony is intended to counter H5E's assertion that, following its takeover of the games in October 2022, H5E no longer operated the games in Washington. Dkt. 453 at 14; *see also* Dkt. 513 at 10 ("[W]e decided it would make sense to disclose an expert who could not only explain IP geolocation . . . but also could analyze the data that High 5 Entertainment had produced and sort of explain to a jury that it isn't, in fact, totally unreliable [and that] IP geolocation . . . is reliable."). H5E filed a motion to exclude Davis's testimony under Federal Rule of Evidence 702, Larsen filed a response, and H5E submitted a reply. Dkt. 431, 453, 483.

The Court need not consider the merits of H5E's motion to exclude. Plaintiff's counsel concedes that Davis was disclosed only as an expert as to H5E for its alleged operation of the games in Washington after October 2022. *See* Dkt. 513 at 15–16. H5E's motion for summary judgment has been granted and it has been dismissed from liability to the Class for its alleged RMLGA and CPA violations after October 2022 on standing grounds. *See supra* Part IV, Section A. Accordingly, the Court DENIES Defendant H5E's motion to exclude the testimony and opinions of Plaintiff's expert Shawn Davis (Dkt. 431) as moot.

## V. CONCLUSION

Because Plaintiff Rick Larsen lacks standing to sue H5E for its own violations of the RMLGA and CPA after it took over operations of H5G's social casino games, the Court does not have jurisdiction over those claims. H5E's motion for summary judgment (Dkt. 426) is therefore GRANTED and Larsen's claims against H5E for those alleged violations are DISMISSED WITHOUT PREJUDICE. Larsen's cross-motion for partial summary judgment (Dkt. 435) is DENIED as moot. Defendant H5E's motion to exclude testimony and opinions of Plaintiff's expert Shawn Davis (Dkt. 431) is also DENIED as moot. Because Larsen also lacks standing to pursue his claims for injunctive relief, his motion for permanent injunction (Dkt. 438) is DENIED and the claims for injunctive relief are DISMISSED WITHOUT PREJUDICE.

Dated this 12th day of December, 2024.

Tiffany M. Cartwright
United States District Judge