The Honorable Tiffany M. Cartwright

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

| | |
|---|---|
| RICK LARSEN, individually and on behalf of all others similarly situated,<br><br>_Plaintiff,_<br><br>_v._<br><br>PTT, LLC (d/b/a HIGH 5 GAMES, LLC), a Delaware limited liability company, and HIGH 5 ENTERTAINMENT, LLC, a New Jersey limited liability company,<br><br>_Defendants._ | Case No. 18-cv-05275-TMC<br><br>**THIRD AMENDED COMPLAINT— CLASS ACTION**<br><br>**JURY DEMAND** |

Plaintiff Rick Larsen brings this case, individually and on behalf of all others similarly situated, against Defendants PTT, LLC, d/b/a High 5 Games, LLC ("High 5 Games") and High 5 Entertainment, LLC ("High 5 Entertainment") (collectively "High 5" or "Defendants") to enjoin their operation of illegal online casino games. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and upon information and belief, including investigation conducted by his attorneys, as to all other matters.

## **<u>NATURE OF THE ACTION</u>**

1.      High 5 owns and operates a video game development company in the so-called "casual games" industry—that is, computer games designed to appeal to a mass audience of casual gamers. Defendants own and operate a host of popular online slot machine games including, *inter alia*, High 5 Casino and High 5 Vegas.

2.      Defendants' online slot machines are available to play on Android and Apple iOS devices.

3.      Defendants provide a bundle of free "chips" to first-time visitors of its online casino that can be used to wager on its games. After consumers inevitably lose their initial allotment of chips, High 5 attempts to sell them additional chips starting at $4.99 for 192,000 chips. Without chips, consumers cannot play the gambling game.

4.      Freshly topped off with additional credits, consumers wager to win more credits. The credits won by consumers playing Defendants' games of chance are identical to the chips that Defendants sell. Thus, by wagering 192,000 chips that were purchased for $4.99, consumers have the chance to win hundreds of thousands of additional chips that they would otherwise have to purchase.

5.      By operating its online casino, Defendants have violated Washington law and illegally profited from tens of thousands of consumers. Accordingly, Rick Larsen, on behalf of himself and a Class of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees.

## PARTIES

6.      Plaintiff Rick Larsen is a natural person and a citizen of the state of Washington.

7.      Defendant PTT, LLC, d/b/a High 5 Games, LLC, is a limited liability company organized and existing under the laws of Delaware, with its principal place of business at One World Trade Center, Floors 58 and 59, New York, New York 10007. High 5 Games conducts business throughout this District, Washington State, and the United States. High 5 Games is a citizen of Florida, New Hampshire, New Jersey, New York, Ohio, Massachusetts, Virginia, Michigan, France, California, and Connecticut and is not a citizen of Washington.

a.     High 5 Games, LLC's members are Anthony Singer, Gabriella Clingman, Lawrence Clingman, Dorothy Litwin, Stuart Litwin, Jerome and Marion Butler, John M. Frank, David Alzapiedi, Melvin Lazar, Leona Lazar, Hildie Lazar, Ellyn Lazar, Andrew Lazar, Gary and Malu Stern, Michael Wachs, Dahlia Harmon, Phyllis Bergman, Ira Bergman, Stacy Thal Revocable Trust, Jeffrey Bergman, Scott Bergman, Michael London, Jodi Honig, Jonathan London, and Michael Rakosi.

b.     Anthony Singer is an individual and a citizen of New Jersey.

c.     Gabriella Clingman is an individual and a citizen of New York.

d.     Lawrence Clingman is an individual and a citizen of New York.

e.     Dorothy Litwin is an individual and a citizen of New Jersey.

f.     Stuart Litwin is an individual and a citizen of New Jersey.

g.     Jerome and Marion Butler are individuals and citizens of New York.

h.     John M. Frank is an individual and a citizen of Michigan.

i.     David Alzapiedi is an individual and a citizen of France.

j.     Melvin Lazar is an individual and a citizen of Florida.

k.     Leona Lazar is an individual and a citizen of New York.

l.     Hildie Lazar is an individual and a citizen of New Jersey.

m.     Ellyn Lazar is an individual and a citizen of Massachusetts.

n.     Andrew Lazar is an individual and a citizen of Ohio.

o.     Gary and Malu Stern are individuals and citizens of New York.

p.     Michael Wachs is an individual and a citizen of New York.

q.     Dahlia Harmon is an individual and a citizen of New Jersey.

r.     Phyllis Bergman is an individual and a citizen of Florida.

s.     Ira Bergman is an individual and a citizen of Florida.

t.     Stacy Thal Revocable Trust is a trust and a citizen of Virginia.

u.     Jeffrey Bergman is an individual and a citizen of New Jersey.

v.     Scott Bergman is an individual and a citizen of California.

1    w.    Michael London is an individual and a citizen of Connecticut and Florida.

2    x.    Jodi Honig is an individual and a citizen of Connecticut.

3    y.    Jonathan London is an individual and a citizen of New York.

4    z.    Michael Rakosi is an individual and a citizen of New York.

5    8.    Defendant High 5 Entertainment, LLC, a subsidiary of High 5 Games, is a limited

6    liability company existing and organized under the laws of the State of New Jersey with its

7    principal place of business at 1200 MacArthur Boulevard, Mahwah, NJ 07430. High 5

8    Entertainment conducts business throughout this District, Washington State, and the United

9    States. Upon information and belief, High 5 Entertainment is a citizen of California, Florida,

10   Nevada, New Hampshire, New Jersey, New York, Ohio, Massachusetts, Virginia, Michigan,

11   France, and Connecticut and is not a citizen of Washington.

12   a.    High 5 Entertainment's members are High 5 Games, LLC and Acies

13   Investments LLC.

14   b.    Acies Investments LLC is a limited liability company organized and

15   existing under the laws of Delaware, with its principal place of business at 1219 Morningside

16   Drive, Suite 110, Manhattan Beach, California, 90266.

17   c.    Acies Investments LLC's members are Dan Fetters, Edward King, Chris

18   Grove, and Jim Murren.

19   d.    Dan Fetters is an individual and a citizen of California.

20   e.    Edward King is an individual and a citizen of California.

21   f.    Chris Grove is an individual and a citizen of Nevada.

22   g.    Jim Murren is an individual and a citizen of Nevada.

23                          **JURISDICTION AND VENUE**

24   9.    Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because

25   (a) at least one member of the class is a citizen of a state different from Defendants, (b) the

26   amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the

27   exceptions under that subsection apply to this action.

10.     The Court has personal jurisdiction over Defendants because Defendants conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### I.     Free-to-Play and the New Era of Online Gambling

12.     The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-game" items that start at $0.99 (purchases known as "micro-transactions" or "in-app purchases").

13.     The in-app purchase model has become particularly attractive to developers of games of chance (*e.g.*, poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2017, free-to-play games of chance generated over $3.8 billion in worldwide revenue, and they are expected to grow by ten percent annually.[1] Even "large land-based casino operators are looking at this new space" for "a healthy growth potential."[2]

14.     With games of chance that employ the in-game purchase strategy, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card

---

[1]     GGRAsia – Social casino games 2017 revenue to rise 7pct plus says report, http://www.ggrasia.com/social-casino-games-2017-revenue-to-rise-7pct-plus-says-report/ (last visited Jan. 4, 2024)

[2]     *Report confirms that social casino games have hit the jackpot with $1.6B in revenue | GamesBeat,* https://venturebeat.com/2012/09/11/report-confirms-that-social-casino-games-have-hit-the-jackpot-with-1-6b-in-revenue/ (last visited Jan. 4, 2024)

games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[3]

15.    Another stated:

"Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[4]

16.    The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[5]

17.    Game Informer, another respected videogame magazine, reported on the rise (and danger) of micro-transactions in mobile games and concluded:

"[M]any new mobile and social titles target small, susceptible populations for large percentages of their revenue. If ninety-five people all play a [free-to-play] game without spending money, but five people each pour $100 or more in to obtain virtual currency, the designer can break even. These five individuals are what the industry calls whales, and we tend not to be too concerned with how they're being used in the equation. While the scale and potential financial ruin is of a different magnitude, a similar profitability model governs casino gambling."[6]

18.    Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so-called free-to-play games of chance (called "casino" games below), and stated that:

"[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (*e.g.*, employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a strong predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who

---

[3]    PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited Apr. 5, 2018).
[4]    The Badger, *Are micro-transactions ruining video games? | The Badger*, http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited Apr. 5, 2018)..
[5]    *Id.* (emphasis added).
[6]    Game Informer, *How Microtransactions Are Bad For Gaming - Features - www.GameInformer.com*, http://www.gameinformer.com/b/features/archive/2012/09/12/how-microtransactions-are-bad-for-gaming.aspx?CommentPosted=true&PageIndex=3 (last visited April 5, 2018)

were seeking treatment stated that social casino games were their first experiences with gambling."

…

"According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make micro-transactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

19.    The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a consumer will transition to online gambling was "micro-transaction engagement." In fact, "the odds of migration to online gambling were approximately *eight times greater* among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions."[8]

20.    The similarity between micro-transaction games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Unfortunately, such games have eluded regulation in the United States. As a result, and as described below, Defendants have thrived, and thousands of consumers have spent millions of dollars unwittingly playing Defendants' unlawful games of chance.

---

[7]    Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), *available at* http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

[8]    *Id.* (emphasis added).

[9]    In late August 2014, South Korea began regulating "social gambling" games, including games similar to Defendants', by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited Apr. 5, 2018). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

1   **II.    A Brief Introduction to High 5**

2       21.    Founded in 1985, High 5 Games has been a leading developer of land-based

3   casino games, including video slot machines. High 5 Games gained popularity in 2008 with the

4   release of its best performing slot machine in the company's history: Da Vinci Diamonds. High 5

5   Games continued to rise in prominence in the casino game industry with the release of the "mega

6   hit" Golden Goddess and Black Widow video slot machine games.

7       22.    Indeed, High 5 Games expanded its casino game operation into the "casual game"

8   industry by launching a multitude of online slot machine games on Apple's iOS, Android, and

9   Facebook.

10      23.    High 5 Games transferred ownership and operation of its online slot machine

11  games to its subsidiary, High 5 Entertainment, in October 2022. High 5 Games executed the

12  transfer after a damages class was certified in this lawsuit comprised of all individuals in

13  Washington who purchased virtual casino chips in either High 5 Casino or High 5 Vegas after

14  April 9, 2014. High 5 Games retained the liability for this lawsuit.

15      24.    Acies Investments, LLC invested $3 million of capital into the new entity, High 5

16  Entertainment, for the purpose of creating an online sweepstakes business. The $3 million

17  investment was not related to the value of the social casino business.

18      25.    High 5 Entertainment receives all revenues from the social casino business. High

19  5 Entertainment has significantly more revenue than High 5 Games and significantly more cash

20  on hand.

21      26.    High 5 Games retained the technical platform on which the social casinos run.

22  High 5 Entertainment does not help maintain the technical platform.

23      27.    The High 5 Entertainment board consists of Anthony Singer and Lisa Husniye

24  Singer. Lisa Husniye Singer is Anthony Singer's wife and an employee of High 5 Games. She is

25  not an employee of High 5 Entertainment. She is involved in the day-to-day operations of High 5

26  Entertainment, making decisions on matters such as promotions to customers and approving

27  contracts with third-party advertisers.

28.     High 5 Entertainment does not have any independent, dedicated corporate officers. Anthony Singer is the CEO of High 5 Entertainment. The Chief Financial Officer of High 5 Games, Jamie Sanko, provides services to High 5 Entertainment as part of a services contract between High 5 Entertainment and High 5 Games. For instance, he does the financial reports for High 5 Entertainment that High 5 Games uses to create its own consolidated financial reports.

29.     Similarly, many High 5 Games employees are included in the services contract with High 5 Entertainment and run the day-to-day operations of High 5 Entertainment. High 5 Games employees have continued to work on the social casino business since the transfer in October 2022.

30.     The founder and CEO of High 5 Games, Anthony Singer, serves as the sole managing member of both High 5 Games and High Entertainment.

31.     Decision making authority for both High 5 Games and High 5 Entertainment rests primarily with Anthony Singer. Lisa Husniye Singer also has decision-making authority for High 5 Entertainment. Acies Investments only has observer rights.

32.     High 5 Games disclosed the existence of High 5 Entertainment to plaintiffs for the first time on December 5, 2023. On July 25, 2024, High 5 Entertainment filed a Motion for Summary Judgment that argued, *inter alia*, that Plaintiff Larsen lacks standing as to High 5 Entertainment because he only ever purchased virtual coins from High 5 Games and that the Court lacks personal jurisdiction over High 5 Entertainment because High 5 Entertainment has from its inception tried to avoid operating in Washington state.

33.     Defendants have made large profits through its online gambling games. As explained further below, however, the revenue Defendants receive from the High 5 Casino online slot machine games are the result of operating unlawful games of chance camouflaged as innocuous videogames.

III.    **Defendants' Online Casino Contains Unlawful Games of Chance**

34.     Consumers visiting Defendants' online casino for the first time are awarded free chips. These free sample chips offer a taste of gambling and are designed to encourage player to get hooked and buy more chips for real money.

35.     After they begin playing, consumers quickly lose their initial allotment of chips. Immediately thereafter, Defendants inform them via a "pop up" screen that their "credits are running low." *See* Figure 1.

*                    *                    *



(**Figure 1.**)

36.     Concurrently with that warning, Defendants provide a link to consumers, allowing to purchase chips with real money at its electronic store. Defendants' chips range in price from $4.99 for 192,000 chips to $99.99 for 9,600,000 chips. *See* Figure 2. Once a player runs out of their allotment of free chips, they cannot continue to play the game without buying more chips for real money.



(**Figure 2.**)

37.     The decision to sell chips by the thousands isn't an accident. Rather, Defendants attempt to lower the perceived cost of the chips (costing just a fraction of a penny per chip) while simultaneously maximizing the value of the award (awarding millions of chips in jackpots), further inducing consumers to bet on its games.

38.     To begin wagering, players select the "BET" that will be used for a spin, as illustrated in Figure 3. Defendants allow players to increase or decrease the amount he or she can wager and ultimately win (or lose). Defendants allow players to multiply their bet by changing the number of "lines" (*i.e.*, combinations) on which the consumer can win, shown in Figure 3 as the "LINE" button.



(**Figure 3.**)

39.     Once a consumer spins the slot machine by pressing the spinning circle button, no action on his or her part is required. Indeed, none of High 5's online casino games allow (or call

1  for) any additional user action. Instead, the consumer's computer or mobile device

2  communicates with and sends information (such as the "BET" amount) to Defendants' servers.

3  Defendants' servers then execute the game's algorithms that determine the spin's outcome.

4  Notably, none of Defendants' games depend on any amount of skill to determine their

5  outcomes—all outcomes are based entirely on chance.

6    40. Consumers can continue playing with the chips that they won, or they can exit the

7  game and return at a later time to play because Defendants maintain win and loss records and

8  account balances for each consumer. Indeed, once Defendants' algorithms determine the

9  outcome of a spin and Defendants displays the outcome to the consumer, Defendants adjust the

10  consumer's account balance. Defendants keep records of each wager, outcome, win, and loss for

11  every player.

12    41. When High 5 Entertainment took over the social casino business in October 2022,

13  it continued to operate the identical online casinos in the same manner described in this section.

14  Nothing about the gameplay, the allotment of chips, or the process of purchasing chips changed.

15    42. High 5 Entertainment continued to operate social casinos in Washington after

16  October 1, 2022, including receiving revenue from Washington-based transactions.

17         **FACTS SPECIFIC TO PLAINTIFF LARSEN**

18    43. In or around December 2014, Plaintiff Larsen began playing High 5 Casino on

19  Facebook. After Plaintiff lost the balance of his initial allocation of free chips, he purchased

20  chips from the High 5 electronic store.

21    44. Thereafter, Larsen continued playing various slot machines and other games of

22  chance within High 5's casino where he would wager chips for the chance of winning additional

23  chips. Starting in December 2014, Plaintiff Larsen wagered and lost (and High 5 therefore won)

24  over $100 at Defendants' games of chance.

25

26

27

## CLASS ALLEGATIONS

45. **Class Definition**: Plaintiff Larsen brings this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) on behalf of himself and Class of similarly situated individuals, defined as follows:

> All individuals in Washington who purchased virtual casino chips on either High 5 Casino or High 5 Vegas after April 9, 2014 ("Damages Class").

> All individuals in Washington who played either High 5 Casino or High 5 Vegas after April 9, 2014 ("Injunctive Class").

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

46. **Numerosity**: On information and belief, tens of thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendants' records, discovery, and other third-party sources.

47. **Commonality and Predominance**: There are many questions of law and fact common to Plaintiff's and the Class's claims, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

    a.    Whether Defendants' online casino games are "gambling" as defined by RCW § 9.46.0237;

    b.    Whether Defendants are the proprietors for whose benefit the online casino games are played;

EDELSON PC
150 California Street, 18th Floor, San Francisco, CA 94111
Tel: 415.212.9300 • Fax: 415.373.9435

c.      Whether Plaintiff and each member of the Class lost money or anything of value by gambling;

d.      Whether Defendants violated the Washington Consumer Protection Act, RCW § 19.86.010, *et seq.*; and

e.      Whether Defendants have been unjustly enriched as a result of its conduct.

f.      Whether High 5 Entertainment is liable as a successor to High 5 Games, either because it is a mere continuance of High 5 Games's social casino business, or because the transfer of the social casinos from High 5 Games to High 5 Entertainment was fraudulent;

g.      Whether High 5 Games transfer to High 5 Entertainment is voidable under RCW § 19.40, *et seq*.

48.      **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff's and the members of the Class sustained damages arising out of Defendants' wrongful conduct.

49.      **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money playing Defendants' games of chance. Plaintiff also has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the Class.

50.      **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' policies that Plaintiff

1 challenges apply and affect members of the Class uniformly, and Plaintiff's challenge of these

2 policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law

3 applicable only to Plaintiff. The factual and legal bases of Defendants' liability to Plaintiff and to

4 the other members of the Class are the same.

5   51. **Superiority**: This case is also appropriate for certification because class

6 proceedings are superior to all other available methods for the fair and efficient adjudication of

7 this controversy. The harm suffered by the individual members of the Class is likely to have been

8 relatively small compared to the burden and expense of prosecuting individual actions to redress

9 Defendants' wrongful conduct. Absent a class action, it would be difficult if not impossible for

10 the individual members of the Class to obtain effective relief from Defendants. Even if members

11 of the Class themselves could sustain such individual litigation, it would not be preferable to a

12 class action because individual litigation would increase the delay and expense to all parties and

13 the Court and require duplicative consideration of the legal and factual issues presented. By

14 contrast, a class action presents far fewer management difficulties and provides the benefits of

15 single adjudication, economy of scale, and comprehensive supervision by a single Court.

16 Economies of time, effort, and expense will be fostered and uniformity of decisions will be

17 ensured.

18   52. Plaintiff reserves the right to revise the foregoing "Class Allegations" and "Class

19 Definition" based on facts learned through additional investigation and in discovery.

20
           **FIRST CAUSE OF ACTION**
     **Violations of Revised Code of Washington § 4.24.070**
21
         **(On behalf of Plaintiff and the Class)**

22   53. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

23   54. Plaintiff, members of the Class, and Defendants are all "persons" as defined by

24 RCW § 9.46.0289.

25   55. The state of Washington's "Recovery of money lost at gambling" statute, RCW §

26 4.24.070, provides that "all persons losing money or anything of value at or on any illegal

27 gambling games shall have a cause of action to recover from the dealer or player winning, or

1  from the proprietor for whose benefit such game was played or dealt, or such money or things of

2  value won, the amount of the money or the value of the thing so lost."

3       56.    "Gambling," defined by RCW § 9.46.0237, "means staking or risking something

4  of value upon the outcome of a contest of chance or a future contingent event not under the

5  person's control or influence."

6       57.    Defendants' "chips" or "credits" sold for use Defendants' online casino games are

7  "things of value" under RCW § 9.46.0285.

8       58.    Defendants' online casino games are illegal gambling games because they are

9  online games at which players wager things of value (the chips and by an element of chance

10  (*e.g.*, by spinning an online slot machine) are able to obtain additional entertainment and extend

11  gameplay (by winning additional chips.)

12       59.    Defendants are the proprietors for whose benefit the online gambling games are

13  played because it owns the High 5 casino games and operates those games for its own profit.

14       60.    As such, Plaintiff and the Class gambled when they purchased chips to wager at

15  Defendants' online gambling game. Plaintiff and each member of the Class staked money, in the

16  form of chips purchased with money, at Defendants' games of chance (*e.g.*, Defendants' slot

17  machines and other games of chance) for the chance of winning additional things of value (*e.g.*,

18  chips that extend gameplay without additional charge).

19       61.    In addition, High 5's online casino games are not "pinball machine[s] or similar

20  mechanical amusement device[s]" as contemplated by the statute because:

21          a.    the games are electronic rather than mechanical;

22          b.    the games confer replays but they are recorded and can be redeemed on

23          separate occasions (*i.e.*, they are not "immediate and unrecorded"); and

24          c.    the games contain electronic mechanisms that vary the chance of winning

25          free games or the number of free games which may be won (*e.g.*, the games allow

26          for different wager amounts).

27

62.    RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

63.    The "chips" Plaintiff and the Class had the chance of winning in Defendants' online casino games are "thing[s] of value" under Washington law because they are credits that involve the extension of entertainment and a privilege of playing a game without charge.

64.    Defendants' online casino games are "Contest[s] of chance," as defined by RCW § 9.46.0225, because they are "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." Defendants' games are programmed to have outcomes that are determined entirely upon chance and a contestant's skill does not affect the outcomes.

65.    RCW § 9.46.0201 defines "Amusement game[s]" as games where "The outcome depends in a material degree upon the skill of the contestant," amongst other requirements. Defendants' online casino games are not "Amusement game[s]" because their outcomes are dependent entirely upon chance and not upon the skill of the player and because the games are "contest[s] of chance," as defined by RCW § 9.46.0225.

66.    For the purposes of liability under RCW § 4.24.070, High 5 Entertainment is not a distinct entity from High 5 Games. After an undisclosed transfer during the pendency of this litigation, High 5 Entertainment became the owner and operator of the same social casino business at issue in this case. High 5 Entertainment is controlled by High 5 Games, and both are controlled by a single managing member.

67.    As a direct and proximate result of Defendants' operation of its gambling game, Plaintiff Larsen and each member of the Class have lost money wagering at Defendants' games of chance. Plaintiff Larsen, on behalf of himself and the Class, seeks an order (1) requiring

1   Defendants to cease the operation of its gambling game; and/or (2) awarding the recovery of all

2   lost monies, interest, and reasonable attorneys' fees, expenses, and costs to the extent allowable.

3        68.     High 5 Entertainment is also responsible for liability incurred by High 5 Games

4   between April 9, 2014, and October 1, 2022, for two reasons. First, because High 5

5   Entertainment is a mere continuance of High 5 Games for the purposes of running the social

6   casinos. Second, because the transfer of ownership and operation of the social casinos was done

7   for the purposes of escaping liability to the Class. And to the extent the transfer left High 5

8   Games insufficiently capitalized to satisfy a judgment in favor of the Class, Plaintiff and the

9   Class lack an adequate remedy at law, justifying the equitable imposition of successor liability

10  on High 5 Entertainment.

11  **SECOND CAUSE OF ACTION**
    **Violations of the Washington Consumer Protection Act, § RCW 19.86.010, *et seq.***

12  **(On behalf of Plaintiff and the Class)**

13       69.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

14       70.     Washington's Consumer Protection Act, RCW § 19.86.010 *et seq.* ("CPA"),

15  protects both consumers and competitors by promoting fair competition in commercial markets

16  for goods and services.

17       71.     To achieve that goal, the CPA prohibits any person from using "unfair methods of

18  competition or unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ."

19  RCW § 19.86.020.

20       72.     The CPA states that "a claimant may establish that the act or practice is injurious

21  to the public interest because it . . . Violates a statute that contains a specific legislative

22  declaration of public interest impact."

23       73.     Defendants violated RCW § 9.46.010, *et seq.* which declares that:

24  "The public policy of the state of Washington on gambling is to keep the criminal
    element out of gambling and to promote the social welfare of the people by limiting

25  the nature and scope of gambling activities and by strict regulation and control.

26  It is hereby declared to be the policy of the legislature, recognizing the close
    relationship between professional gambling and organized crime, to restrain all

27  persons from seeking profit from professional gambling activities in this state; to

restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace."

74.    Defendants have violated RCW § 9.46.010, *et seq.*, because its online casino games are illegal online gambling games as described in ¶¶ 53-68 *supra.*

75.    For the purposes of liability under RCW § 19.86.010, *et seq.*, High 5 Entertainment is not a distinct entity from High 5 Games. After an undisclosed transfer during the pendency of this litigation, High 5 Entertainment became the owner and operator of the same social casino business at issue in this case. High 5 Entertainment is controlled by High 5 Games, and both are controlled by a single managing member, Anthony Singer.

76.    Defendants' wrongful conduct occurred in the conduct of trade or commerce—*i.e.*, while Defendants were engaged in the operation of making computer games available to the public.

77.    Defendants' acts and practices were and are injurious to the public interest because Defendants, in the course of their business, continuously advertised to and solicited the general public in Washington State and throughout the United States to play its unlawful online casino games of chance. This was part of a pattern or generalized course of conduct on the part of Defendants, and many consumers have been adversely affected by Defendants' conduct and the public is at risk.

78.    Defendants have profited immensely from its operation of unlawful games of chance, amassing hundreds of millions of dollars from the losers of its games of chance.

79.    As a result of Defendants' conduct, Plaintiff and the Class members were injured in their business or property—*i.e.*, economic injury—in that they lost money wagering on Defendants' unlawful games of chance.

80.    Defendants' unfair or deceptive conduct proximately caused Plaintiff's and the Class members' injury because, but for the challenged conduct, Plaintiff and the Class members

1   would not have lost money wagering at or on Defendants' games of chance, and they did so as a

2   direct, foreseeable, and planned consequence of that conduct.

3        81.     Plaintiff, on his own behalf and on behalf of the Class, seeks to enjoin further

4   violation and recover actual damages and treble damages, together with the costs of suit,

5   including reasonable attorneys' fees. High 5 Entertainment is also responsible for liability

6   incurred by High 5 Games between April 9, 2014, and October 1, 2022, for two reasons. First,

7   because High 5 Entertainment is a mere continuance of High 5 Games for the purposes of

8   running the social casinos. Second, because the transfer of ownership and operation of the social

9   casinos was done for the purposes of escaping liability to the Class. And to the extent the transfer

10   left High 5 Games insufficiently capitalized to satisfy a judgment in favor of the Class, Plaintiff

11   and the Class lack an adequate remedy at law, justifying the equitable imposition of successor

12   liability on High 5 Entertainment.

### THIRD CAUSE OF ACTION
**Unjust Enrichment**
**(On behalf of Plaintiff and the Class)**

15        82.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth

16   herein.

17        83.     Plaintiff and the Class have conferred a benefit upon Defendants in the form of

18   the money Defendants received from them for the purchase of chips to wager at Defendants'

19   online casino games.

20        84.     The purchase of the chips to wager at Defendants' online casino is and was

21   beyond the scope of any contractual agreement between Defendants and Plaintiff and members

22   of the Class.

23        85.     Defendants appreciate and/or have knowledge of the benefits conferred upon it by

24   Plaintiff and the Class.

25        86.     Under principles of equity and good conscience, Defendants should not be

26   permitted to retain the money obtained from Plaintiff and the members of the Class, which

27   Defendants have unjustly obtained as a result of its unlawful operation of unlawful online

gambling game. As it stands, Defendants have retained millions of dollars in profits generated from its unlawful games of chance and should not be permitted to retain those ill-gotten profits.

87.    Accordingly, Plaintiff and the Class seek full disgorgement and restitution of any money Defendants have retained as a result of the unlawful and/or wrongful conduct alleged herein.

### FOURTH CAUSE OF ACTION
**Violations of the Uniform Voidable Transactions Act**
**(On behalf of Plaintiff and the Class)**

88.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

89.    The state of Washington's "Uniform Voidable Transactions Act," RCW § 19.40.041(1), provides, "A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation…with actual intent to hinder, delay, or defraud any creditor of the debtor."

90.    Under RCW § 19.40.041(2), "actual intent" may be determined through consideration of various non-exhaustive factors including: whether "(a) the transfer or obligation was to an insider; (b) the debtor retained possession or control of the property transferred after the transfer; (c) the transfer or obligation was disclosed or concealed; (d) before the transfer was made…the debtor had been sued or threatened with suit; (e) the transfer was of substantially all the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and (k) the debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider f the debtor."

91.    A creditor, defined by RCW § 19.40.011(4), means a person who has a claim.

92.     A claim, defined by RCW § 19.40.011(3), means "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

93.     Plaintiff Larsen and the Class are creditors with a claim against High 5 under RCW § 19.40.011(4) because they have a contingent right to payment based on a class action lawsuit holding High 5 liable for illegal gambling operations.

94.     The transfer of social casino operations, ownership, and revenue from High 5 Games to High 5 Entertainment is voidable as to Plaintiff Larsen and the Class because the transfer was made with actual intent to hinder the exercise of the creditor's right to payment.

95.     The transfer from High 5 Games to High 5 Entertainment was to an insider, because Mr. Singer transferred the assets to his own majority-owned LLC of which he was the sole managing member.

96.     Mr. Singer and High 5 Games maintained control of all the transferred social casino assets, including all financial decisions and day-to-day operational decisions.

97.     Despite ongoing litigation between Plaintiff Larsen and High 5 Games, High 5 Games did not disclose the creation of High 5 Entertainment, the redistribution of revenue, or the transfer of the social casino business.

98.     High 5 Games transferred the most significant portion of its assets and revenue streams to High 5 Entertainment while retaining sole liability for illegal gambling conduct prior to October 2022. High 5 Entertainment claims it has no liability for pre-transfer damages claim. The transfer occurred during the pendency of the lawsuit and after class certification.

99.     Thus, the transfer is voidable. Under RCW § 19.40.071, Plaintiff Larsen and the Class seek (1) an order avoiding the transfer to the extent necessary to satisfy their claims against High 5, and/or (2) an attachment to the property transferred by High 5 Games to High 5 Entertainment subjecting it to judgement in this litigation, and/or (3) an injunction against further disposition of assets by High 5 Entertainment that would prevent Plaintiff Larsen and the Class from satisfying their claim.

**PRAYER FOR RELIEF**

Plaintiff Rick Larsen, individually and on behalf of all others similarly situated, respectfully requests that this Court enter an Order:

a) Certifying this case as a class action on behalf of the Class defined above, appointing Rick Larsen as representative of the Class, and appointing his counsel as class counsel;

b) Declaring the Defendants' operation of High 5 Casino and High 5 Vegas, as set out above, violates the RMLGA;

c) Declaring that Defendants' conduct, as set out above, violates the CPA;

d) Entering judgment against Defendants, in the amount of the losses suffered by Plaintiff and each member of the Class;

e) Enjoining Defendants from continuing the challenged conduct;

f) Awarding damages to Plaintiff and the Class members in an amount to be determined at trial, including trebling as appropriate;

g) Awarding restitution to Plaintiff and Class members in an amount to be determined at trial, and requiring disgorgement of all benefits that Defendants unjustly received;

h) Awarding reasonable attorney's fees and expenses;

i) Awarding pre- and post-judgment interest, to the extent allowable;

j) Entering judgment for injunctive and/or declaratory relief as necessary to protect the interests of Plaintiff and the Class; Using the remedies under RCW § 19.40.071, including voiding the transfer from High 5 Games to High 5 Entertainment, attaching the transferred assets, or enjoining further asset transfers, as necessary to satisfy the Class's claims;

k) Awarding such other and further relief as equity and justice require.

**JURY DEMAND**

Plaintiff requests a trial by jury of all claims that can be so tried.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

Respectfully Submitted,

**RICK LARSEN**, individually and on behalf of all others similarly situated,

Dated: December 23, 2024

By: /s/ Todd Logan

Todd Logan, WSBA #60698
tlogan@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300 / Fax: 415.373.9435

By: /s/ Cecily C. Jordan

Cecily C. Jordan, WSBA #50061
cjordan@tousley.com
TOUSLEY BRAIN STEPHENS PLLC
1200 Fifth Avenue, Suite 1700
Seattle, Washington 98101
Tel: 206.682.5600

*Attorneys for Plaintiff and Class Counsel*